**United States District Court**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JOSHUA YARBROUGH, | § | |
| and MATT LOFLAND,     ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | Civil Action 4:19-cv-905 |
| | § | |
| vs. | § | **JURY DEMANDED** |
| | § | |
| CSS CORP., and | § | |
| GLOW NETWORKS, INC.*,* | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS CSS CORP. AND GLOW NETWORKS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE SEAN D. JORDAN:

Respectfully submitted,


 */s/ Brian P. Sanford*
Brian P. Sanford
Texas Bar No. 17630700
bsanford@sanfordfirm.com
Elizabeth "BB" Sanford
Texas Bar No. 24100618
esanford@sanfordfirm.com

**THE SANFORD FIRM**
1910 Pacific Ave., Suite 15400
Dallas, TX 75201
Ph:  (214) 717-6653
Fax: (214) 919-0113


**ATTORNEYS FOR PLAINTIFFS**

TABLE OF CONTENTS

Pages

TABLE OF AUTHORITIES ......................................................................... iv

SUMMARY JUDGMENT FACTS ................................................................ 1

RESPONSE TO STATEMENT OF ISSUES ................................................ 3

RESPONSE TO STATEMENT OF UNDISPUTED FACTS......................... 3

ARGUMENT AND AUTHORITIES ........................................................... 4

   Issue One: Hostile Work Environment...................................................... 5

      1.  Plaintiffs Are Members of a Protected Class................................... 6

      2.  Plaintiffs Suffered Unwelcome Harassment ................................. 6

      3.  The Unwelcome Harassment Was Because Plaintiffs are Black ............. 10

      4.  The Harassment Affected a Term, Condition, or Privilege of Employment ....................................................................... 13

      5.  Defendants Knew or Should Have Known About the Harassment and Failed to Take Prompt Remedial Action................................... 16

   Issue Two: Constructive Discharge. ...................................................... 17

      1.  Sterling Vicks............................................................... 18

      2.  Joshua Yarbrough........................................................... 19

      3.  Lee Green .................................................................. 19

      4.  Rukevwe Ologban ........................................................... 20

      5.  Matt Lofland ............................................................... 21

      6.  Brett Samuels .............................................................. 22

7. Brandon Price ............................................................................................. 22

CERTIFICATE OF SERVICE...................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**                                                                 **Pages**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................... 4

*Barrow v. New Orleans S.S. Ass'n,*
   10 F.3d 292 (5th Cir. 1994) ............................................................. 18

*Brown v. Kinney Shoe Corp,*
   237 F. 3d 556 (5th Cir. 2001) .......................................................... 17

*Burks v. Oklahoma Pub. Co.,*
   81 F.3d 975 (10th Cir. 1996) ........................................................... 18

*Clark County School Dist. v. Breeden,*
   532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) .......................... 11

*Clay v. United Parcel Serv., Inc.,*
   501 F.3d 695 (6th Cir. 2007) ............................................................. 5

*EEOC v. WC&M Enters., Inc.,*
   496 F.3d 398- (5th Cir.2007) ............................................................ 11

*Erenberg v. Methodist Hosp.,*
   357 F.3d 787 (8th Cir. 2004) ............................................................. 5

*Faragher v. Boca Raton,*
   524 U.S. 775 (1998) ...................................................................... 12

*Faruki v. Parsons SIP,*
   123 F. 3d. 315 (5th Cir. 1997) ......................................................... 18

*Harris v. Forklift Sys., Inc.,*
   510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) .......................... 13

*Huffman v. MQ Const. Co.,* 08 C,
   3679, 2009 WL 3788721 (N.D. Ill. Nov. 12, 2009)................................. 13

*Hulsey v. Pride Rests., LLC,*
   367 F.3d 1238 (11th Cir.2004) .......................................................... 5

*Lounds v. Lincare, Inc.,*
  812 F.3d 1208 (10th Cir. 2015) .................................................................... 5

*Nat'l R.R. Passenger Corp. v. Morgan,*
  536 U.S. 101 (2002) ....................................................................................... 12

*Oncale v. Sundowner Offshore Servs. Inc.,*
  523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ....................................... 11, 12
*Pfau v. Mnuchin, …* ............................................................................................ 10, 12
  1:18-CV-422-RP, 2019 WL 2124673, at *4 (W.D. Tex. May 15, 2019).

*Pennsylvania State Police v. Suders,*
  542 U.S. 129 (2004) ....................................................................................... 18

*Poole v. City of Shreveport,*
  691 F.3d 624 (5th Cir. 2012) ......................................................................... 4

*Reeves v. C.H. Robinson Worldwide, Inc.,*
  594 F.3d 798 (11th Cir. 2010) ....................................................................... 5

*Reeves v. Sanderson Plumbing Prods., Inc.,*
  530 U.S. 133 (2000) ....................................................................................... 5

*Russell v. McKinney Hosp. Venture,*
  235 F.3d 219 (5th Cir.2000) ......................................................................... 13

*United Air Lines, Inc. v. Evans,*
  431 U.S. 553 (1977) ....................................................................................... 11

*Waters v. Mills,*
  EP-13-CV-00241-FM, 2014 WL 11342500 (W.D. Tex. Dec. 17, 2014) ............. 15, 16

*Watkins v. Tregre,*
  997 F.3d 275 (5th Cir. 2021) ......................................................................... 17

*West v. City of Houston,*
  960 F.3d 736 (5th Cir. 2020) ......................................................................... 6

## **Rules**

Fed. R. Civ. P. 56(a) ........................................................................................ 4

v

**United States District Court**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JOSHUA YARBROUGH, | § | |
| and MATT LOFLAND,     ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | Civil Action 4:19-cv-905 |
| | § | |
| vs. | § | **JURY DEMANDED** |
| | § | |
| CSS CORP., and | § | |
| GLOW NETWORKS, INC.*,* | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS CSS CORP. AND GLOW**
**NETWORKS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE SEAN D. JORDAN:

Plaintiffs Joshua Yarbrough, Matt Lofland, Lee Green, Sterling Vicks, Joshua Walker, Michael Brown, Adawale Ashiru, Paul Tijani, Peter Tijani, Brandon Price, Harom Pringle, Osasu William Saigheyisi, Brett Samuels, and Rukevwe Ologban respond to Defendants CSS Corp. and Glow Networks, Inc's motion for partial summary judgment. The motion should be denied because genuine issues of fact exist for the jury to decide at trial.

### BASIC SUMMARY JUDGMENT FACTS

- Defendant's human resources representative stated, "don't lay off any white people." (Ex. 1, Appx 3; Ex 29, Appx, 143, Lofland, 58:14-17).

1

- ■ Defendants had a caste system in ranking employees based on their race, and systematically discriminated against its African and African American employees because of the color of their skin. (Ex. 39, Appx 277-280).

- ■ Many of the Black employees made complaints to their supervisors and the human resources department about the harassing and discriminatory treatment.

- ■ Debbie Cahoon, Senior Human Resources Manager of CCS Corp, stated that she addressed at least one Plaintiff's concerns "internally," but never provided any details. (Ex. 10, Appx 33). This was proven to be false as nothing changed.

- ■ When Defendants were planning their upcoming layoff, 55 percent of the Black employees on the project were selected as opposed to only 22 percent of the white employees and nine percent of the Asian (mostly employees of Indian descent). (Ex. 8, Appx 29).[1]

- ■ When Defendants began a new project, Defendants only chose to bring back its Indian employees and did not rehire any Black employees. (Ex. 9, Appx 31)[2]

- ■ Sandeep Pauddar, the project manager, and Mohammed Silat, the evening shift team lead, are two of the main supervisors Defendants allowed to harass and discriminate against Plaintiffs.

---

[1] The spreadsheet notes 12 of 22 the Black employees were selected, 6 of the 27 white employees were selected, and 3 of the 34 Asian (mostly Indian) employees were selected. The native document produced by Defendants is a spreadsheet. This portion of the document has been converted to a PDF.
[2] The native document produced by Defendants is a spreadsheet. This portion of the document has been converted to a PDF.

- All of the Plaintiffs are African or African American, except for Matt Lofland who is Caucasian, and have a claim for hostile work environment and discrimination. Some of the Black Plaintiffs also have a claim for retaliation. Mr. Lofland only has a claim for retaliation.

## RESPONSE TO STATEMENT OF ISSUES

The issues before the Court are 1) whether the Black/African/African American Plaintiffs present evidence sufficient for a jury to find that they suffered a hostile work environment; and 2) whether Lee Green, Sterling Vicks, Brandon Price, Brett Samuels, and Rukevwe Ologban were constructively discharged from CSS Corp. and Glow Networks, Inc.

## RESPONSE TO STATEMENT OF UNDISPUTED FACTS

Plaintiffs dispute that Defendants distributed to Plaintiffs all of their policies and procedures during orientation, because at least two Plaintiffs do not remember receiving a policy regarding discrimination in the workplace, a policy Defendants claim it possessed at the time of Plaintiffs' orientation. (Ex. 31, Appx 173-188, Paul Tijani, 27:23-28:2; Ex. 32, Appx 189-215, Peter Tijani, 41:11-23). Plaintiffs dispute that Tier 1 employees generally conducted integrations while Tier 2 employees would provide support to Tier 1 employees. The Tier 1 and Tier 2 labels were arbitrary and used to segregate the Black employees from the white and Indian employees. (Ex. 31, Appx 173-188, Paul Tijani, 48:2-12; Ex. 26, Appx 64-92, Aigheyisi, 98:24-99:23). Many Tier 2 employees did integration work while Tier 1 employees provided support to the Tier 2 employees. (Ex. 26, Appx 64-92, Aigheyisi, 98:24-99:23).

3

Plaintiffs dispute that cameras were installed in Defendants' entire Irving facility. The cameras were only installed in specific rooms where Defendants strategically and discriminatorily placed its Black employees, so that Defendants could monitor its Black employees more closely than its white or Indian employees. (Ex. 39, Appx 277-280). Plaintiffs dispute that a video surveillance policy was distributed to all RITC employees. Defendants have produced only two signed policies acknowledging receipt. (Ex. 24, Appx 61; Ex. 25, Appx 63).  Not all Plaintiffs received this policy. (Ex. 31, Appx 173-188, Paul Tijani, 27:23-28:2; Ex. 32, Appx 189-215, Peter Tijani, 41:11-23).

<u>ARGUMENTS AND AUTHORITIES</u>

For a motion for summary judgment to be granted, the movant must show "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). In considering the evidence to determine a motion for summary judgment, courts must:

- draw all reasonable inferences in favor of the nonmoving party;

- not make any credibility determinations or weigh the evidence;

- ■ disregard all evidence favorable to the moving party that the jury is not required to believe; and

- ■ give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent the evidence comes from disinterested witnesses.

*See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

## I.   Hostile Work Environment.

Disparate treatment can take the form either of a "tangible employment action," such as a firing or demotion, or of a "hostile work environment" that changes "the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (citing *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir.2004)). Defendants do not move for summary judgment on disparate treatment for demotions, failure to promote, and termination, except for constructive discharge. Defendants are contesting the disparate treatment based upon hostile work environment. The "overarching analytical framework" articulated in *McDonnell Douglas* to racially hostile work environment under Section 1981). *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015). *See also Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004).

To prevail on a § 1981 claim for hostile work environment, Plaintiffs must demonstrate that they (1) are a member of a protected class; (2) suffered unwelcomed harassment; (3) the harassment was based on their membership in that protected

class; (4) the harassment affected a term, condition, or privilege of employment; and (5) Defendants knew or should have known about the harassment and failed to take prompt remedial action. *See West v. City of Houston*, 960 F.3d 736, 741 (5th Cir. 2020).

**Plaintiffs Are Members of a Protected Class.**

Defendants do not dispute that the Black plaintiffs were a member of a protected class.

### 1. Plaintiffs Suffered Unwelcome Harassment.

The unwelcome harassment to the Black plaintiffs began almost as soon as they finished orientation and lasted the entire time of their employment. (Ex. 38, Appx 271-276). Defendants argue that the Plaintiff's primary allegation of hostile work environment arises from the cameras that were strategically placed in the Irving facility. (Dkt. #68, Pg. 6). This is not true. Plaintiffs described at least 16 specific actions that demonstrate the severity or pervasiveness of the Defendants' treatment during their time of employment: 1) Defendants human resources representative ordered the supervisors to "don't lay off any white people;" (Ex. 1, Appx 3; Ex 29, Appx, 143, Lofland, 58:14-17). 2) Defendants grouped the Black workers together in specific rooms to complete their job duties because of the color of their skin; (Ex. 30, Appx 156-172, Ologban, 30:19-31:10; Ex. 26, Appx 64-92, Aigheyisi, 32:15-17, 19-20; Ex. 28, Appx 107-121, Green, 31:12-18; Ex. 34, Appx 233-45, Samuels, 18:21-26; Ex. 32, Appx 189-215, Peter Tijani, 72:9-11; Ex. 34, Appx 233-54, Vicks, 37:6-20; Ex. 37, Appx 265-70, Pringle, 39:16-23, 54:4-16; Ex. 33, Appx 216-32, Price, 25:20-26:3; Ex 29, Appx, 135-37, Lofland, 47:20-23, 48:19-49:10; Ex. 38, Appx

271-276). 3) Defendants did not allow the Black workers to use their personal cell phones because of the color of their skin, even when the Black workers needed to communicate with the field technicians with their cell phones, but allowed the white and Indian workers to use their personal cell phones; (Ex. 34, Appx 233-45, 26:10-25; Ex. 27, Appx 93-106, Ashiru, 26:18-23; 32:1-14; Ex. 30, Appx 156-172, Ologban, 23:1-4; Ex. 32, Appx 189-215, Peter Tijani, 84:6-9; Ex 29, Appx 144-45, Lofland, 62:11-63:1; Ex. 38, Appx 271-276). 4) Defendants did not allow the Black workers the same breaks as whites and Indians because of the color of their skin; (Ex. 26, Appx 64-92, Aigheyisi, 28:26-29:10, 32:22-14, 55:19-25; Ex. 28, Appx 107-121, Green, 55:19-25; Ex. 31, Appx 173-188, Paul Tijani, 52:15-18; Ex. 32, Appx 189-215, Peter Tijani, 68:11-16;  Ex. 34, Appx 233-54, Vicks, 39:13-19, 54:21-25:4; Ex 29, Appx 144-45, Lofland, 62:11-63:1; Ex. 38, Appx 271-276). 5) Defendants installed cameras in the rooms mostly populated by Black workers, but not in rooms populated by mostly white or Indian workers because of the color of their skin; (Ex. 27, Appx 93-106, Ashiru, 20:24, Ex. 34, Appx 233-45, Samuels 18:24-19:1; Ex. 32, Appx 189-215, Peter Tijani, 68:16-24; Ex. 34, Appx 233-54, Vicks, 39:8-13, 40:1-18; Ex. 37, Appx 265-70, Pringle, 50:7-18; Ex 29, Appx 135, Lofland, 47:20-23; Ex. 38, Appx 271-276). 6) Defendants constantly spoke to Black workers in a condescending and manipulative tone; (Ex. 30, Appx 156-172, Ologban, 37:22-23; Ex. 31, Appx 173-188, Paul Tijani, 36:16-23, 81:13-14; Ex. 38, Appx 271-276). 6) Defendants required Black workers to clean up dishes after white and Indian workers; (Ex. 31, Appx 173-188, Paul Tijani, 35:2-36:2; Ex. 38, Appx 271-276). 7) Defendants denied qualified Black workers promotions

7

because of the color of their skin and instead hired white and Indian workers to fill those positions; (Ex. 31, Appx 173-188, Paul Tijani, 49:14-50:14; Ex. 34, Appx 233-45, Samuels, 54:11-13; Ex. 26, Appx 64-92, Aigheyisi, 39:14-16, 40:1-6; Ex. 27, Appx 93-106, Ashiru, 29:7-11, 25, 30:2-4, 19-31:9; Ex. 36, Appx 255-64, Yarbrough, 52:1-8; Ex. 32, Appx 189-215, Peter Tijani, 128:7-10, Ex. 34, Appx 233-54, Vicks, 80:10-15; Ex 29, Appx 149-50, Lofland, 76:13-77:21). 8) Defendants demoted qualified Black workers because of the color of their skin and instead hired white and Indian workers to fill those positions; (Yarbrough, 32:19-24; Ex. 28, Appx 107-121, Green, 2215-23:10; Ex. 31, Appx 173-188, Paul Tijani, 56:14-18; Ex 29, Appx 152-53, Lofland, 97:22-98:7; Ex. 38, Appx 271-276). 9) Defendants restricted training to its Black workers because of the color of their skin while allowing white and Indian workers extra training; (Ex. 37, Appx 265-70, Pringle, 57:15-25; Ex 29, Appx 144-45, Lofland, 62:25-63:1, Ex. 43, Appx 291). 10) Defendants gave more sites and work assignments to its Black workers than the white and Indian workers because of the color of their skin; (Ex. 31, Appx 173-188, Paul Tijani, 52:19-53:13; Ex. 32, Appx 189-215, Peter Tijani, 54:21-55:11, 53:21-54:1; Ex. 34, Appx 233-54, Vicks, 13:16-23; Ex. 38, Appx 271-276; Ex. 43, Appx 291). 11) Defendants yelled, disciplined, verbally abused, and falsely accused Black workers even after it was proved that the Black workers did not commit such mistakes, and Defendants did not treat the white or Indian workers this way; (Ex. 26, Appx 64-92, Aigheyisi, 29:25-30:4, 8-23, 31:3-16; Ex. 3, Appx 7-13; Ex. 5, Appx 17-21; Ex. 30, Appx 156-172, Ologban, 37:22-23; Ex. 32, Appx 189-215, Peter Tijani, 137; 21-23; Ex. 28, Appx 107-121, Green, 9-10; Ex 29, Appx 150, Lofland, 77:5-6; Ex. 34,

Appx 233-45, Samuels, 35:24-25; Ex. 34, Appx 233-54, Vicks, 55:14-18; Ex. 33, Appx 216-32, Price, 59:26-60:16; Ex. 38, Appx 271-276). 12) Because the Defendants gave its Black workers more sites than the white and Indian workers or wrong sites that white and Indian workers did not receive, which forced the Black workers to work overtime to complete the tasks; and (Ex. 27, Appx 93-106, Ashiru, 29:7-11, 21-23, 30:9-11; Ex. 26, Appx 64-92, Aigheyisi, 57:19-58:4, 81:22-23; Ex. 31, Appx 173-88, Paul Tijani, 52:19-53:13; Ex. 30, Appx 156-72, Ologban, 38:12-16, 41:2-11; Ex. 38, Appx 271-276). 13) conversely, Defendants denied some Plaintiffs the option of over time while allowing white and Indian workers to work overtime; (Ex. 27, Appx 93-106, Ashiru, 29:30:9-11; Ex. 7, Appx 27). 14) Defendants did not allow dress its Black workers of Nigerian descent to wear native dress while allowing its Indian workers to wear native dress; (Ex. 2, Appx 6-8; Ex. 30, Appx 156-172, Ologban, 44:19-45:10; Ex. 27, Appx 93-106, Ashiru, 21:1-11; Ex. 26, Appx 64-92, Aigheyisi, 25:14-26:17; Ex. 31, Appx 173-188, Paul Tijani, 71:10-22; Ex. 11, Appx 35; Ex. 38, Appx 271-276). 15) Defendant's night shift team lead would walk around making videos of the Black employees but not employees of other races; (Ex. 30, Appx 156-172, Ologban, 33:9-10:10; Ex. 38, Appx 271-276). and 16) Defendants threatened Plaintiffs (Ex. 3, Appx 7-13; Ex. 5, Appx 17-21; Ex. 30, Appx 156-172, Ologban, 37:22-23; Ex. 32, Appx 189-215, Peter Tijani, 137; 21-23; Ex. 28, Appx 107-121, Green, 9-10; Ex 29, Appx 150, Lofland, 77:5-6; Ex. 34, Appx 233-45, Samuels, 35:24-25; Ex. 38, Appx 271-276).

In *Pfau v. Mnuchin*, the court found a co-worker who exercised supervisory actions outside of his authority and duties along with five specific actions of that co-

9

worker's harassment plausibly creates a hostile work environment. *Pfau v. Mnuchin*, 1:18-CV-422-RP, 2019 WL 2124673, at *4 (W.D. Tex. May 15, 2019). Interrupting, ranting, using "a demanding tone," telling someone to quit while clenching fists, and punching one fist into another repeatedly is pervasive. *Id.*

One of the main harassers at CSS and Glow, Mohammed Silat, was "untouchable." (Ex. 2, Appx 6-8). Plaintiffs complained and no supervisor, human resource representative, or any agent of Defendants did anything to stop Mr. Silat. (PS 335; Ex. 26, Appx 64-92, Aigheyisi, 85:4). The Black plaintiffs here were able to describe a plethora of harassing behaviors that multiple supervisors conducted throughout their entire term of employment and a reasonable jury, viewing all the circumstances of the case in the light most favorable to Plaintiffs, could find that the cumulative conduct was a discriminatory hostile work environment.

### 2. The Unwelcome Harassment Was Because Mr. Sullivan is African American.

Defendants argue that the harassing conduct towards the Plaintiffs was not racially motivated because there is no evidence of verbal abuse or racial slurs. (Dkt. #68, Pg. 5). This is not true. Verbal abuse existed and at least on Plaintiff remembers hearing racial slurs while at work. (Ex. 27, Appx 93-106, Ashiru, 49:3-7). Defendants yelled at Plaintiffs, spoke in condescending tones towards Plaintiffs; cursed at Plaintiffs, falsely accused Plaintiffs, and threatened to terminate Plaintiff (eventually following through with that threat); all of which is evidence of verbal abuse. (Ex. 3, Appx 7-13; Ex. 5, Appx 17-21; Ex. 30, Appx 156-172, Ologban, 37:22-23; Ex. 32, Appx

189-215, Peter Tijani, 137; 21-23; Ex. 28, Appx 107-121, Green, 9-10; Ex. 34, Appx 233-45, Samuels, 35:24-25). Mr. Ologban recalls Mr. Silat threatening to not let him or the Black employees leave. (Ex. 30, Appx 156-172, Ologban, 34:13-14). Paul Tijani was "shaking" after one particularly horrible incident where Mr. Pauddar threatened to fire him after falsely accusing Mr. Tijani of doing his job wrong even after Mr. Pauddar was proven wrong. (Ex. 3, Appx 7-13). Mr. Silat verbally admitted his horrible treatment to Paul Tijani by saying, "I am an asshole and I am about to be even more of an asshole." (Ex. 3, Appx 7-13). Mr. Silat followed through on that threat.

The Fifth Circuit has ruled that the context of an alleged pattern of harassment can infer harassment based on a protected status, even if no explicit comments were made about the protected status. *EEOC v. WC&M Enters., Inc.,* 496 F.3d 398-99 (5th Cir.2007) (citing *Oncale v. Sundowner Offshore Servs. Inc.,* 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.")).

As the Supreme Court has recently stated, "workplace conduct is not measured in isolation." *Clark County School Dist. v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). *See also United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558 (1977) (Discriminatory incidents outside of the filing period may be relevant background information to current discriminatory acts.). The statute does not

11

separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002) (Title VII race discrimination case). *See Oncale v. Sundowner Offshore Servs. Inc.,* 523 U.S. 75, 81–82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

In *Pfau*, the defendant argued that the examples of harassment had no indication that any of them were done because of sex in the context of a motion to dismiss for failure to state a claim. *Id.* The Court disagreed. The complaint's detailed allegation about harassment against women, together with the allegation that men were not harassed in the same way, imply that the harassment was because of sex. *Id.* For this reason, actions like a person punching one fist into his other hand's open palm while grunting and making eye contact and clenching a fist while telling the plaintiff to quit her job are considered harassment because of sex in context of the other treatment. *Id.* In viewing "all the circumstances" of the case—including the frequency of the alleged harassment, whether it was physically threatening, and whether it impaired plaintiff's ability to perform her work—and taking plaintiff's factual allegations as true and in the light most favorable to her, the Court found that she plausibly alleged a hostile work environment. *Id.* at *4 (*citing Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998).

Context matters and the jury is in the best position to evaluate contested evidence regarding an employer's motivation. *see Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 225 (5th Cir.2000). Of the 13 specific actions showing a hostile work environment against Black employees because of their race, at least five directly show how this treatment interfered with the Plaintiffs' term, condition, or privilege of employment.

### 3. The Harassment Affected a Term, Condition, or Privilege of Employment.

"A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993). Defendants argue that most of the Plaintiffs did not receive disciplinary action and could still complete their job duties; therefore, the harassment does not unreasonably interfere with their job performance. (Dkt. #68, Pg. 6). This is not the appropriate analysis. The proper inquiry "is not whether work has been impaired" but whether a reasonable juror could conclude that Huffman's work conditions were discriminatorily altered. *Harris,* 510 U.S. at 24 (Scalia, J., concurring)." *Huffman v. MQ Const. Co.*, 08 C 3679, 2009 WL 3788721, at *3 (N.D. Ill. Nov. 12, 2009).

Several plaintiffs had to stay after hours to complete job assignment and were not compensated for that extra time. (Ex. 31, Appx 173-188, Paul Tijani, 52:19-53:13;

Ex. 32, Appx 189-215, Peter Tijani, 54:21-55:11, 53:21-54:1; Ex. 35, Appx 246-54, Vicks, 13:16-23). It mentally made completing a task more difficult. (Ex. 30, Appx 156-172, Ologban, 50:2-4; Ex. 31, Appx 173-188, Paul Tijani, 71:20-24; Ex. 32, Appx 189-215, Peter Tijani, 144:9-16; Ex. 43, Appx 291). Several Plaintiffs developed insomnia and sleeping issues from the Defendants' treatment. (Ex. 26, Appx 64-92, Aigheyisi, 129:22-130:6; Ex 29, Appx 124, Lofland, 17:10-11; Ex. 32, Appx 189-215, Peter Tijani, 143:11-12; Ex. 35, Appx 246-54, Vicks, 76:16-18). Plaintiffs had to constantly defend their work product, which took time away from actually completing their assigned tasks. (Ex. 2, Appx 6-8; Ex. 5, Appx 17-21; Ex. 4, Appx 14-16; Ex. 3, Appx 7-13).

Unlike Defendants argue, Defendant did formally discipline several Plaintiffs. (Ex 29, Appx 146-47, Lofland, 68:13-70:12). Defendants verbally disciplined the Plaintiffs who did not receive a formal write up or performance improvement plan. (Ex. 26, Appx 64-92, Aigheyisi, 29:25-30:4, 8-23, 31:3-16; Ex. 3, Appx 7-13; Ex. 5, Appx 17-21; Ex. 30, Appx 156-172, Ologban, 37 22-23; Ex. 32, Appx 189-215, Peter Tijani, 137; 21-23; Ex. 28, Appx 107-121, Green, 9-10; Ex 29, Appx 150, Lofland, 77:5-6; Ex. 34, Appx 233-45, Samuels, 35:24-25; Ex. 35, Appx 246-54, Vicks, 55:14-18; Ex. 33, Appx 216-32, Price, 59:26-60:16).

The Defendants drafted "exit reports" for some of the Plaintiffs[3] without consulting with the Plaintiffs nor allowing the Plaintiffs a chance to respond. The

---

[3] Michael Brown, Adawale Ashiru, Brandon Price, Lee Green, William Aigheyisi, Rukevwe Ologban, Joshua Walker, Paul Tijani, Peter Tijani, and Brett Samuels.

reports are filled with negative performance evaluations. (Ex. 13-23, Appx 38-59). For example, Mr. Ashiru Mr. Aigheyisi, and Mr. Paul Tijani received all 1s (Unsatisfactory) for every performance criterion. (Ex. 14, Appx 41; Ex. 13, Appx 39). For Mr. Ashiru's strengths, Defendants wrote, "none." (Ex. 14, Appx 41). This is not true. Mr. Ashiru was a smart and hard worker who had telecom experience to do the job. (Ex. 27, Appx 93-106, Ashiru, 7:5-8:8). Defendants gave a performance improvement plan (PIP) to William Aigheyisi as racial harassment and discrimination. (Ex. 12, Appx 37). The PIP stated its reason was because Mr. Aigheyisi was sleeping on the job. (Ex. 12, Appx 37). While Mr. Aigheyisi admits to sleeping one time while at the office, it was only done after he completed his work assignments; furthermore, white and Indian workers were allowed to sleep on the job. (Ex. 26, Appx 64-92, Aigheyisi, 135, 15-17, 136:10-137:3). Mr. Aigheyisi only received this disciplinary action because of Defendants' double standard of treatment: the white and Indian workers were allowed special treatment and the Black workers were punished. (Ex. 26, Appx 64-92, Aigheyisi, 102:17-104:4). These poor performance appraisals support a finding for Plaintiffs for this element. *See Waters v. Mills,* EP-13-CV-00241-FM, 2014 WL 11342500, at *5–6 (W.D. Tex. Dec. 17, 2014) (finding that because the Plaintiff received "exceeds expectations" for her work performance and the level of severity of the Defendant's behavior, this element was not met.).

Finally, Defendants ultimately terminated the Plaintiffs' employment or made the conditions so unbearable that had no other option but to quit. _____. This is the

ultimate interference with an employee's job performance. A reasonable juror could determine that Defendants interfered with Plaintiffs' job performance.

### 4. Defendants Knew or Should Have Known About the Harassment and Failed to Take Prompt Remedial Action.

Just as in *Sansone* where the 5th Circuit ruled that there was a fact issue for a hostile work environment claim, Plaintiffs trained to report problems "first to your manager" but "if your manager is the individual who is harassing you…you may go to any more senior person" or human resources. *Id*. (CSS 329-40). Several Plaintiffs followed this procedure for months, complaining to various supervisor and to HR, but their complaints and reports were never addressed. (Ex. 2, Appx 6-8; Ex. 3, Appx 7-13). Others feared retaliation if they complained at all. Several Plaintiffs began putting their complaints in writing, sending them to CSS and Glow's human resource department, even using the words and phrases "racial discrimination," "[the] only difference between both set[s] of people is their skin color" and "workplace discrimination," (Ex. 2, Appx 6-8; Ex. 3, Appx 7-13). Peter Tijani wrote to Ms. Cahoon, CSS Corp's Senior HR Manager, that he "involved the US Equal Employment opportunity commission and filing charges for discrimination at the work place." (Ex. 5, Appx 17-21). The emails and complaints show that Defendants knew and should have known about the harassment fulfilling this final element.

Plaintiffs were harassed because of the color of their skin, complained about the harassment to their supervisors and HR, and began emailing about the complaints, but these supervisors failed to take any action and began the process to

16

terminate their employment or harass them enough to force them to quit. Viewing all the circumstances, including the frequency of the harassment, whether it was humiliating, and whether it impaired the Plaintiffs' ability to perform work and taking the Plaintiffs' factual allegations as true and in the late most favorable to them, the Court should find that they have plausibly alleged a hostile work environment.

## II.   Constructive Discharge

The standard *McDonnell Douglas* framework for circumstantial evidence of discrimination is to show that (1) Plaintiffs belong to a protected group, (2) Plaintiffs were qualified for their position, (3) Plaintiffs suffered an adverse employment action, and (4) a similarly situated employee outside of their protected group was treated more favorably. *See Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021). Defendants only argue that certain Plaintiffs cannot meet their prima facie case for discrimination and retaliation because the third element is not met. Defendants argue that Plaintiffs cannot show an adverse employment action, specifically, they cannot show they were constructively discharged. (Dkt. #68, Pg. 9-14).

Constructive termination occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *Brown v. Kinney Shoe Corp*, 237 F. 3d 556, 566 (5th Cir. 2001). Several intolerable conditions are enumerated in Brown, but the Fifth Circuit made clear in *Faruki v. Parsons SIP*, that constructive discharge can also be proven when it is shown that the plaintiff employee was given an ultimatum being forced to choose between resigning and being fired.

17

*Faruki v. Parsons SIP,* 123 F. 3d. 315 (5th Cir. 1997) (*citing Burks v. Oklahoma Pub. Co.,* 81 F.3d 975, 978 (10th Cir. 1996), cert. denied, 519 U.S. 931 (1996)). In *Faruki,* the employee was told that he should find another job, his employer would be unable to retain him, and that he would be put on indefinite unpaid leave in one week. Under that scenario, the plaintiff had no choice but to resign and did so. Constructive discharge can be based upon an aggravated hostile working environment that reaches a breaking point. *See* P̲ennsylvania *State Police v. Suders,* 542 U.S. 129, 146 (2004). To show constructive discharge, the following factors are relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not. *Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 297 (5th Cir. 1994).

## 1. **Sterling Vicks**

Mr. Vicks was working a second job at Samsung, after being denied a raise at CSS Corp. (Ex. 40, Appx 281-83). Defendants used an inside contact at the Samsung job to find out which of its employees were working there, including Mr. Vicks. (Ex. 40, Appx 281-83). Defendants gave Mr. Vicks an ultimatum: resign from Samsung or you will be fired. (Ex. 40, Appx 281-83). Mr. Vicks was forced to resign CSS Corp. to continue his job at Samsung. (Ex. 40, Appx 281-83). This meets Mr. Vicks burden for constructive discharge.

### 2. Joshua Yarbrough[4]

Mr. Yarbrough began his employment with Defendants as a Tier 2 employee. (Yarbrough, 16:21-22). Mr. Yarbrough was then promoted to the Quality Assurance Team. (Yarbrough, 25: 15-23). After working on this team for a few months, Mr. Pauddar informed Mr. Yarbrough that Mr. Silat's girlfriend (who is also Indian) would take over Mr. Yarbrough's position on the quality assurance team. (Yarbrough, 32:19-34:1). Mr. Pauddar demoted Mr. Yarbrough down to a Tier 1 position, lower than the position when Mr. Yarbrough first began his employment at CSS Corp. (Yarbough, 33:23-34:1). When Mr. Yarbrough refused the Tier 1 position, Mr. Pauddar made it clear that was the only position for Mr. Yarbrough and implied that Mr. Yarbrough should resign if he did not want to take the demotion. (Yarbrough, 34:8-17). Mr. Yarbrough was demoted and then forced to resign if he did not take the demotion, meeting his burden for constructive discharge.

### 3. Lee Green

Mr. Green began his employment at CSS Corp as a RAN engineer. (Ex. 28, Appx 107-121, Green, 14:14-15). After about three months he was promoted to the quality assurance team with Mr. Yarbrough. (Ex. 28, Appx 107-121, Green, 35:5-19). Although Mr. Pauddar stated that he was going to give Mr. Green a raise with this promotion, Mr. Pauddar never did. (Ex 29, Appx 139, Lofland, 52:5-22). During this time, Mr. Green started a petition to stand up against the discrimination and

---

[4] Defendants list Mr. Yarbrough in its table of contents and heading for this section as "not constructively discharged;" however, Defendants do not make any formal argument in its motion. Plaintiffs argue that Defendants have waived their argument against Mr. Yarbrough.

harassment and had about 30 people on the list. (Ex. 28, Appx 107-121, Green, 22:15-23:10). Once the Defendants learned of this petition, Defendants demoted Mr. Green back to a Tier1 RAN engineer even though he was good at his job, and put him in the front room with all the other Black workers. (Ex. 28, Appx 107-121, Green, 22:15-23:10l Ex 29, Appx 138-39, Lofland, 51:8-11, 52:23-53:3). After being demoted harassed, and humiliated by Defendants, Mr. Green had no choice but to seek a new job and leave CSS and Glow.

### 4. Rukevwe Ologban

Defendants grouped him together with other African and African Americans; Defendants did not allowed him to use his personal phone while other races were allowed; Defendants spoke to him condescending; Defendants yelled at him, Defendants did not allow him to wear his native dress while allowing the Indian workers to wear their native dress; Defendants allowed supervisors to walk around and make videos of him; Defendants threated to fire him; Defendants assigned him more sites than the non-Black workers; Defendants did not provide assistance in accordance with Defendants' protocol, but instead was told to "figure it out yourself; and he had to mentally prepare to go to work every day due to Defendants' harassing and discriminatory conduct. (Ex. 30, Appx 156-172, Ologban, 30:19-31:10, 23:1-4, 37:22-23, 44:19-45:10, 33:9-10:10, 38:12-16, 41:2-11, 50:2-4). In the end, Mr. Ologban had to look for and take a new job opportunity for his sanity. (Ex. 30, Appx 156-172, Ologban, 51:5-8).

### 5. Matt Lofland[5]

Mr. Lofland began working at CSS and Glow as a Tier 2 employee. (Ex 29, Appx 125, Lofland, 34:2-4). About a month and a half later Mr. Lofland was promoted to bridge manager and eventually promoted to team lead. (Ex 29, Appx 131-34, Lofland, 40:2-6, 43:4-7). Once Mr. Lofland began questioning Defendants' racially discriminatory promoting and demoting decisions, Defendants demoted Mr. Lofland. (Ex 29, Appx 138-40, Lofland, 51:8-17, 53:9-54:1). Mr. Silat's (Indian) girlfriend was hired on as a Tier 2 and had Mr. Lofland train her. Mr. Lofland confronted Mr. Pauddar about the way he and Mr. Silat were treating the Black workers. (Ex 29, Appx 140, Lofland, 53:9-54:1). Mr. Lofland complained to Mr. Pauddar about five to seven times. (Ex 29, Appx 145, Lofland, 63:7-8). Mr. Lofland's Black employees who he supervised came to him complaining of racial discrimination and harassment, which Mr. Lofland also escalated to Mr. Pauddar. (Ex 29, Appx 145, Lofland, 63:17-23). Shortly after, Mr. Pauddar demoted Mr. Lofland (and Mr. Yarbrough) to Tier 1 and promoted Mr. Silat's girl friend to that role instead. (Ex 29, Appx 140, 151, Lofland, 53:9-54:1, 79:22-25). When the human resource department came to the Irving facility location because no HR representative had an office at the Irving facility, Mr. Lofland asked to speak with the HR representatives to discuss the unequal treatment. (Ex 29, Appx 142, Lofland, 57:19-58:5). The next day, Mr. Pauddar told HR that they needed to fire Mr. Lofland for "insubordination," which

---

[5] Defendants list Mr. Lofland in its table of contents and heading for this section as "not constructively discharged;" however, Defendants do not make any formal argument in its motion. Plaintiffs argue that Defendants have waived their argument against Mr. Lofland.

was pretext for retaliating against me for reporting harassment and discrimination. (Ex 29, Appx 142-43, Lofland, 57:19-58:5). The moment Mr. Pauddar demoted Mr. Lofland to Tier 1 replacing him with an Indian employee with less experience, Mr. Lofland had no choice but to resign and did so. (Ex 29, Appx 152-53, Lofland, 97:22-98:7).

### 6. Brett Samuels

Mr. Samuels was hired as a Tier 1 employee. (Ex. 34, Appx 233-45, Samuels, 42:8-9). Defendants grouped him in an assigned room with other Black employees, Defendants did not allow him to use his personal phone while other races were allowed; Defendants installed cameras to specifically watch him and other Black employees; Defendants denied him a promotion; and Defendants threated to fire him. (Ex. 34, Appx 233-45, Samuels, 18:21-26, 26:10-25, 18:24-19:1, 54:11-13, 35:24-25). Mr. Samuels began working a second job at Samsung. (Ex. 34, Appx 233-45, Samuels, 37:4-22). Mr. Silat used an inside contact at the Samsung job to find out which of its employees were working there, including Mr. Samuels. (Ex. 34, Appx 233-45, Samuels, 37:4-22). Defendants gave Mr. Samuels an ultimatum: resign from Samsung or you will be fired. (Ex. 34, Appx 233-45, Samuels, 37:4-22). Mr. Samuels was forced to resign CSS Corp. to continue his job at Samsung. (Ex. 34, Appx 233-45, Samuels, 37:4-22). This meets Mr. Samuels burden for constructive discharge.

### 7. Brandon Price

Mr. Price was RITC engineer at CSS Corp from November 2017 until July 2018. (Ex. 33, Appx 216-32, Price, 15:15-19). He was hired back for a second project

for Defendants in May 2019. (Ex. 33, Appx 216-32, Price, 65:22-66:3). The job was supposed to be a remote integration position in Los Angeles California, his hometown; however, once Mr. Price began the position, it was revealed that he was only hired to drive engineers from LAX to cell sites. Mr. Price tried to contact HR to discuss his initial confusion. Defendants required Mr. Price to use his personal vehicle and did not compensate him accordingly. Mr. Price, an African American man, was hired to chauffeur individuals who flew in from India, to do a job that Mr. Price was hired to do. Eventually, Defendants fired Mr. Price a second time. (Ex. 33, Appx 216-32, Price, 66:5-69:12). Defendants misrepresented the position, demeaned him to be a chauffeur with his own vehicle for persons who were doing the job he was hired to do. The humility of this dishonesty, degradation, and demotion is sufficient for constructive discharge.

WHEREFORE, Plaintiffs request that the Court deny the motion for partial summary judgment and allow a trial by jury.

Respectfully submitted,


 /s/ Brian P. Sanford
Brian P. Sanford
Texas Bar No. 17630700
bsanford@sanfordfirm.com
Elizbeth "BB" Sanford
Texas Bar No. 24100618
esanford@sanfordfirm.com

THE SANFORD FIRM
1910 Pacific Ave., Suite 15400
Dallas, TX 75201
Ph:  (214) 717-6653

Fax: (214) 919-0113

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 24, 2021, I electronically served the foregoing document on all counsel of record via Court's electronic filing system.

*/s/ Brian P. Sanford*

24