UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JOSHUA YARBROUGH, ET AL. | § | |
| | § | |
| v. | § | CIVIL NO. 4:19-CV-905-SDJ |
| | § | |
| CSS CORP., ET AL. | § | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiffs, a group of fourteen former employees of Defendant Glow Networks, Inc. and/or CSS Corp. (collectively, "Glow"), brought this lawsuit against Glow to redress alleged violations of 42 U.S.C. § 1981. With the exception of Matt Lofland, who is Caucasian, all Plaintiffs are Black former employees who contend that Glow discriminated against them based on their race. They claim discrimination based on both tangible actions, such as terminations and denials of promotions, and on the alleged creation of a hostile work environment. Plaintiffs Lofland, Adawale Ashiru, Brett Samuels, Paul Tijani, Peter Tijani, Joshua Walker, and Osasu William Aigheyisi[1] additionally allege that Glow retaliated against them for reporting and opposing race discrimination.

Before the Court is Glow's Motion for Partial Summary Judgment. (Dkt. #68). In its motion, Glow argues that Plaintiffs cannot establish a claim of hostile work environment. Glow also challenges Plaintiffs Lee Green, Sterling Vicks, Brandon Price, Samuels, and Rukevwe Ologban's race discrimination and/or retaliation

---

[1] In Plaintiffs' pleadings, Osasu's last name is spelled "Saigheyisi." However, in Exhibit 2 to Plaintiffs' response to the partial summary-judgment motion, which is an email sent by Osasu, he spells his last name "Aigheyisi." (Dkt. #77-3 at 2). The Court will use the latter spelling throughout this order.

1

claims, arguing that because they were not constructively discharged, there is no evidence of an adverse employment action to support these claims. Plaintiffs responded to the motion, (Dkt. #77), Glow filed a reply, (Dkt. #80), and Plaintiffs filed a surreply, (Dkt. #83).

Also before the Court are Glow's Objections to Plaintiffs' Summary Judgment Evidence. (Dkt. #81). Plaintiffs responded to Glow's objections. (Dkt. #82).

The Court, having considered the motions, the subsequent briefing, the record, and the applicable law, **OVERRULES in part and SUSTAINS in part** the evidentiary objections and **GRANTS in part and DENIES in part** the partial summary-judgment motion. Specifically, the Court grants Glow's motion for partial summary judgment with respect to: (1) the hostile work environment claims brought by all Plaintiffs except for Lofland; (2) the race discrimination claims predicated on constructive discharge brought by Green, Vicks, Samuels, Price, and Ologban; and (3) the retaliation claim brought by Samuels. The Court denies Glow's motion for partial summary judgment with respect to Price's race discrimination claim that is not predicated on a constructive-discharge theory.

## I. BACKGROUND

Glow specializes in IT solutions for the telecommunications industry. Plaintiffs worked on Glow's Remote Integration and Testing Center ("RITC") project in 2017 and 2018, (Dkt. #68 at 4), and some returned to work for Glow again in 2019 and 2020, (Dkt. #68-1 at 108); (Dkt. #77-34 at 12). The RITC project had multiple shifts, including a small day shift and a significantly larger night shift. (Dkt. #68 at 4). All Plaintiffs other than Lofland, who was a team lead, were either Tier 1 or Tier 2

employees.[2] (Dkt. #68 at 5). According to Glow, Tier 1 employees conducted integrations, while Tier 2 employees provided support to Tier 1 employees. (Dkt. #68 at 5). According to Plaintiffs, the Tier 1 and Tier 2 labels were arbitrary. (Dkt. #77 at 8). Plaintiffs' allegations center chiefly on two managers employed at the RITC during the relevant time—Mohammad Silat and Sandeep Pauddar.

Sometime in 2018, cameras were installed at the Irving office where Plaintiffs worked. (Dkt. #68 at 5). The parties dispute many facts surrounding these cameras, but they agree at least that there were cameras in the first room of the multi-room Irving office and that at least some Plaintiffs received a video surveillance policy. (Dkt. #56 ¶ 34); (Dkt. #68 at 5, 9); (Dkt. #77 at 9). Plaintiffs allege that Glow assigned Black employees to the front two rooms, where they were in range of the cameras. (Dkt. #56 ¶ 38).

According to Plaintiffs, Black employees were treated differently in other ways as well. They claim, for example, that they were disciplined for engaging in conduct for which others were not disciplined, including leaving their desks without informing a manager, taking breaks lasting more than a couple of minutes, and using their cell phones. (Dkt. #56 ¶¶ 41–46). Although there is some overlap among the actions of which each plaintiff complains, a brief overview of the specific allegations lodged by each plaintiff is warranted.[3]

---

[2] Joshua Yarbrough and Green were selected to work on the Quality Assurance team for a portion of their employment, at which time they were not in Tier 1 or Tier 2 roles. (Dkt. #77 at 24).

[3] Because allegations regarding the cameras appear in virtually every deposition and declaration submitted by Plaintiffs, the Court will not repeatedly rehash those claims below but has considered them in reaching a decision on Plaintiffs' hostile work environment claims.

## A. Joshua Yarbrough

In his declaration opposing summary judgment, Yarbrough states that: Glow monitored Black employees' break times, Black employees were listed as the worst performers, it was "uncomfortable" to work for Glow, "you never knew if your job was on the line," and Glow restricted his training. (Dkt. #77-40). Yarbrough also contends that Black employees did not receive promotions, (Dkt. #77-40 ¶ 3), but states in the next paragraph that he was promoted to Quality Analyst, (Dkt. #77-40 ¶ 4). Yarbrough claims that he was later demoted from this position and replaced with Silat's girlfriend, who was "Arabic." (Dkt. #77-40 ¶ 4). Yarbrough resigned in July 2018 after accepting a job with Samsung. (Dkt. #77-24).

## B. Lee Green

Green was hired as a RAN Engineer for Glow. (Dkt. #77-29 at 3). After approximately three months, he was moved into a quality assurance role. (Dkt. #77-29 at 4). He was in that position for about a month before being replaced and moved back into the RAN Engineer position. (Dkt. #77-29 at 5–6). Green testified that while he was in the quality assurance role, he was not assigned to sit in the room with the camera in it. (Dkt. #68-1 at 31). Green also testified that Black employees were reprimanded for taking breaks and told not to leave their desks to have lunch and that he and Silat had "different confrontations, or conversations, rather." (Dkt. #77-29 at 11). According to Green, unlike Black employees, Silat and his "constituents" were permitted to take numerous breaks. (Dkt. #77-29 at 10). Green resigned in June 2018 after accepting a job with Samsung. (Dkt. #77-17).

4

## C. Sterling Vicks

Vicks testified that: he missed out on raises and promotions, he was assigned to a team of all of the Black employees in the RITC program, the team was placed in the room with the camera, and Silat would call into the room if he watched the video feed from the camera and saw that employees were not in their seats. (Dkt. #77-36). Vicks also submitted a declaration in opposition to summary judgment, in which he states that Silat would come into the room in which Vicks was sitting, "stare at the guys in that room," and then go talk to another manager, Dan Paddock. (Dkt. #77-41 ¶ 3). According to Vicks, when asked about his behavior, Silat just smiled and walked away. (Dkt. #77-41 ¶ 3). Vicks also claims that Pauddar told him that he and his coworkers in the room had to let Silat or Pauddar know if they were going to be away from their stations, while Indian and white workers were allowed to leave to take breaks. (Dkt. #77-41 ¶ 3). Vicks resigned from Glow after accepting an offer to work for AT&T Performing Arts Center. (Dkt. #77-36 at 3).

## D. Michael Brown

In his declaration opposing summary judgment, Michael Brown states that: team leads would move his desk area repeatedly, forcing him to set up elsewhere before he could start working, team leads and coworkers smirked at him, he was extremely overworked, and his training was restricted even though white and Indian employees were given extra training. (Dkt. #77-44). Brown argues that white and Indian employees were not treated as poorly as he was. (Dkt. #77-44 ¶¶ 2–3). Brown claims that this treatment caused him to show up to work with headaches and stomach aches. (Dkt. #77-44 ¶ 2). Plaintiffs also submitted evidence that Brown

asked Pauddar for overtime hours because he had not received any in the five months he had been working for Glow. (Dkt. #77-8). In his deposition, Brown testified that he was never disciplined while working for Glow and never received a poor performance review. (Dkt. #68-1 at 52). Brown was laid off in November 2018 when his position was eliminated due to decreased funding. (Dkt. #77-16).

**E. Paul Tijani**

Paul Tijani testified that: Pauddar asked him to clean up the kitchen almost every night, he was extremely overworked, mostly white and Indian employees got promoted, Silat would say he could promote, demote, or terminate anyone, Silat assigned him more sites even when white and Indian employees were leaving for the day, he was not paid for overtime hours spent working on the extra sites, he was told not to wear his native attire in the workplace even though Indian women were allowed to wear theirs, and Nigerian employees worked longer hours than white and Indian employees. (Dkt. #77-32). Tijani also claimed that Pauddar would badger him about whether he was going to quit and that he was bullied and humiliated every night. (Dkt. #77-32 at 15). Despite his repeated allegations about being overworked, however, Tijani stated that he was never given work that he could not complete, and he testified that no one ever criticized his work performance. (Dkt. #68-1 at 116). Tijani lodged a formal complaint regarding workplace discrimination in January 2018. (Dkt. #77-4). He was terminated a couple of months later for watching videos on his cell phone during work hours. (Dkt. #77-19).

**F. Peter Tijani**

In his deposition, Peter Tijani testified that: he was assigned more sites than white and Indian employees, Silat told him not to wear his dashiki in the workplace, he was not allowed to go even a minute past his lunch break, and Silat constantly gave him the wrong sites. (Dkt. #77-33). He also testified that white and Indian employees only got one or two sites, while he witnessed other Black employees receive four or five sites, (Dkt. #77-33 at 5–6), and that Indian employees were allowed to take breaks whenever they wanted to do so, (Dkt. #77-33 at 7). Despite his allegations of being given extra sites, Tijani testified that he was always able to complete his job. (Dkt. #77-33 at 5). But he stated that the job was mentally draining and depressing, caused him anxiety, and gave him headaches, and he testified that he could barely sleep. (Dkt. #77-33 at 17, 25–26). Tijani complained to Human Resources about Silat's behavior in January 2018. (Dkt. #77-5). He was terminated in February 2018 for poor behavior. (Dkt. #77-20). Tijani emailed Human Resources after his termination, claiming that it was wrongful and that he felt "humiliated, discriminated and sad." (Dkt. #77-6).

**G. Joshua Walker**

In Walker's declaration, submitted in conjunction with Plaintiffs' response to the summary-judgment motion, he states, among other things, that: (1) Black employees' cell phones were taken away; (2) Black employees got written up for being on their phones even if they had finished their assigned tasks; (3) Black employees were given more sites; (4) Silat was constantly chatting with Black employees on Skype when he was at home; (5) Silat constantly questioned Black employees and

threw fits; (6) Silat said mean things to and was aggressive and condescending toward Black employees; (7) managers would yell at and embarrass Walker; (8) Silat did not allow him to read a work-related book during his downtime; (9) Walker did not receive a raise when he was promoted; (10) Silat tried to get people fired; (11) Silat yelled and laughed at Walker in front of other employees; (12) Black employees were not allowed the same breaks as others; (13) Black employees were made to clean up other employees' dishes; (14) Silat did not follow Human Resources policy; (15) Black employees were denied promotions and were demoted; (16) Black employees received less training and more work; (17) Black employees were disciplined and falsely accused; (18) some Black employees were denied overtime; (19) Nigerian workers were not allowed to wear their native dress; (20) a team lead took videos of Black employees; and (21) Black employees were threatened with being fired. (Dkt. #77-39). Walker resigned in August 2018 after accepting a job with Samsung. (Dkt. #77-23).

## H. Brandon Price

Price worked for Glow two separate times. He testified that during his first stint, he was scrutinized and criticized more than others, and that only Brown was scrutinized in the same way. (Dkt. #77-34 at 6); (Dkt. #68-1 at 64). Price also testified that Paddock would "pick [him] out of the group and . . . quiz [him]," (Dkt. #68-1 at 68), and that Paddock made inappropriate comments, but Price could not recall what they were. (Dkt. #68-1 at 66). Price left Glow for the first time in July 2018, when he resigned after accepting another position. (Dkt. #77-21). He was rehired in May 2019. (Dkt. #77-34 at 16). After being rehired by Glow for a remote integration position, Price claims that he was forced to move to Los Angeles, not given a rental

car or housing stipend, and asked to drive other employees around the city rather than perform integration work. (Dkt. #77-34 at 13–16). He was terminated in July or August 2019. (Dkt. #77-34 at 16).

## I. Brett Samuels

In his deposition, Samuels testified that: he was not allowed to use his cell phone even though his son was in the intensive care unit, Black employees were split up and forced to sit in different places throughout the RITC, Black employees were either seated under cameras or right in front of a manager, he was threatened with termination, and the job became "San Quentin" when Silat was promoted. (Dkt. #77-35). Samuels stated that white and Indian employees were not spoken to when they used their phones at work. (Dkt. #77-35 at 5). Samuels resigned in July 2018 and went to work at Samsung. (Dkt. #77-22).

## J. Adawale Ashiru

In his deposition, Ashiru testified that: a supervisor told him that he could not wear his native dress to work, Silat was spying on him, Silat blamed African employees every time something happened, African employees never got overtime, African employees were not permitted to use their cell phones, and African employees did not get promoted. (Dkt. #77-28). Ashiru testified that Indian employees were allowed to wear their native dress and that non-African employees were promoted to Tier 2 positions over African employees. (Dkt. #77-28 at 6, 8–9). Finally, Ashiru stated that he heard racial slurs "against his colleagues," but he could not remember any specific comments. (Dkt. #77-28 at 11). Ashiru was terminated for poor performance in April 2018. (Dkt. #77-15).

## K. Osasu William Aigheyisi

In his deposition, Aigheyisi testified that: Black employees' breaks were limited, he was not allowed to read when he finished his work, he was never put on a promotion list, he was intentionally given bad sites or bad information so he could be disciplined, and Black employees, but not white or Indian employees, were micromanaged. (Dkt. #77-27). He also testified that he was denied a promotion to Tier 2, whereas Silat's girlfriend was hired as a Tier 2 even though she had no experience. (Dkt. #77-27 at 10–11). He was unable to identify her race, but he stated that she was not Black. (Dkt. #77-27 at 11). Aigheyisi also testified that white and Indian employees were allowed to take breaks and, when they finished their work, could watch movies and read books. (Dkt. #77-27 at 4–5). On January 8, 2018, Paddock placed Aigheyisi on a Performance Improvement Plan for sleeping while on shift and watching a video on his computer monitor. (Dkt. #77-13). Aigheyisi testified that white and Indian employees slept and did not get disciplined. (Dkt. #77-27 at 25). Aigheyisi complained about Silat and race discrimination in March 2018. (Dkt. #77-3). He was terminated for playing a game on his phone during work hours that same month. (Dkt. #77-14).

## L. Harom Pringle

Harom Pringle testified that: Black employees were not allowed to sit together, other employees received coaching that he did not receive, other employees could talk through and work on a tool and receive overtime pay for that work, whereas he could not, and other employees were told about things like password changes, whereas Pringle had to figure it out on his own. (Dkt. #77-38). Pringle testified that he was

never written up, reprimanded, or criticized and that no one ever raised their voice to him. (Dkt. #77-38). Pringle's employment with Glow ended when he was selected for inclusion in a layoff. (Dkt. #80-1).

**M. Rukevwe Ologban**

Ologban testified that: he was moved to the front room, away from other Nigerian employees, Silat recorded him and kept a close eye on Nigerian employees, Silat threatened Nigerian employees that he could fire them at any time, Silat spoke to him in a condescending manner, Silat rushed him through his work and sent him extra sites, Silat told him not to ask for help, and Silat sometimes came to where he was sitting and told him and those around him not to use their phones. (Dkt. #77-31). Ologban also testified that he was never disciplined, did not receive a bad performance review, and never complained about Silat's conduct. (Dkt. #68-1 at 95, 99–100). He stated that he believed Black employees were being treated differently because Silat did not videotape other employees and did not send as many sites to other employees. (Dkt. #77-31 at 6, 11). Ologban testified that he felt "bottled up with too much work," (Dkt. #77-31 at 9), but could always get his work done, (Dkt. #77-31 at 10–11). He also testified that he "had to prepare mentally every day before going to work to deal with all of the toxicity." (Dkt. #77-31 at 14). Ologban resigned in August 2018 after accepting a job with Samsung. (Dkt. #77-18).

Ologban worked for Glow a second time in 2020, and he testified that he did not feel that he was discriminated against on the basis of his race during that term of employment. (Dkt. #68-1 at 109). His second term of employment ended when Glow

released him due to the COVID-19 pandemic and the project slowing down. (Dkt. #68-1 at 108).

### N. Matt Lofland

Although Lofland's claims are not subject to Glow's partial summary-judgment motion, several of his allegations are relevant to other Plaintiffs' claims. For example, at some point during Plaintiffs' employment, Glow conducted a layoff. (Dkt. #56 ¶ 63). Lofland contends that his project manager, Pauddar, told him that at some time Human Resources told Pauddar: "Don't lay off any white people." (Dkt. #56 ¶ 64); (Dkt. #77-2 at 3). Pauddar responded, "I am not making any decisions on [sic] based on [whether] somebody is white or black, or anything." (Dkt. #77-2 at 3). Lofland also provided testimony and a declaration in support of the other Plaintiffs' claims, stating that: (1) cameras were installed in two rooms, and Glow slowly started moving all of the Black employees into those rooms; (2) Silat treated Black employees more harshly with respect to using phones and taking breaks; (3) Silat tried to record Black employees being on their phones and would time their bathroom breaks; (4) Lofland recommended Walker for promotion, but a less-qualified Indian employee was promoted instead; and (5) Pauddar "basically admit[ed] that Human Resources and management were going after Black employees." (Dkt. #77-30); (Dkt. #77-42).

* * *

Based on the foregoing, Plaintiffs bring claims for race discrimination and retaliation. Glow seeks summary judgment on the hostile work environment claims brought by all Plaintiffs except for Lofland and on Vicks's, Green's, Ologban's, Samuels's, and Price's discriminatory and/or retaliatory termination claims.

## II. LEGAL STANDARD

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

Because Federal Rule of Civil Procedure 56 requires that there be no "genuine issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (first emphasis omitted). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 476 (citing *Anderson*, 477 U.S. at 248).

"Courts consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Int'l Ass'n of Machinists & Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*,

13

199 F.3d 796, 798 (5th Cir. 2000). If, when considering the entire record, no rational jury could find for the nonmoving party, the movant is entitled to summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 280, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### III. DISCUSSION

#### A. Evidentiary Objections

Glow objects to five exhibits submitted by Plaintiffs in support of their response to Glow's summary-judgment motion: two spreadsheets and portions of the declarations of Walker, Yarbrough, and Lofland. "The issue at the summary judgment phase is not whether the parties have presented admissible evidence to support their motions for summary judgment, but whether they have shown that they will be able to present admissible evidence at trial." *BP Energy Co. v. Glob. Health Tech. Grp., LLC*, No. H-19-3243, 2020 WL 5947605, at *6 (S.D. Tex. Oct. 7, 2020). Parties may submit declarations in support of their positions on summary judgment. Such declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). The Court will consider each of Glow's objections in turn.

#### i. Spreadsheet exhibits (Exhibits 8 and 9)

Glow objects to two spreadsheet pages related to a planned layoff, arguing that the pages are part of a three-page spreadsheet, and that, pursuant to the rule of optional completeness, the Court should order Plaintiffs to produce the entire

14

spreadsheet. Federal Rule of Evidence 106 states: "If a party introduces . . . part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time." Because Glow attached the third page of the spreadsheet to its reply, *see* (Dkt. #80-1), the Court need not order Plaintiffs to produce the entire spreadsheet. However, Glow's objection is sustained insofar as the Court will consider all three pages of the spreadsheet together.

### ii. Walker declaration (Exhibit 38)

Glow objects to the first sentence of Paragraph 8 and to the entirety of Paragraphs 10 through 26 of Walker's declaration on the grounds that the assertions contained therein are conclusory. The Court sustains Glow's objection as to the first sentence of Paragraph 8. Walker's assertion that Silat "tried to get people fired purposely," (Dkt. #77-39 ¶ 8), is an unsubstantiated conclusion. *See Ramon v. Cont'l Airlines Inc.*, 153 F.App'x 257, 259 (5th Cir. 2005) (per curiam) ("Unsupported allegations or affidavits setting forth ultimate or conclusory facts . . . are insufficient to either support or defeat a motion for summary judgment." (citation omitted)); *see also Richardson v. Oldham*, 12 F.3d 1373, 1378 (5th Cir. 1994) (finding that district court acted within its discretion in striking "[m]ere conclusory allegations" from affidavit (citation omitted)). Plaintiffs' argument that the "same paragraph details specific facts supporting the statement," (Dkt. #82 at 6), is unpersuasive. In the sentence immediately following the challenged sentence, Walker states only that Silat said that certain people needed to be fired, and the remainder of the paragraph deals with an unrelated instance of Silat allegedly failing to follow policy with respect

to sending employees home without pay if they were tardy to work. None of these facts support the conclusion that Silat intentionally tried to get employees fired.

The Court also sustains Glow's objection with respect to the phrase "because of the color of our skin" in Paragraphs 11 through 14 and Paragraphs 17 through 20. These allegations reflect only Walker's conclusory, subjective belief; therefore, the Court strikes these portions of Walker's declaration. The Court overrules Glow's objections to the remainder of Paragraphs 10 through 26 and finds that the remaining allegations are not conclusory.

### iii. Yarbrough declaration (Exhibit 39)

Glow next objects to Paragraphs 2, 6, and 7 of Yarbrough's declaration, arguing that all three are conclusory. As with the challenged portions of Walker's declaration, the Court finds that the phrases "because of our race," (Dkt. #77-40 ¶ 2), and "because of the color of my skin," (Dkt. #77-40 ¶ 6), are unsubstantiated conclusions and must be stricken. The Court otherwise overrules Glow's objections to Paragraphs 2 and 6. The Court sustains Glow's objection to Paragraph 7. Yarbrough provides no factual support for his conclusory and subjective belief that Glow "had a caste system" in ranking employees on the basis of race or that Glow "systematically discriminated against its African and African American employees because of the color of our skin." (Dkt. #77-40 ¶ 7). Contrary to his assertion, Yarbrough does not "detail[] the specific acts to support his conclusions" throughout Paragraph 7. (Dkt. #82 at 10–11). Therefore, the Court strikes Paragraph 7 in its entirety.

### iv. Lofland declaration (Exhibit 41)

Finally, Glow objects to Paragraph 2 and to the first sentence of Paragraph 4 of Lofland's declaration, arguing that these portions of the declaration are conclusory. Glow also argues that the challenged portion of Paragraph 4 lacks foundation and is thus inadmissible under Federal Rule of Evidence 602. Paragraph 2 of Lofland's declaration is nearly identical to Paragraph 7 of Yarborough's declaration, and the Court sustains Glow's objection and strikes Paragraph 2 for the same reasons. The first sentence of Paragraph 4 reads: "A week or so after this 'incident,' I noticed that Sandeep Pauddar and Mohammad Silat were basically going after Lee Green and Joshua Yarbrough." (Dkt. #77-42 ¶ 4). The Court finds that Lofland adequately alleged his personal knowledge by describing, later in the paragraph, a conversation he had with Pauddar about the matter. The Court also disagrees that this allegation is conclusory. For these reasons, the Court overrules Glow's objections to Paragraph 4.

### B. Summary-Judgment Motion

"[S]ection 1981 provides a cause of action for public or private discrimination based on race or alienage." *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 762 (5th Cir. 1986) (citation omitted). To succeed on their Section 1981 claims, Plaintiffs must demonstrate intentional discrimination. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). "Intentional discrimination can be established through either direct or circumstantial evidence." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citation omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all

times with the plaintiff." *Vadie v. Miss. State Univ.*, 218 F.3d 365, 372 (5th Cir. 2000) (quotation omitted).

Section 1981 provides several theories of liability under which Plaintiffs may recover. They assert three such theories here: disparate treatment, hostile work environment, and retaliation. Glow challenges the hostile work environment claims and certain disparate treatment and retaliation claims. The Court turns first to the hostile work environment claims asserted by all Plaintiffs other than Lofland.

### i. Hostile work environment

Section 1981 precludes employers from requiring employees "to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "A hostile work environment exists when the workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Johnson v. Halstead*, 916 F.3d 410, 417 (5th Cir. 2019) (quoting *Harris*, 510 U.S. at 21). To survive summary judgment on their hostile work environment claims, Plaintiffs must show that: (1) they are members of a protected class; (2) they suffered unwelcome harassment; (3) the harassment was based on their membership in a protected class; and (4) the harassment affected a term, condition, or privilege of employment.[4] *West v. City of Hous.*, 960 F.3d 736, 741 (5th Cir. 2020). Ultimately, "a plaintiff's hostile environment claim is based on the cumulative effect of a thousand

---

[4] Because the alleged harassers were Plaintiffs' supervisors, Plaintiffs need not prove that Glow "knew or should have known about the hostile work environment yet allowed it to persist." *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 321–22 (5th Cir. 2019). Regardless, Glow did not challenge this element in its motion for partial summary judgment.

cuts, rather than on any particular action taken by the defendant." *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737 (5th Cir. 2017) (quotation omitted).

Glow challenges the third element of Plaintiffs' hostile work environment claims—whether the alleged harassment was based on race—and the fourth element—whether the alleged harassment affected a term, condition, or privilege of employment.

### a. Harassment based on race

The Court finds that there is no genuine dispute as to whether the alleged harassment was based on Plaintiffs' race. "[Section] 1981 claims necessarily entail proof of intentional discrimination." *Gray v. Entergy Operation, Inc.*, 240 F.3d 1074, 2000 WL 1835299, at *4 (5th Cir. 2000) (unpublished table decision) (per curiam) (citation omitted). Such evidence is nonexistent in this case. Plaintiffs claim that Black employees were treated less favorably than white and Indian employees in terms of, inter alia, breaks, monitoring, promotions, training, and workload. Plaintiffs provide very little evidence of specific white or Indian employees who were treated better or specific examples to support their general assertions.

Multiple Plaintiffs conceded that they did not recall witnessing any racial slurs, cartoons, or jokes in the workplace. *See* (Dkt. #68-1 at 11–12, 35–36, 51, 68–69, 84, 115); (Dkt. #77-36 at 4); (Dkt. #77-38 at 5). Only Ashiru testified that he had heard Silat using racial slurs, but he could not recall anything specific. Ashiru seemed to be referring to incidents involving arguments between Silat and Ashiru's coworkers, and his testimony on this topic is unclear. (Dkt. #77-28 at 11). Lofland

also contends that Human Resources told Pauddar not to lay off any white people, but Pauddar stated that he would not comply with that order, (Dkt. #77-2 at 3), and, in fact, five white employees were selected for the layoff, (Dkt. #80-1). Glow selected the same number of Black employees as white employees for that layoff. (Dkt. #80-1).

Essentially, Plaintiffs conclude in their deposition testimony and declarations that the alleged harassment they experienced was based on race because white and Indian employees were not (or were less commonly) subjected to the same treatment. Without evidence indicating that Plaintiffs were intentionally subjected to the alleged harassment because of their race, the Court cannot agree. *See, e.g.*, *Whitlock v. Lazer Spot, Inc.*, 657 F.App'x 284, 287 (5th Cir. 2016) (agreeing with district court that plaintiff failed to link alleged harassment to race where he claimed he was punished for infractions for which white employees were not punished and that a white employee was given credit for work done by Black employees); *Harris-Childs v. Medco Health Sols., Inc.*, 169 F.App'x 913, 917 (5th Cir. 2006) (affirming district court's grant of summary judgment because the alleged harassment was not racially based where employee asserted that employer "treated her worse than non-African-American pharmacists in terms of scheduling, work performance expectations, and disciplinary incidents (including threats of termination)" and "did not recall ever hearing a racist remark during her employment"); *Nkemakolam v. Northside Indep. Sch. Dist.*, No. 5:15-CV-99-DAE, 2015 WL 3651546, at *5 (W.D. Tex. June 11, 2015) (holding that plaintiff did not adequately allege harassment based on race where plaintiff argued only that similarly situated non-class members were not subjected to same treatment).

"Fifth Circuit precedent makes it clear that subjective belief of racial motivation cannot import racial animus into an individual's conduct, and, without objective evidence, is insufficient to create a *prima facie* claim for a hostile work environment . . . ." *Montgomery v. Sears Roebuck & Co.*, 720 F.Supp.2d 738, 745 (W.D. La. 2010). Here, Plaintiffs have failed to meet their burden of presenting objective evidence that creates a genuine factual issue as to a racial basis for the alleged harassment in this case. Accordingly, summary judgment is appropriate.

### b. Harassment affecting a term, condition, or privilege of employment

Even if the Court could infer that the alleged harassment was based on Plaintiffs' race, however, any such harassment did not affect a term, condition, or privilege of Plaintiffs' employment. The fourth prong of a hostile work environment claim requires a showing that the harassment was severe or pervasive. *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). In this regard, Plaintiffs must show that the alleged harassment was either severe or pervasive; they need not prove both. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive. *Harris*, 510 U.S. at 21–22. To determine whether the work environment was objectively offensive, courts consider the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id.* at 23.

Plaintiffs' allegations are generally vague about the frequency with which the alleged harassment occurred. Some alleged conduct, like forcing Black employees to sit in the room with the cameras and monitoring break times, appears to have happened daily. Other challenged actions, like managers prohibiting Black employees from wearing their native dress or demoting Black employees, were isolated incidents. Viewing the facts in the light most favorable to Plaintiffs, the Court finds that the frequency of the alleged conduct weighs slightly in Plaintiffs' favor.

The Court finds that the alleged harassment suffered by Plaintiffs was not objectively severe. "[T]he required showing of severity of seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (5th Cir. 1991). But even considering the frequency of some of the alleged conduct, the Court finds it insufficiently severe to be actionable. For instance, many of Plaintiffs' allegations amount simply to complaints that they were required to adhere to workplace rules while others were not. While this treatment likely was frustrating, no reasonable jury could conclude that it was severe. *See Harrison v. Mayorkas*, No. 21-161, 2021 WL 5907713, at *8 (E.D. La. Dec. 14, 2021) ("[H]eightened scrutiny of work performance and compliance with the work rules generally are not the type of harassment that can support a hostile environment claim."). Similarly, grouping Black employees together and putting them in a room or rooms with cameras in them is not sufficiently severe. Only one plaintiff, Vicks, testified that the cameras were actually used, and even then, the Court finds that his testimony that Silat would call into the room if he saw on the

camera that someone was not at their desk does not reflect objectively severe harassment.

The Court finds that the remaining incidents—such as certain Plaintiffs being told not to wear their native dress, being asked to clean up after others, being denied training, being denied overtime, and being passed over for promotions—are insufficiently severe, even when considered holistically. *See, e.g.*, *Montgomery-Smith v. George*, 810 F.App'x 252, 259–60 (5th Cir. 2020) (finding denials of promotions, laughing and glaring, and isolation and ostracism to be insufficiently severe to support a hostile work environment claim); *Aguirre v. Valerus Field Sols., L.P.*, No. H-15-3722, 2019 WL 2570069, at *9 (S.D. Tex. Jan. 23, 2019) (finding conduct insufficiently severe as a matter of law where, among other things, plaintiff was given an overload of job duties, denied requests for assistance and additional compensation, and promised promotions that she never received).

In sum, the level of harassment that has been found severe enough to support a finding of hostile work environment is "simply in a different league of severity" than that alleged by Plaintiffs. *Hernandez v. Rush Enters., Inc.*, No. 4:19-cv-638, 2020 WL 7396508, at *5 (E.D. Tex. Dec. 17, 2020) (citing *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Hale v. Tex. Dep't of Crim. Just.*, No. 7:18-CV-097-M-BQ, 2019 WL 7500593, at *6 (N.D. Tex. Dec. 3, 2019), *report and recommendation adopted*, No. 7:18-CV-097-M, 2020 WL 95653 (N.D. Tex. Jan. 8, 2020); *Pfau v. Mnuchin*, 1:18-CV-422-RP, 2019 WL 2124673, at *4 (W.D. Tex. May 15, 2019)). Therefore, the Court finds that this element weighs against Plaintiffs.

Third, Plaintiffs produced no evidence of physically threatening conduct, and very little evidence of objectively humiliating conduct. Price testified that, during his second period of employment with Glow, he was forced to chauffer other employees around. (Dkt. #77-34 at 14–16). This incident might be humiliating, but Price provides no explanation for his subjective belief that it was based on his race. Other evidence, like certain Plaintiffs' testimony that they were asked to do dishes, lack supporting factors to show that Plaintiffs found it humiliating and/or that a reasonable person would find it humiliating. Finally, other statements, like Walker's testimony that managers "would . . . embarrass you any chance they get," (Dkt. #77-39 ¶ 6), are too conclusory to qualify as competent summary judgment evidence. This element also weighs against Plaintiffs.

Finally, Plaintiffs did not provide sufficient evidence that the alleged harassment interfered with their work performance. Yarbrough, Green, Price, Samuels, and Ashiru adduced no evidence that their work performance was impacted. Vicks and Aigheyisi testified to experiencing anxiety and insomnia, but these issues appear to have begun after their employment with Glow concluded, and neither testified that the issues impacted their work performance. (Dkt. #77-27 at 22–23); (Dkt. #77-36 at 7). Aigheyisi also testified that Silat intentionally gave certain people "bad sites or bad information" so they could be written up, but he provided no information about who this happened to and did not allege that he was ever disciplined for this reason or that his work otherwise suffered as a result. (Dkt. #77-27 at 6–7). Paul Tijani testified that he had to work overtime to complete his assignments, (Dkt. #77-32 at 10–11), but stated that he was never given work

that he could not complete. (Dkt. #68-1 at 116). Similarly, Walker stated that Black employees had to work overtime to complete extra work but never claimed that the alleged harassment interfered with his job performance. (Dkt. #77-39 ¶ 22). Walker further stated that it was "difficult" to communicate with Field Techs without using personal cell phones, but he did not testify that his job performance was actually, much less unreasonably, hindered. (Dkt. #77-39 ¶ 4). Pringle testified that password changes and access updates were not communicated to him, and that it could take him thirty minutes to an hour to figure out what was happening, but he did not testify that this unreasonably interfered with his ability to do his job. (Dkt. #77-38 at 4).

Brown, Peter Tijani, and Ologban produced some evidence of interference with their work performance. Brown testified that he had stomach aches and headaches at work, but it is unclear if these ailments interfered with his ability to work. Peter Tijani testified that he suffered depression, anxiety, and insomnia and that Silat gave him the wrong sites to work on; yet he also stated that he was always able to complete his job. Finally, Ologban testified that Silat rushed him through his work and gave him extra work and that he had to mentally prepare to deal with the toxic environment at Glow, but he too testified that he could always get his work done. Because the challenged conduct did not "unreasonably interfere[]" with Plaintiffs' work performance, the fourth element weighs against Plaintiffs. *Cain v. Blackwell*, 246 F.3d 758, 760 (5th Cir. 2001) (quotation omitted).

Considering the totality of the circumstances, the Court concludes that Plaintiffs have failed to present sufficient evidence to create a genuine issue of material fact regarding whether the alleged harassment was severe or pervasive such

that it affected a term, condition, or privilege of Plaintiffs' employment. Accordingly, the Court grants Glow's summary-judgment motion as to the claims for hostile work environment.

### ii. Discriminatory and retaliatory termination

To establish a prima facie case of race discrimination or retaliation, a plaintiff must show, among other things, that he or she suffered an adverse employment action. *Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021); *Hague v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 560 F.App'x 328, 333 (5th Cir. 2014). Glow argues that it is entitled to summary judgment on (1) the race discrimination claims brought by Green, Vicks, Samuels, Price, and Ologban and (2) the retaliation claim brought by Samuels because they were not constructively discharged. Without a constructive discharge, Glow argues, these individuals did not suffer any adverse employment actions.

"Constructive discharge requires a greater degree of harassment than required by a hostile environment claim." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). For this reason, the Fifth Circuit has repeatedly dismissed constructive discharge claims after determining that the plaintiff could not recover under a hostile work environment theory. *See, e.g.*, *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 195 n.7 (5th Cir. 1996). However, the Fifth Circuit has also held that "a plaintiff may be constructively discharged if the employer gives the employee an ultimatum to quit or be fired." *Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014). Because Plaintiffs cannot recover under a hostile work environment theory and because the ultimatums that certain Plaintiffs claim they were given are

insufficient, the Court finds that Green, Vicks, Samuels, and Ologban have failed to demonstrate a factual issue as to constructive discharge. With respect to Price's 2018 resignation from Glow, the Court similarly finds that Price has failed to demonstrate a factual issue as to constructive discharge. However, because Price is not relying on a theory of constructive discharge with respect to his 2019 termination, the Court finds that a factual issue remains with respect to that termination.

Green and Ologban argue only that they were constructively terminated due to intolerable working conditions, and Samuels argues that he was constructively terminated either due to intolerable working conditions or because Glow gave him an ultimatum. Because the Court finds that Green, Ologban, and Samuels cannot survive summary judgment on their hostile work environment claims, the Court also finds that their constructive discharge claims based on intolerable working conditions must fail.[5]

Neither Vicks nor Samuels can survive summary judgment on their claims that they were constructively discharged when Glow issued each of them an ultimatum. Both Vicks and Samuels were working a second job at Samsung when they resigned from their positions with Glow. Vicks testified that Glow gave him an ultimatum: resign from Samsung or be fired. (Dkt. #77-41 ¶ 2). Similarly, Samuels testified that Pauddar told him that he had to "make a choice" between Samsung and Glow. (Dkt. #77-35 at 9). Both Vicks and Samuels chose to quit Glow and continue on

---

[5] Even if the failure of their hostile work environment claims did not doom their constructive discharge-based claims, the Court finds that Green, Ologban, and Samuels have not otherwise demonstrated "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Vallecillo v. U.S. Dep't of Housing & Urban Dev.*, 155 F.App'x 764, 768 (5th Cir. 2005) (quotation omitted).

at Samsung instead. Thus, based on their own allegations, Vicks and Samuels quit Glow because Glow did not permit them to hold two jobs at the same time. This is not the type of "quit or be fired" ultimatum that has been found to establish constructive discharge. *Perret*, 770 F.3d at 338; *see also Ricks v. Friends of WWOZ, Inc.*, No. 18-9767, 2019 WL 4671582, at *8 (E.D. La. Sept. 25, 2019) (collecting cases). Rather, Vicks and Samuels were given the option of quitting their jobs at Samsung and retaining their jobs at Glow or keeping their jobs at Samsung and losing their jobs at Glow. This is not the type of ultimatum that supports a constructive discharge claim. Therefore, Vicks's and Samuels's own testimony affirmatively negates any argument that they were constructively discharged.

Price worked for Glow two separate times. In their summary-judgment briefing, Plaintiffs address only Price's second discharge from Glow. Because Plaintiffs do not contest Price's resignation from Glow in July 2018, the Court grants Glow's summary-judgment motion as to this resignation. Price worked for Glow again in 2019. The parties do not dispute that he was terminated from this second position. *See* (Dkt. #77-34 at 16 ("I might have been released at the end of July [or] in the middle of August.")); (Dkt. #77 at 28 ("Eventually, Defendants fired Mr. Price a second time.")); (Dkt. #80 at 8 n.4 ("As Price was terminated from that position, Price has no constructive discharge claim arising from [his second] stint of employment.")). Because Price is not relying on a constructive-discharge theory with respect to his second termination from Glow, and because a termination constitutes an adverse employment action, the Court denies Glow's summary-judgment motion as to Price's

2019 termination. *See Foster v. Tex. Health Sys.*, No. 3:99-CV-1217-L, 2002 WL 1461737, at *8 (N.D. Tex. June 30, 2002).

For the foregoing reasons, the Court concludes that Green, Vicks, Samuels, and Ologban have failed to provide evidence sufficient to establish a genuine issue of material fact as to whether they were constructively discharged. Therefore, Glow is entitled to summary judgment on the race discrimination claims brought by Green, Vicks, Samuels, and Ologban and on the retaliation claim brought by Samuels. The Court finds that Price failed to provide evidence sufficient to establish a genuine issue of material fact as to whether he was constructively discharged from Glow in 2018. However, because Price was terminated from Glow in 2019 and does not contend he was constructively discharged at that time, Glow is not entitled to summary judgment on Price's claim for race discrimination in connection with his 2019 termination.

## IV. CONCLUSION

For the foregoing reasons, Glow's Motion for Partial Summary Judgment, (Dkt. #68), is **GRANTED in part and DENIED in part**. All claims asserted by Green, Vicks, Samuels, and Ologban are **DISMISSED WITH PREJUDICE.** In addition, the hostile work environment claims asserted by Yarbrough, Walker, Brown, Ashiru, Peter Tijani, Paul Tijani, Price, Pringle, and Aigheyisi are **DISMISSED WITH PREJUDICE.** Finally, the Court grants summary judgment with respect to Price's race discrimination claim to the extent it is predicated on his 2018 resignation, but denies summary judgment with respect to Price's race discrimination claim to the extent it is predicated on his 2019 termination from Glow.

**So ORDERED and SIGNED this 2nd day of February, 2022.**

_____

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE