**United States District Court**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JOSHUA YARBROUGH, | § | |
| and MATT LOFLAND,    ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | Civil Action 4:19-cv-905 |
| | § | |
| vs. | § | **JURY DEMANDED** |
| | § | |
| CSS CORP., and | § | |
| GLOW NETWORKS, INC., | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFFS' RESPONSE TO MOTIONS FOR JUDGMENT**
**AS A MATTER OF LAW, FOR NEW TIRAL, OR FOR REMITTITUR**

TO THE HONORABLE SEAN D. JORDAN:

Respectfully submitted,

/s/ *Brian P. Sanford*
Brian P. Sanford
Texas Bar No. 17630700
bsanford@sanfordfirm.com
Elizabeth "BB" Sanford
Texas Bar No. 24100618
esanford@sanfordfirm.com

**THE SANFORD FIRM**
1910 Pacific Ave., Suite 15400
Dallas, TX 75201
Ph:  (214) 717-6653
Fax: (214) 919-0113

**ATTORNEYS FOR PLAINTIFFS**

<u>TABLE OF CONTENTS</u>

<u>Pages</u>

TABLE OF AUTHORITIES.................................................................................. vii

SUMMARY ........................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I. Motion for Judgment as a Matter of law.......................................................... 2

   A.  The Civil Rights Act of 1866 ...................................................................... 2

   B.  Standard of Review....................................................................................... 2

   C.  Applying the Standard .................................................................................. 3

   D.  McDonnell Douglas Evidence Is Sufficient ................................................ 3

   E.  The But-For Standard .................................................................................... 4

   F.  Direct Evidence ............................................................................................ 5

   G.  Indirect Evidence.......................................................................................... 6

       1.  The Prima Facie Case ............................................................................ 6

             a.  Matt Lofland ..................................................................................... 7

             b.  Joshua Yarbrough............................................................................. 7

             c.  Paul Tijani ......................................................................................... 7

             d.  Peter Tijani ....................................................................................... 8

             e.  William Aigheyisi ............................................................................ 8

             f.  Joshua Walker .................................................................................. 8

             g.  Michael Brown ................................................................................. 9

             h.  Adawale Ashiru................................................................................ 9

      i.  Brandon Price ........................................................................ 9

      j.  Harom Pringle......................................................................... 9

2.  Pretext .............................................................................................. 10

     a.  Disparate Treatment............................................................. 10

     b.  Lack of Investigation ........................................................... 10

     c.  Weaknesses, Implausibility, Inconsistencies, Incoherencies, and
         Contradictions ....................................................................11

     d.  Subjective Criteria .............................................................. 12

     e.  Failure to Follow Policies ....................................................13

     f.  Proof of Pretext May be Shown When Evidence
        is Viewed in its Totality .......................................................13

3.  General Evidence of Pretext ........................................................... 14

     a.  Defendant's Alleged "Legitimate Reasons" for
        Camera Installation are Pretext for Discrimination
        and Retaliation ................................................................... 14

     b.  Defendant's Continued Gas Lighting about Plaintiffs'
        Beliefs is Pretext for Discrimination and Retaliation............................ 16

     c.  Actions Speak Louder Than Words ......................................17

     d.  Defendant Enforced its Policies Differently on
        Black Employees versus Non-Black Employees .................................... 18

4.  Specific Evidence of Pretext ........................................................... 18

     a.  Matt Lofland ....................................................................... 18

     b.  Joshua Yarbrough................................................................ 21

     c.  Peter and Paul Tijani........................................................... 23

      d.   William Aigheyisi ...................................................................... 25

      e.   Joshua Walker ........................................................................... 27

      f.   Michael Brown ........................................................................... 29

      g.   Adawale Ashiru ........................................................................ 30

      h.   Brandon Price ............................................................................31

      i.   Harom Pringle ........................................................................... 32

   5.  Totality of Circumstance ................................................................ 33

II. Response to Motion for New Trial .................................................................. 33

  A.  The Jury Verdict Was Not Against the Great
      Weight of the Evidence ..................................................................... 33

  B.  The Verdict Was Not the Result of Unfair Passion or Prejudice ........................... 34

  C.  Identical Compensation Awards Were Not Excessive ............................................. 35

  D.  Evidence of Mental Anguish ................................................................. 36

   1.  Matt Lofland ............................................................................. 36

   2.  Joshua Yarbrough......................................................................... 37

   3.  Peter and Paul Tijani .................................................................... 38

   4.  William Aigheyisi ........................................................................ 41

   5.  Joshua Walker ........................................................................... 42

   6.  Michael Brown ........................................................................... 43

   7.  Adawale Ashiru ........................................................................... 43

   8.  Brandon Price............................................................................. 44

9. Harom Pringle ................................................................. 44

III. Remittur ........................................................................... 45

A. Maximun Recovery Rule – Compensatory Damages ............................. 45

1. Wide Discretion to Decide.............................................. 45

2. Inapplicable if Unique Facts ........................................ 46

3. The Case is Unique .................................................... 46

4. If Not Unique ......................................................... 47

a. Closely Related to Personal Injury Damages ........................ 47

1. Examples of Personal Injury Damages................................. 47

2. Calculation if Personal Injury Awards are Applicable ........................... 48

b. Employment Cases Generally................................. 48

1. Examples of Damages in Employment Cases ........................ 48

2. Calculation if Damages in Employment Cases
Generally are Considered ................................. 49

c. Fifth Circuit Employment Cases ................................. 49

1. Examples of Damages in Fifth Circuit................................. 49

d. Inflation................................................................. 50

e. Limited Calculation ................................................ 50

B. Punitive Damages ................................................................. 50

1. Reprehensibility or Culpability ................................. 52

2. The Relationship Between the Penalty and the Harm................................. 52

3. The Sanctions Imposed in Other Cases for Comparable

Misconduct ...................................................................................................... 52

CERTIFICATE OF SERVICE .......................................................................... 54

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Adams v. Ethyl Corp.*,
    838 F. App'x 822 (5th Cir. 2020) ................................................................. 47

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200(1995) ...................................................................................... 34

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................................... 2

*Andrews v. City of Philadelphia*,
    895 F.2d 1469 (3d Cir. 1990) ....................................................................... 13

*Baker v. Bd. of Regents of State of Kan.*,
    991 F.2d 628 (10th Cir. 1993) ...................................................................... 35

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ...................................................................................... 51

*Boehms v. Crowell*,
    139 F.3d 452 (5th Cir. 1998) ........................................................................ 13

*Bostock v. Clayton Cnty., Georgia*,
    140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020) ................................................... 4

*Bray v. Marriott Hotels*,
    110 F.3d 986 (3rd Cir. 1997) ....................................................................... 13

*Brunnemann v. Terra Int'l, Inc.*,
    975 F.2d 175 (5th Cir. 1992) ........................................................................ 34

*CBOCS W., Inc. v. Humphries*,
    553 U.S. 442 (2008) ...................................................................................... 2

*Chance v. Bd. of Examiners & Bd. of Ed. of City of New York*,
    534 F.2d 993 ................................................................................................. 34

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*,
 532 U.S. 424 (2001) ...................................................................................51

*Crawford v. W. Elec. Co., Inc.*,
 614 F.2d 1300 (5th Cir. 1980) .................................................................. 12

*Danville v. Reg'l Lab Corp.*,
 292 F.3d 1246 (10th Cir. 2002) .................................................................11

*Diaz v. Tesla, Inc.*,
 No. 3:17-CV-06748-WHO, 2022 WL 1105075 (N.D. Cal. Apr. 13, 2022) ........ 48, 49, 53

*Dotson v. City of Indianola, Miss.*,
 739 F.2d 1022 (5th Cir. 1984) .................................................................. 34

*Douglass v. Delta Air Lines, Inc.*,
 897 F.2d 1336 (5th Cir. 1990).......................................................... 45, 46, 47

*E.E.O.C. v. Chevron Phillips Chemical Co., LP*,
 570 F.3d 606 (5th Cir. 2009) ................................................................... 10

*Edwards v. Aaron Rents, Inc.*,
 482 F. Supp. 2d 803 (W.D. Tex. 2006) ................................................... 50, 53

*Eiland v. Westinghouse Elec. Corp.*,
 58 F.3d 176 (5th Cir. 1995) ...................................................................... 47

*Fonseca v. Sysco Food Services of Arizona, Inc.*,
 374 F.3d 840 (9th Cir. 2004) ..................................................................... 10

*Foradori v. Harris*,
 523 F.3d 477 (5th Cir. 2008) ..................................................................... 46

*Foster v. Univ. of Maryland-E. Shore*,
 787 F.3d 243 (4th Cir. 2015) ....................................................................... 4

*Fuentes v. Perskie*,
 32 F.3d 759 (3rd Cir. 1994) ...................................................................... 14

*Goldstine v. FedEx Freight Inc.*,
 No. C18-1164 MJP, 2021 WL 952354 (W.D. Wash. Mar. 11, 2021)....................... 48, 52

*Goodman v. Lukens Steel Co.*,
  482 U.S. 656 (1987) ................................................................................ 35

*Gorzynski v. JetBlue Airways Corp.*,
  596 F.3d 93 (2d Cir. 2010) ......................................................................11

*Greta L. Anderson v. American Airlines*,
  352 Fed. Appx. 182 (9th Cir. 2009) ....................................................... 49

*Hale v. Wood Grp. PSN, Inc.*,
  769 F. App'x 113 (5th Cir. 2019) ............................................................ 47

*In re Mirant Corp.*,
  03-46590 DML, 2005 WL 6443618 (Bankr. N.D. Tex. Nov. 22, 2005) ...................... 28

*Jiang v. Tex. Comm'n on Envtl. Quality*,
  321 F. Supp. 3d 738 (W.D. Tex. 2018) ..................................................... 4

*Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant*,
  491 F.2d 1364 (5th Cir. 1974) ................................................................ 34

*Johnson v. Offshore Express, Inc.*,
  845 F.2d 1347 (5th Cir.) ........................................................................ 46

*Johnson v. PRIDE Indus., Inc.*,
  7 F.4th 392 (5th Cir. 2021) ............................................................. 6, 45

*Johnson v. Ry. Exp. Agency, Inc.*,
  421 U.S. 454 (1975) ................................................................................ 2

*Kingston v. Int'l Bus. Machines Corp.*,
  No. C19-1488 MJP, 2021 WL 2662216 (W.D. Wash. June 29, 2021) ................... 48

*Lebron v. United States*,
  279 F.3d 321 (5th Cir. 2002) ........................................................... 46, 47

*Lewis v. Pugh*,
  289 F. App'x 767 (5th Cir. 2008) .............................................................51

*Lindsey v. Bio-Med. Applications of Louisiana, L.L.C.*,
  9 F.4th 317 (5th Cir. 2021) ....................................................... 10, 12, 13

*Long v. Eastfield Coll.*,
    88 F.3d 300 ................................................................................................ 4

*Martin v. Toledo Cardiology Consultants, Inc.*,
    548 F.3d 405 (6th Cir. 2008) .................................................................... 11

*Mayberry v. United States*,
    151 F.3d 855 (8th Cir. 1998) .................................................................... 35

*Medina v. Ramsey Steel Co., Inc.*,
    238 F.3d 674 (5th Cir. 2001) .................................................................... 12

*Migis v. Pearle Vision, Inc.*,
    135 F.3d 1041 (5th Cir. 1998) .................................................................. 36

*Monroe v. Columbia Coll. Chicago*,
    990 F.3d 1098 (7th Cir. 2021) .................................................................. 35

*Oden v. Oktibbeha County, Miss.*,
    246 F.3d 458 (5th Cir. 2001) .................................................................... 36

*Owens v. Circassia Pharms., Inc.*,
    33 F.4th 814 (5th Cir. 2022) .................................................................... 10

*Palasota v. Haggar Clothing Co.*,
    499 F.3d 474 (5th Cir. 2007), order clarified ................................... 12

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
    212 F.3d 493 (9th Cir. 2000) .................................................................... 49

*Puga v. RCX Sols., Inc.*,
    922 F.3d 285 (5th Cir. 2019) .............................................................. 45, 50

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000) ..................................................................... passim

*Reilly v. TXU Corp.*,
    271 F. App'x 375 (5th Cir. 2008) .............................................................. 5

*Russell v. McKinney Hosp. Venture*,
    235 F.3d 219 (5th Cir. 2000) .................................................................... 13

x

*Salinas v. O'Neill*,
    286 F.3d 827 (5th Cir. 2002) ........................................................................ 45

*Serrano-Cruz v. DFI Puerto Rico, Inc.*,
    109 F.3d 23 (1st Cir.1997) ........................................................................ 14

*Shager v. Upjohn Co.*,
    913 F.2d 398 (7th Cir.1990) ...................................................................... 14

*Smith v. Bd. of Supervisors of S. Univ.*,
    656 F. App'x 30 ............................................................................................ 4

*Smith v. City of Seven Points, Tex.*,
    608 F. Supp. 458 (E.D. Tex. 1985) ............................................................ 50

*Smith v. Lowe's Home Centers, Inc.*,
    No. CIV.SA-03-CA-1118-XR, 2005 WL 1902544 (W.D. Tex. Aug. 10, 2005) ....... 49, 50

*Stacks v. Southwestern Bell Yellow Pages, Inc.*,
    27 F.3d 1316 (8th Cir.1994) ...................................................................... 14

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408  (2003) .................................................................................. 51

*Stennett v. Tupelo Pub. Sch. Dist.*,
    619 Fed. Appx. 310 (5th Cir. 2015) ...................................................... 10, 11

*Steward v. Sears Roebuck & Co.*,
    231 Fed. Appx. 201 (3rd Cir. 2007) .......................................................... 14

*Stroud v. BMC Software, Inc.*,
    No. 07-20779, 2008 WL 2325639 (5th Cir. June 6, 2008) ............................ 6
*Swanson v. Gen. Servs. Admin.*,
    110 F.3d 1180 (5th Cir.1997) ...................................................................... 6

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) .................................................................................. 12

*Tisdale v. Federal Exp. Corp.*,
    415 F.3d 516 (6th Cir. 2005) .................................................................... 11

*Trujillo v. PacifiCorp*,
    524 F.3d 1149 (10th Cir. 2008) ........................................................11

*Tuli v. Brigham & Women's Hosp.*,
    656 F.3d 33 (lst Cir. 2011) ........................................................ 48

*United States v. Burke*,
    504 U.S. 229 ........................................................ 35

*Vaughn v. Woodforest Bank*,
    665 F.3d 632 (5th Cir. 2011) ........................................................ 6

*Vogler v. Blackmore*,
    352 F.3d 150 (5th Cir. 2003) ........................................................ 50

*Watkins v. Tregre*,
    997 F.3d 275 (5th Cir. 2021) ........................................................ 6, 12

*Watson v. Department of Rehabilitation*,
    212 Cal.App.3d 1271 (1989) ........................................................ 49

*Watson v. Norton*,
    10 Fed. Appx. 669, 2001 WL 290081 (10th Cir. 2001) ................................ 14
*Wheat v. United States*,
    860 F.2d 1256 (5th Cir.1988) ........................................................ 45, 46, 47

*Wood v. Trustees of Indiana Univ.*,
    2006 WL 1072776 (S.D. Ind. Apr. 20, 2006) ........................................ 28

*Young v. United Parcel Serv., Inc.*,
    135 S. Ct. 1338 (2015) ........................................................ 14

**Statutes**

42 U.S.C. § 1981 ........................................................ 2

**Rules**

Fed. R. Civ. P. 50 ........................................................ 2, 3

**Other Authorities**

9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed.1995) ... 3

**United States District Court**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JOSHUA YARBROUGH, | § | |
| and MATT LOFLAND, et. al., | § | |
| | § | |
| | § | Civil Action 4:19-cv-905 |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | **JURY DEMANDED** |
| | § | |
| CSS CORP., and | § | |
| GLOW NETWORKS, INC., | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFFS' RESPONSE TO MOTIONS FOR JUDGMENT**
**AS A MATTER OF LAW, FOR NEW TIRAL, OR FOR REMITTITUR**

TO THE HONORABLE SEAN D. JORDAN:

Plaintiffs respond to the Motion to Judgment as a Matter of Law; or, in the Alternative, Motion for New Trial; or, in the Alternative, Motion For Remittitur (Dkt. #150) filed by Defendant Glow Networks, Inc. The motions should be denied or limited in scope.

**Summary**

Sufficient evidence supports the jury's verdict. Plaintiffs provided direct and indirect evidence of discrimination. The evidence was sufficient to justify the jury's verdict and the Court's judgment. Neither a new trial nor a remittitur are needed. If a remitter is needed, it should be limited.

**Argument**

## I.    Motion for Judgment as a Matter of Law

### A.    The Civil Rights Act of 1866

The Civil Rights Act of 1866, 42 U.S.C. § 1981, made it unlawful to discriminate in employment because of race and to retaliate against employees who report or oppose discrimination. *See Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). During the trial, the Court twice denied oral motions by respondent for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, and the case went to the jury. 1855:3-8; 2365:4-8.[1]

### B.    Standard of Review

In entertaining a motion for judgment as a matter of law, the Court should review all of the evidence in the record. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). In doing so, the Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id. (quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).  Thus, although the Court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves*, at 151. That is, the Court should give credence to the

---

[1] Numbered cites separated by colons are to page and line of the trial transcript.

-2-

evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (*quoting* 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed.1995).

### C.    Applying the Standard

Applying this standard, Defendant is not entitled to a judgment as a matter of law. In this case, in addition to establishing a prima facie case of discrimination and retaliation and creating a jury issue as to the falsity of Defendant's explanation, Plaintiffs introduced additional evidence that Defendant was motivated by race-based animus by virtue of evidence that Defendant's human resource manager stated, "Don't lay off any white people." Pl. Ex. 11.

### D.    McDonnell Douglas Evidence Is Sufficient

Each of the plaintiffs provided evidence of a prima facie case and evidence that the reason given for the adverse action was not credible. The Supreme Court explained in *Reeves* that evidence of the McDonnell Douglas standard at trial is sufficient to deny a Rule 50 motion. *See Reeves,* at 147. The Supreme Court stated, "[A]lthough the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* (quoting *St Mary's Honor* and *Burdine* (citations omitted). "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find

that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id* at 148. Evidence of pretext combined with the prima facie case is enough to permit a factfinder to find discrimination. *See id.*

### E.    The But-For Standard

Showing the prima facie case and that the reason for the adverse action by the employer is not credible usually satisfies the but-for causation standard. *See Smith v. Bd. of Supervisors of S. Univ.*, 656 F. App'x 30, 33 n. 4 (5th Cir. 2016) (Discussing but-for satisfied by the third step of McDonnell Douglas); *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (But-for causation standard does not demand anything beyond what is already required by the *McDonnell Douglas* "real reason" standard); *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n. 4 (5th Cir. 1996) (prima facie case does not resolve the ultimate but-for cause required by final process). The Court, following the Fifth Circuit Pattern Jury Instructions informed the jury that but-for causation was required for proving discrimination and retaliation and that if they disbelieved the reason given by Defendant for the adverse action, they may find proof of discrimination or retaliation. (Dkt. #116).

The Supreme Court recently explained that but-for cause is not sole cause; events have multiple but-for causes. *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739, 207 L. Ed. 2d 218 (2020). Congress did not even require discrimination or retaliation to be the primary cause when it prohibited the behavior. *See id.* Under this standard, disproving one of the employer's reasons is enough. *See Jiang v. Tex. Comm'n on Envtl. Quality*, 321 F. Supp. 3d 738, 747 (W.D. Tex. 2018) ("A reasonable jury could conclude that Defendants

were not being truthful about some of their stated reasons for terminating Jiang, infer from that conclusion that the other stated reasons are also untrue, and then further infer from the totality of the evidence that the true reason was discriminatory."). *See also* Robert S. Mantel, "Pretext After Bostock—Disproving One of the Employer's Reasons is Enough," 28 Wash. & Lee J. Civ. Rts. & Soc. Just. 65, 68 (2022).

### F.    Direct Evidence

Direct evidence is evidence, which if believed, proves the fact in question without inference or presumption. *Reilly v. TXU Corp.*, 271 F. App'x 375, 379 (5th Cir. 2008). For a remark to constitute direct evidence of racial discrimination, the statement must be (1) related to the protected class of persons of which the plaintiff is a member, (2) proximate in time to the employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue.

Plaintiffs presented evidence that the HR Manager instructed the manager making layoff decisions, "Don't lay off any white people." Pl. Ex. 11; 364:2-7. The remark is related to the protected class of persons of which the plaintiff is a member – not white, proximate in time to the employment decision – during the layoff process, made by an individual with authority over the employment decision at issue – the Senior HR Manager and Defendant's highest ranking HR professional in the U.S., and is employment decision at issue – layoffs.

### G.   Indirect Evidence

### 1.   The Prima Facie Case

To show a prima facie case for race discrimination the plaintiff shows: 1) he belongs to a protected group; 2) he was qualified for her position; 3) he suffered an adverse employment action; and 4) he was replaced by someone outside of his protected group or a similarly situated employee outside of his protected group was treated more favorably. *See Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021); *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011).

To establish a prima facie case of discrimination based on a failure-to-promote theory, a plaintiff must show that (1) he is a member of a protected class; (2) he sought and was qualified for a position for which applicants were being sought; (3) he was rejected for the position; and (4) the employer either (a) hired a person outside of the plaintiff's protected class, or (b) continued to seek applicants with the plaintiff's qualifications. *Johnson v. PRIDE Indus., Inc.,* 7 F.4th 392, 406 (5th Cir. 2021).

The prima facie case for retaliation is that (1) he engaged in an activity protected; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 407–08 (5th Cir. 2021). A causal link in the prima facie case can be shown by the short proximity of time between the protected activity and the adverse employment action. *See Swanson v. Gen. Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir.1997); *Stroud v.*

*BMC Software, Inc.*, No. 07-20779, 2008 WL 2325639, at *5 (5th Cir. June 6, 2008). Each of the Plaintiffs presented evidence on the prima facie case.

### a.    Matt Lofland

■ Protected Class/Made complaint: 354:19-355:4; 362:2-10; 391:15-17; 428:23-429:7; 352:9-13; 359:14-362:1

■ Qualified: 382:1-3;385:22-386:9, 18-23

■ Adverse Action: 354:19-355:2; 356:16-359:1; 3686-24

■ Persons not complaining did not receive adverse action: 2456:19-2457-10; 352:15-354:1; 365:18-367:7; Pl. Ex. 11

### b.    Joshua Yarbrough

■ Black: 350:15-16; 2320:15-16

■ Qualified: 588:4-11; 589:2-5; 592:18-19

■ Adverse action; demoted. 365:18-23; 464:1-16; 356:16-359:1 367:18-21

■ Persons who were not Black did not receive adverse action. 365:19-366:1, 13-17; 589:2-590:17; 2456:19-2457-10; 347:16-349:12; 363:2-365:3; 423:3-20; 340:3-12; 352:15-354:1; Pl. Ex. 11 11; 1035:16-18.

### c.    Paul Tijani

■ Protected Class/Black: 2312:20-21; 2320: 24-2321:2; 855:8-10

■ Complaint: 812:6-814:15

■ Qualified: 588:4-11; 589:2-5; 792:1-794:17

■ Adverse Action (Terminated): 794:18-814:15; 810:19-811:3

■ Persons not Black did not receive adverse action: 589:2-590:17; 347:16-349:12; 363:2-365:3; 423:3-20; 340:3-12; Pl. Ex. 11; 1035:16-18

### d.    Peter Tijani

■    Protected Class/Black: 991:23-992:2

■    Complaint:  941:13-942:8;  945:25-946:22;  950:2-963:6;  967:6-985:5

■    Qualified: 588:4-11; 589:2-5; 926:22-928:11

■    Adverse Action (Terminated): 963:24-967:5; 984:16-990:24

■    Persons not Black did not receive adverse action: 589:2-590:17; 347:16-349:12; 363:2-365:3; 423:3-20; 340:3-12; Pl. Ex. 11; 934:25-936:2; 939:22-941:12; 1035:16-18

### e.    William Aigheyisi

■    Protected Class/Black: 346:18; 2312:18-19; 1130:2-5

■    Complaint: 1185:18-21; 1220:3-14; 1223:12-1224:21

■    Qualified: 588:4-11; 589:2-5; 1130:8-1131:16

■    Adverse  Action:  (Termination)  1132:2-6;  1222:6-8;  1179:8-1181:4; 1185:18-21; 1210:13-20; 1225:10

■    Persons not Black did not receive adverse action: 589:2-590:17; 347:16-349:12;  363:2-365:3;  423:3-20;  340:3-12;  Pl.  Ex.  11; 1035:16-18; 1185:18-1190:24; Pl. Ex. 10

### f.    Joshua Walker

■    Protected Class/Black: 2321:13-14; 744:3-4

■    Qualified: 586:23-587:1;  588:4-11;  589:2-5;  354:10-18;  742:14-743:8; 760:15-761:20

■    Adverse Action (Failure to Promote): 352:15-353:21; 354:10-18; 744:5-746:13; 765:14-17; 768:22-769:5

■    Persons  not  Black  did  not  receive  adverse  action:  353:17-21; 589:2-590:17; 347:16-349:12; 363:2-365:3; 423:3-20; 340:3-12; Pl. Ex.  11;  1035:16-18;  744:5-746:13;  747:15-750:17;  752:21-753:9; 753:15-755:2; 759:1-765:8

**g.     Michael Brown**

- Protected Class/Black: 1472:25-1473:1

- Qualified: 588:4-11; 589:2-5; 1469:2-1470:1; 1471:5-18; 1497:8-9

- Adverse Action: (Termination) 1494:4-1496:9; 1498:17-19

- Persons not Black did not receive adverse action: 589:2-590:17; 347:16-349:12; 363:2-365:3; 423:3-20; 340:3-12; Pl. Ex. 11; 1035:16-18; 1473:2-1487:19; 1490:11-1494:3; 1496:7-1497:9; 1551:15-1553:10

**h.     Adewale Ashiru**

- Protected Class/Black: 2322:9-12; 1386:16-19; 1391:11; 1410:2-6

- Qualified: 588:4-11; 589:2-5; 1387:5-1388:4; 1409:16-1410:1

- Adverse Action: (Termination) 1388:5-13; 1404:2-1406:14; 1412:6-11

- Persons not Black did not receive adverse action: 589:2-590:17; 347:16-349:12; 363:2-365:3; 423:3-20; 340:3-12; Pl. Ex. 11; 1035:16-18; 1390:19-1398:22; 1410:2-13

**i.     Brandon Price**

- Protected Class/Black: 1825:13-15

- Qualified: 588:4-11; 589:2-5; 1818:5-1819:13; 1821:4-18

- Adverse Action(Termination): 1827:16-21

- Persons not Black did not receive adverse action: 589:2-590:17; 347:16-349:12; 363:2-365:3; 423:3-20; 340:3-12; Pl. Ex. 11; 1035:16-18; 1821:9-1824:24; 1825:13-1827:14; 1828:25-1829:10

**j.     Harom Pringle**

- Protected Class/Black: 1626:15

- Qualified: 588:4-11; 589:2-5; 1537:16-1539:9; 1553:23-2554:2

- ■ Adverse Action (Termination): 1540:15-24; 1553:11-22; 1626:5-15

- ■ Persons not Black did not receive adverse action: 589:2-590:17; 347:16-349:12; 363:2-365:3; 423:3-20; 340:3-12; Pl. Ex. 11; 1035:16-18; 1540:15-24; 1542:14-1550:14; 1551:15-1553:10; 1590:2-1591:20

The prima facie case raises a presumption and inference of discrimination or retaliation. *See Reeves*, at 143; *Lindsey v. Bio-Med. Applications of Louisiana, L.L.C.*, 9 F.4th 317, 324 (5th Cir. 2021).

## 2.   Pretext

Pretext may be shown in a variety of ways.

### a.  Disparate Treatment

The Fifth Circuit has "recognized that one method of creating a genuine issue as to pretext is by presenting evidence showing disparate treatment." *Stennett v. Tupelo Pub. Sch. Dist.*, 619 Fed. Appx. 310, 317 (5th Cir. 2015) (citations omitted).

### b.  Lack of Investigation

An employer's investigatory choices might, depending on the facts of a particular case, be suspicious in a way that renders the "defendant's explanation ... unworthy of credence" and permits an inference of discrimination. *Owens v. Circassia Pharms., Inc.,* 33 F.4th 814, 828–29 (5th Cir. 2022) (*citing Reeves*, 530 U.S. at 147). *See also E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 624-625 (5th Cir. 2009) (no attempt to check the accuracy of incorrect assumptions)*; Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) (argument that employer's reason was ridiculous was

supported by lack of investigation). *See also Pruitt v. Dallas Indep. Sch. Dist.*, No. 3-04-CV-0554, at p. 12 (N.D. Tex. Apr. 21, 2006) ("The failure to investigate this discrepancy, contrary to established policy, is some evidence of pretext.").

The failure to interview key witnesses is relevant. *See* e.g., *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 108 (2d Cir. 2010) (ADEA); *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 414-15 (6th Cir. 2008) (Title VII retaliation case); *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1159 (10th Cir. 2008) (ADA case); *Tisdale v. Federal Exp. Corp.*, 415 F.3d 516, 529-30 (6th Cir. 2005) (Title VII case).

### c. Weaknesses, Implausibilities, Inconsistencies, Incoherencies, and Contradictions

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence that the employer did not act for the asserted non-discriminatory reasons." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (internal quotation marks and citation omitted). "If a plaintiff produces sufficient evidence to create a genuine issue as to the falsity of the employer's proffered hiring rationale, then *Reeves* further instructs that this evidence may, together with the plaintiff's *prima facie* case, permit a fact finder to infer that discrimination was the true reason behind the employer's decision." *Stennett*, at 317 (*citing Reeves*, 530 U.S. at 148). Any evidence that casts doubt on the employer's assertion is in play, and a fact dispute exists so long as the plaintiff's evidence "is of such quality and

weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. *Lindsey v. Bio-Med. Applications of Louisiana, L.L.C.*, 9 F.4th 317, 325–26 (5th Cir. 2021) (quoting *Watkins v. Tregre*, 997 F.3d 275, 284-83 (5th Cir. 2021).

### d.  Subjective Criteria

Subjective criteria is inappropriate for the employer's explanation. *See Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001). One reason for not allowing subjective reasons is "to prevent the judge from making credibility determinations in the summary judgment context." *Id.* Deciding the appropriateness of using measures that is "in the eye of the beholder" is "the trier-of-fact's duty to determine." *Id.* at 682. *See also Crawford v. W. Elec. Co., Inc.,* 614 F.2d 1300, 1315 (5th Cir. 1980). Another reason is to allow a plaintiff a fair opportunity to rebut the alleged reasons. The defendant must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981) ("The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions"). Additionally, because it is possible for an employer to discriminate without doing so willfully, a jury was entitled to reject the employer's claim that it "believed" the plaintiff had committed the conduct it relied upon. *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 481 (5th Cir. 2007), order clarified (Sept. 27, 2007) (ADEA case) (rejecting excuse that employer "believed" plaintiff voluntarily resigned).

### e.  Failure to Follow Policies

The failure of an employer to follow its policies in the matter is evidence of pretext. *See Lindsey v. Bio-Med. Applications of Louisiana, L.L.C.*, 9 F.4th 317, 326 (5th Cir. 2021) (employer's failure to follow its own progressive discipline policy); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 224 (5th Cir. 2000) (reversing JMOL in part because of pretext evidence that employer had not followed its progressive discipline policies) (ADEA); *Boehms v. Crowell*, 139 F.3d 452, 459 (5th Cir. 1998) (ADEA).

### f.  Proof of Pretext May be Shown When Evidence is Viewed in Its Totality.

Plaintiffs have presented multiple forms of evidence of pretext, which viewed individually suffice for a factfinder to find pretext. However, the evidence is stronger when viewed as a whole. Evidence of discrimination must be considered in light of the totality of the circumstances. *See Bray v. Marriott Hotels*, 110 F.3d 986 (3rd Cir. 1997) (*citing Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")). "A plaintiff is not required to 'cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a

factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.'" *Steward v. Sears Roebuck & Co.*, 231 Fed. Appx. 201 (3rd Cir. 2007) (*citing Fuentes v. Perskie*, 32 F.3d 759, 764 n.7 (3rd Cir. 1994)). Common sense comes into play, as well. "Of course, when an employer claims to have made a decision for a reason that does not seem to make sense, a factfinder *may* infer that the employer's asserted reason for its action is a pretext for unlawful discrimination. *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1356 (2015) (Alito, J., concurring). A company cannot use correction requirements or standards as a means to set up a person to fail to cover for discrimination or retaliation. *See, e.g., Watson v. Norton*, 10 Fed. Appx. 669, 2001 WL 290081 (10th Cir. 2001); *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 26 (1st Cir.1997); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1325-26 (8th Cir.1994); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990).

### 3. General Evidence of Pretext

#### a. Defendant's Alleged "Legitimate Reasons" for Camera Installation are Pretext for Discrimination and Retaliation

Defendant twists Yarbrough's testimony when it states that Yarbrough testified Glow's Surveillance Policy for installing cameras in the office are legitimate business reasons. Def. brief at pg. 12. Yarbrough stated that Defendant's Video Surveillance Policy expresses legitimate business reasons for an employer *if* that was the real reason Defendant installed the cameras. 544:4-19. The cameras were not installed to promote the safety of all

employees as the policy suggests. The cameras were not placed in every room; therefore, Defendant was unable to monitor all employees. 544:20-25. Aside from placing one camera in a manager's office, the cameras were only placed in the front two rooms where the Black employees were systematically moved. 340:13-17; 341:8-13; 342:10-343:20; 508:25-509:3; 544:20-545:2; 453:13-15; 1186:1121; 1396:9-12; 1481:1-7; 1544:5-17.

Conflicting testimony also exists about Defendant's purported reasons for installing the cameras. The policy states that the cameras were installed for safety purposes. Def. Ex. 24. Lofland testified that the Defendant indicated that the cameras were installed to monitor employees for disciplinary purposes, to which Lofland objected because if that were true then the cameras should be in every room not just the front two rooms. 396:517. Cahoon stated that although she does not remember when the cameras were installed, they were installed for various reasons: to monitor employees taking breaks, leaving early, or employees being "very dramatic." 710:10-25. Walker understood Defendant's alleged reason for installing the cameras was to monitor employees clocking in on time. 752:21-753:9. He thought that was an excuse for the real reason; Defendant utilized a fingerprint clock-in-and-out machine, negating any need for a camera. 752:21-753:9. Yarbrough heard the same excuse about needing the cameras to monitor Black employees to make sure they were not leaving early. 453:13-20. But that reason proved false because the employee's fingerprint would report when the employee left. 453:13-20.

Defendant's shifting explanations for installing cameras casts doubt on its alleged "legitimate reasons" and supports the plaintiffs' claim that Defendant's reasons are

pretext for the real reason: the cameras were installed to further monitor the Black employees who were systematically placed in the front two rooms, while not monitoring non-Black employees or assigning non-Black employees to the front two rooms.

### b. Defendant's Continued Gas Lighting about Plaintiffs' Beliefs is Pretext for Discrimination and Retaliation

Defendant states that Yarbrough did not testify that Black employees were subjected to any discipline, adverse employment action, or otherwise being treated less favorably, merely that it was his belief or perception of an array of concerns about Black employees. Def. brief at pg. 12. This is not true. Yarbrough was an eyewitness to the treatment of Black workers at Defendant's facility. His testimony about the discrimination is based on his personal observations, what he saw and heard, and what he experienced. 447:13-17. He supports his testimony with numerous specific examples, including adverse employment actions: African American employees being moved to the front rooms; cameras installed in those front rooms only; Black employees not allowed the same breaks or length of breaks as non-Black employees; Black employees were not allowed to have their feet on the desk while non-Black employees could; Black employees had a dress code while non-Black employees did not; Black African employees could not wear their traditional dress while Asian employees could; Defendant's cell phone policy was not enforced equally between Black and non-Black employees; Black employees being denied promotions; and HR telling management not to lay off any white employees. 447:13-456:11. Black employees even came

-16-

together to start a petition to protest the unequal and unfair treatment of Black employees as compared to non-Black employees. 456:12-457:7.

Aigheyisi testified that the Defendant would not listen to him and that it tried to make him feel like his feelings or experiences were not valid. 1231:1-18. The Defendant tried to make him feel like he was making the discrimination and retaliation up. 1231:1-18. At first he questioned himself because the Defendant kept ignoring him and not believing him, but Aigheyisi finally recognized the gas-lighting. 1220:3-14; 1231:1-18. Nobody listened to the Black employees when they complained. 813:4.

### c.   Actions Speak Louder Than Words

Defendant implies that because the Plaintiffs heard no derogatory remarks towards them, that no discrimination could have occurred. That is misleading. The Plaintiffs experienced the discrimination daily. 458:16-459:1; 1547:15-16. Paul Tijani testified that the Asian employees would laugh at the Black employees or go quiet as the Black employees walked by. 890:22-891:15. Pringle knows from his personal experience that someone does not need to use racial slurs to treat you differently because of race. 1556:17-1557:22. Aigheyisi said it best when he said "you don't have to call me a "n*gger" before I know your actions" show unequal and unfair treatment. 1231:12-18. As the saying goes, "actions speak louder than words."

### d. Defendant Enforced its Policies Differently on Black Employees versus Non-Black Employees

The Defendant enforced its policies differently on Black employees over Asian or white employees. 745:4-14. The Defendant implemented a policy to not use personal cell phones on the job, but only enforced that policy on Black employees. 745:10-747:18. 749:22-750:17. The Defendant would allow non-Black employees to read on the job during downtime, but not Black employees. 748:1-749:21. Black employees were not allowed to choose which room to work in; they were assigned to the front rooms. 750:12-751:20. Black employees were watched on cameras, while non-Black employees were not. 751:21-753:24. The policy on being late was not enforced equally. 759:1-760:17. Although the Defendant had a sign-up list for those who wanted to work overtime, Black employees were consistently denied overtime opportunities. 759:1-760:17; 1478:1-25; 1548:14-1549:17. Black employees could not take as long of breaks as non-Black employees. 764:9-19.

### 4.   Specific Evidence of Pretext

### a.  Matt Lofland

Lofland confronted Sandeep Pauddar about Black employee not being promoted while non-Black employees were being promoted, specifically Joshua Walker and Sterling Vicks. 351:9-354:18. Once Lofland complained to Pauddar about the unequal promoting, Pauddar and Mohammad Silat began to exclude Lofland from meetings. 354:19-355:2.

Lofland was aware of the petition that Black employees were starting because of the unfair treatment by Defendant. 355:8-357:9. Lofland was concerned that these Black

employees would be retaliated against and terminated if they continued the petition. 355:8-357:9. Lofland went to Pauddar about the petition and Pauddar told Lofland that anyone who participates in the petition or protest "will be fired on the spot." 355:8-357:9. Pauddar continued, stating that he will speak to Debbie Cahoon, head of HR, and "every single one of them will be fired on the spot." 355:8-357:9. Defendant began treating Lofland more unfairly after this. 355:8-357:9.

Lofland spoke up and confronted Silat about the unequal treatment. 345:3-12. For example, Lofland saw and reported that Defendant's policies were not being enforced equally among Black employees and non-Black employees. 345:3-12.

Lofland confronted Pauddar about another issue: treating Yarbrough unequally and unfairly and targeting him. 357:10-358:19. Pauddar told Lofland to stop bringing up Yarbrough and promotions of other employees, who were Black. 357:10-358:19.

Defendant argues that Lofland never made a complaint of discrimination to management. Def. brief at pg. 23. That is not true. First, Defendant spoke of layoffs based on seniority, but then terminated a senior Black employee before a non-Black employee who only worked for Defendant for one month. 359:14-361:7. Lofland confronted Pauddar about the unequal treatment. 359:14-361:7. Lofland also complained to HR about the unequal treatment with the layoffs. 359:14-361:7. While the company eventually brought that Black employee back to work, it is evidence of discrimination.

Lofland saw so many red flags of discrimination and retaliation that he recorded one of his confrontations with management. 361:11-12. He recorded the conversation because

-19-

every time he brought up unfair treatment of Black employees versus non-Black employees, nothing was changing. 361:11-12. He could tell that his job was on the line due to his previous complaints. 361:11-12. Lofland asked Pauddar if there is anything they could do about HR and the unfair treatment. 361:1-362:10. Lofland saw that the Defendant had a pattern of firing anyone who complained in writing to HR. 361:1-362:10. He was scared for his job. 361:1-362:10. Pl. Ex. 11.

In that recorded conversation, the manager Pauddar (Asian) stated that HR Manager Debbie Cahoon (white) told Pauddar, "don't lay off any white people." Pl. Ex. 11. 364:2-7. The Defendant company was evaluating its employees based on performance and Pauddar noticed that most of the low performers were Black and most of the high performers were Indian. 363:2-365:3. Black employees being consistently low performers and Asian employees being always on top was not consistent with the truth. 363:2-365:3. When Pauddar confronts Cahoon about the alleged performance evaluation, which he believed was racist, Cahoon tells him to not layoff any white people "in the meantime." 363:2-365:3. Lofland opposed this statement and told Pauddar that it was racist. Pl. Ex. 11. After this conversation, Lofland saw the writing on the wall. 365:9. Shortly after that, Lofland was asked to train Karen Montalbo, his future replacement, his Quality Assurance job responsibilities and demoted to a position lower than his starting position. 365:18-368:19.

This is direct evidence, of retaliation because Lofland complained about the racist comments after reporting unfair treatment of Black employees.

### b.  Joshua Yarbrough

Defendant claims that its alleged legitimate, non-discriminatory reasons for demoting Yarbrough was because the project was winding down and it needed Yarbrough to do the lower-level, Tier 1 work (two positions lower than his current position and one position lower than the position for which he was originally hired), and cited to testimony by Sandeep Pauddar. Def. brief at 25; 2009:5-24; 468:2-10. This is pretext for discrimination.

First, Pauddar did not demote Yarbrough until Yarbrough complained about the unfair treatment of Black employees. Yarbrough participated in a petition with other Black employees to confront Defendant about the unfair treatment of Black employees. 461:18-462:4. While Yarbrough denies participating in the petition when he is originally confronted by Pauddar, he is confident that Pauddar knew of his involvement because Lofland shares that Pauddar said he would never forgive Yarbrough (for participating in the petition). 462:5-18. Yarbrough also confronted Pauddar about the unequal treatment of Black employees. 455:12-456:11. Defendant's claim that Yarbrough "never once complained" is simply not true. Def. brief at pg. 26. Pauddar even admits at trial that he remembers Yarbrough coming to him and expressing a concern how the layoffs were being decided and disproportionately impacting Black employees as opposed to employees of other races. 2006:3-12. Yarbrough was demoted after his complaint to Pauddar about the unequal treatment of Black employees and after Yarbrough participated in the petition. 461:23-462:18.

Defendant argues that because the project was winding down, Yarbrough was needed to do Tier 1 work and it "needed its most experienced employees…to work [the remaining complex cites]." Def. brief at pg. 26. Notably, Defendant never gave this reason to Yarbrough at the time Defendant demoted Yarbrough. Defendant did not give any reason at all why it demoted Yarbrough when it demoted him. 468:3-6. It is only at trial Plaintiffs learn this newly alleged non-discriminatory reason that he was needed to work the more complex cites or that Montalbo absorbed Yarbrough's duties and converted them into a report generation role. Def. brief at 26. 2009:5-13.

Defendant gave Yarbrough's position to Karen Montalbo, who Defendant admits is not Black and may be partially Asian. Def. brief at 26; 463:6-18; 2012:18. Defendant admits that Montalbo was trained for Yarbrough and Lofland's Quality Assurance job duties, yet then states that Montalbo did not do anything with the QA team, that Mohmmad Silat (the then-boyfriend and now-husband of Montalbo) can remember. 2304:5-15; 2267:20-2268:11. Defendant claims Yarbrough only speculates that Montalbo took over his QA responsibilities because he stopped working for Defendant the same day he was demoted and could not know about the state of his former job duties after he left. Def. brief at p. 26. This is not true, and Yarbrough does not speculate. At the same time that Pauddar demotes Yarbrough to Tier 1, Pauddar tells Yarbrough that Montalbo will be taking over the QA responsibilities. 465:13-21. It is through the Defendant's own admission that Yarbrough learns of his replacement by a non-Black employee. 465:13-21.

Defendant argues Yarbrough was never written up, disciplined on the job, and no cross words were spoken to him, and there is no evidence to infer discriminatory animus towards Yarbrough. Def. brief at 27. Yarbrough's lack of formal disciplinary action is a credit to his work ethic and good performance. However, Pauddar testifies at trial that he did give oral feedback to Yarbrough multiple times that Yarbrough was not doing enough work. 2011:11-13. Because Yarbrough was promoted, performed well, did not receive any disciplinary action, had no prior warning of an impending demotion because the project winding down, and no reason was given to him at the time of demotion, Yarbrough was surprised when he was abruptly demoted. 465:13-21. Yarbrough also had personal knowledge that HR was intentionally trying to avoid laying off any white employee, because Pauddar told Yarbrough. 455:8-456:11.

### c.  Peter and Paul Tijani

The Defendant discriminated against Peter and Paul Tijani by scrutinizing them more than their non-Black peers, not enforcing their policies equally, increasing the workload for them, giving them wrong site information as a set up for failure, assigning them seats in the front, placing them under cameras, not allowing them to wear their traditional African dress, and humiliating them in front of their other workers. 794:19-818:23; 932:12-1012:8. Defendant attempt to argue that the Tijani brothers were terminated for engaging in in bad conduct and that there is no evidence that the Defendant "did not believe that either Tijani was not doing what led to each of their respective terminations. Def. brief at pg. 34. While it is unclear on the specific conduct Defendant refers to as its

decision to terminate the Tijani brothers, it refers to a photo of one of the Tijani brothers as proof of misconduct without referencing which brother to which it refers. Def. Ex. 46. Indeed, the picture is attached to another worker's termination form, not either of the Tijani brothers and it was not brought up at either of the Tijani's terminations. The fact that the Defendant has a picture of one of the Tijani brothers is further evidence that Defendant systematically discriminated against its Black employees, including moving them to the front rooms and placing them under cameras to be overly scrutinized.

Defendant argues that because management did not know about the Tijanis' EEOC complaint of discrimination, there is no evidence of retaliation because the decision makers were unaware of the complaint. Def. brief at 37. The EEOC complaint was the final of many complaints made by the Tijani brothers. It was not the first. The Tijani brothers were explicit in their dissent to the discrimination and retaliation. The brothers first complained orally to one of their supervisors, Dan Paddock, following the chain of command. 815:2-818:24. When Paddock did nothing, the Tijanis confront Pauddar and Silat about the situation. 815:2-818:24. Nothing changed. In January 2018, the Tijani brothers go to human resources and put their complaints in writing. Pl. Ex. 4; Pl. Ex. 6; Def. Ex. 54; 815:2-818:24. Peter Tijani explains "the humiliation, discrimination and oppression" complaints he made in writing. Pl. Ex. 6. Paul Tijani sends "a formal complaint, observations of workplace discrimination." Pl. Ex. 4. After detailing the specific examples of discrimination, Paul Tijani writes that he felt "very oppressed and humiliated" and Silat threatened him saying "[Silat] is an *sshole and [he] is about to even be more of an *sshole." Pl. Ex. 4. Paul Tijani

-24-

wrote that we was "targeted" and that "[a] lot of discrimination, unfair-treatment and favoritism occurs in the workplace." Pl. Ex. 4. The Tijani brothers could not be clearer about their opposition and reports of discrimination. Peter Tijani testified at trial that working for Defendant felt like slavery. 1005:4-11.

HR never conducted an investigation into these complaints. 829:4-830:2. Paul Tijani repeatedly went to the HR office to follow up on his complaints. 829:4-830:2. Nothing changed. 829:4-830:2. Peter Tijani is terminated less than 30 days from his written complaints and mere days after his continued verbal complaints. 833:21-836:17. Paul Tijani is fired a couple of weeks after Peter Tijani, a little over 30 days from his written complaints and mere days after his continued verbal complaints. 833:21-836:17.

### d.  William Aigheyisi

Defendant argues that Aigheyisi was terminated because he was caught playing Candy Crush on his phone. Def. brief at pg. 38. A jury could find that terminating a person for playing a game on a personal phone during a break is  not reasonable or believable. The Defendant tries to add credibility to its pretextual termination reason by noting that Aigheyisi was on a performance improvement plan and received a verbal warning for sleeping. Def. brief at pg. 39. Aigheyisi's disciplinary action is all directly a result of the discriminatory behavior by Pauddar, Silat, and HR. Aigheyisi was good at his job and completed his job duties even when the Defendant gave more work to him than his non-Black peers and intentionally gave him wrong sites. 1155:8-13. When the Defendant could not find a performance reason to write up Aigheyisi, they turned to alleged unprofessional

behavior. Aigheyisi admitted to playing Candy Crush on his phone one time. 1215:17-1216:16. Most workers experience some downtime during working hours and want to take a brief mental break by playing a fun and mindless game. The Defendant's own policies acknowledge that "employees may have down time between site assignments or while waiting for a field tech to call back." 1140:18-24. Sometimes downtime could last up to three hours. 746:7-13. Non-Black employees were seen playing on their phone, watching movies on their personal devices, taking extended breaks, and sleeping on the job. 1221:4-23; 1171:10-19; 1173:19-1174:5. The Defendant did not punish the non-Black workers for that unprofessional conduct. 1215:17-1216:16; 1221:4-23; 1171:10-19; 1173:19-1174:5. The Defendant chose to only punish its Black workers when and did not enforce its policies equally.

Aigheyisi experienced daily discrimination and then retaliation once he reported it. 1142:25-1152:24; 1219:1-8. Aigheyisi saw that Black employees were retaliated against if they complained. 1148:2-1151:23. Aigheyisi first reported the discriminatory conduct of Pauddar and Silat to Paddock orally, following the chain of command. 1151:1-1152:24. When the Defendant refused to address Aigheyisi's verbal complaints, he wrote a complaint to HR, subject line: "COMPLIANT. THIS IS GETTING OUT OF HAND." Pl. Ex. 10. In that email, Aigheyisi writes that another employee complained of discrimination to Pauddar who, instead of addressing the compliant, refused to take action. Pl. Ex. 10. Aigheyisi wrote that "racial discrimination is a real issue and it needs to be addressed." Pl. Ex. 10. The Defendant does not address the racial discrimination that is ripe within its

company. No investigation was conducted. 1224:4-1227:12. Instead, the same day Aigheyisi writes the complaint, he is fired. 1223:16-22; 1217:15-1227:12; Pl Ex. 10.

### e.  Joshua Walker

Defendant argues that Walker was at most equally qualified to the non-Black employees promoted over Walker. The overwhelming evidence at trial proves that is not true. Walker graduated from Syracuse University with a Bachelor of Science degree in Information Technology. 742:15-24. He has multiple technical certifications. 743:1-3. He had five years of software-IT industry experience before he started working for Defendant. 743:4-8. Walker was excellent at his job, won an award for his job performance, and worked on more sites than other non-Black co-workers. 760:15-764:16. Black and non-Black employees would even come to Walker for help on the job. 760:15-764:16. Walker testified that the employees the Defendant promoted over him were not as good at their job; they did not work as hard as Walker; and at least one did not have a college degree. 760:15-764:16.

Walker began to see and feel the way Defendant treated Black employees differently from non-Black employees a couple of months after he started working for Defendant. 744:25-754:23. Walker heard his manger talk about "these people should be fired," referring to Black employees. 762:1-19.

Walker saw the Defendant retaliate against Black employees who complained, reported, or opposed discrimination. 753:11-755:2; 758:9-760:17. HR and managers were known to retaliate against Black employees who spoke up about the discrimination and

different treatment. 753:11-755:2; 758:9-760:17. The Defendant singled out Walker from others and gave harsher punishments. 753:11-755:2; 758:9-760:17. Walker experienced the same discrimination on a daily basis as his other Black peers. 753:11-755:2; 758:9-25. instead of speaking up and being retaliated against, Walker chose to take it on the chin and get through it as best he could. 765:3-8. This job was Walker's livelihood and he did not want to have move back home to Detroit, which would be the consequence of the Defendant terminating him before he had another job lined up. 765:1-766:8.

The Defendant denied Walker a promotion from Tier 1 to Tier 2. 765:11-13. Defendant's alleged reason for not promoting Walker is that Walker was not ready for to perform complex job sites. 2013-25-2017:13. That reason is not believable. Many of Walker's peers testified as to how qualified, hardworking, and an excellent performer at his job he was, and Lofland recommended to Defendant to promote Walker. 352:15-353:24; 354:11-18; 392:11-14; 454:24-7. Walker also credibly testifies that he was more qualified than the non-Black peers who received the promotion instead of him, although he does state later he is not sure if they were more qualified. 760:15-764:16. 779:18-22. A plaintiff's testimony on the legal definition of "qualification" is not dispositive. *See In re Mirant Corp.*, 03-46590 DML, 2005 WL 6443618, at *6 (Bankr. N.D. Tex. Nov. 22, 2005) (Fact witnesses who have no legal training cannot be expected to understand what facts support a specific legal position.); *Wood v. Trustees of Indiana Univ*., 2006 WL 1072776 at *7 (S.D. Ind. Apr. 20, 2006) ("[Plaintiff] is not an attorney and it is not incumbent upon her at [a] deposition to prove up her case or even to know what evidence supports her case and what

does not. She is there to honestly answer the questions of opposing counsel, who is educated and trained to know what may or may not be supportive evidence and what questions to ask to elicit responses that provide the scope of that evidence.").

The overwhelming majority of evidence, from Walker and his peers, show that Walker was exceedingly more qualified than the non-Black workers who were promoted while he was denied the promotion.

### f.  Michael Brown

Michael Brown unequivocally testified that he was treated differently because of his race. 1473:2-5. He gave examples: his training was deliberately delayed; his laptop was similarly delayed; there was a pecking order where Black employees were at the bottom, below white and Indian employees; his equipment was delayed; his white manager would take weeks before answering Brown; Brown had to beg for overtime opportunities before he was finally allowed; Brown was consistently moved around; Brown was placed under the cameras; Brown received no troubleshooting help from his non-Black peers; and Brown's non-Black peers would take Brown's work equipment; the Defendant tried to prevent Brown from being trained. 1473:2-1491:20 Pringle also witnessed the Defendant delay providing Brown with a laptop to be able to do his job, unlike the non-Black employees. 1551:20-1553:10. Nokia, the Defendant's customer, praised Brown for Brown's good work. 1485:31-491:20.

Brown should have been the last employee to be laid off, but he was not. 1493:6-1498:19. More than one white employee, who were hired after Brown and who Brown

trained, were not terminated. 1493:6-1498:19. The Defendant also should have assigned Brown to the next project with Verizon because Brown had the appropriate skills and experience. 1493:6-1498:19. Pauddar initially confirmed that Brown would be hired on the next project, but he never did. 1495:8-12.

### g.  Adewale Ashiru

Adewale Ashiru is the only plaintiff that the Defendant claims was terminated for performance reasons, due to a handoff of a site from Ashiru to another employee on the subsequent shift. Def. brief at 40; 2349:11-2357:3. During the handoff, the Defendant claimed that Ashiru left without properly informing the field technician or communicating with the new employee. 2215:20-2221:11. That is not true. Ashiru informed the field technician by phone that Ashiru was handing the site off to the next RITC technician, Michael Salbador (white). 2351:12-2352:16. Ashiru's shift ended at 9:00pm, but he was forced to wait another hour before he can hand over the site to Salbador. 2349:11-2357:3. Ashiru followed the proper handoff process. 2349:11-2357:3. Ashiru tried to explain the situation to HR when Silat blamed Ashiru for Salbador not handling the site transition properly, but HR refused to listen – instead HR took his laptop, with the evidence, and terminated his employment without telling Ashiru. 2349:11-2357:3. 1388:5-1389. Ashiru called HR multiple times, using both Defendant's office and HR personal numbers. 1405:1-1406:7. HR never responded or returned his calls or emails. 1405:1-1406:7. Ashiru's termination is clear.

Ashiru testified that he had many experiences at the Irving facility where he was treated differently than his non-Black peers. 1390:19-1391:19. In Ashiru's African culture, the Dashiki is worn on the weekends; therefore, Ashiru only wore his on the weekends. 1392:12-1393:15. The Asian employees wore their native dress daily. 1392:12-1393:15. Silat, one of Ashiru's supervisors, instructed Ashiru to not wear his native dress while allowing the Asian employees to wear their native dress. 1390:19-1391:19. Silat instructed Ashiru to not sit with his other African peers. 1390:19-1391:24. The Defendant did not allow Ashiru to communicate to the field technicians via text message, even though there was a language barrier. 1395:4-1398:8. The Defendant moved Ashiru into the front rooms with the other Black employees. 1395:4-1398:8. The Defendant placed cameras to monitor Ashiru and other Black employees, but not non-Black employees. 1395:4-1398:8. Silat and Pauddar controlled the office and there is testimony that Silat had the power to terminate employees. 1395:4-1398:8; 833:6-8; 882:4-11.

### h.  Brandon Price

Agreeing to perform a job without knowing all the details is no excuse for a company to discriminate. The Defendant was intentionally vague about Brandon Price's new job details even when Price consistently asked. 1821:19-1823:4.

The Defendant also argues that hiring Price, the only Black employee to be rehired, means that they promote diversity. Def. brief at pg. 33; Pl. Ex. 25. The opposite is true. The Defendant fired, demoted, or refused to hire its Black employees and only rehired Asian employees, except for Price. Pl. Ex. 25. Because Price is a large, Black man from the

Compton area, the Defendant felt they could re-hire him to chauffeur two of its international employees, one from Korea and one from India, for a job that Price could do. 1819:11-1831:18. The Defendant argues that it terminated Price because he could no longer perform his job functions. Def. brief at 33. The job duties the Defendant refers to are not being able to afford to drive when because the Defendant would not pay for his gas or help with location fees. 1819:11-1831:18. Price was fully capable of driving; the Defendant does not argue there was a performance issue. 1819:11-1831:18. Defendant's excuse of a terminating Price for a legitimate reason extreme pretext.

### i.  Harom Pringle

Harom Pringle has worked in the wireless communications industry for over 20 years. 1538:23-1539:2. Pringle, like Brown, was hired to mainly work on the day shift because of his many years of experience. 1539:23-25. Even though Pringle did not work on a daily basis under Pauddar and Silat (usually night shift managers), Pringle had ample evidence that he was treated differently than his non-Black peers. 1540:15-1551:12. He witnessed the Defendant's unequal treatment of the Tijani brothers and counseled the Tijani brothers when they needed help. 1540:15-1551:12. The different treatment between Black and non-Black employees caused Pringle to start his own investigation into the matter when HR would not. 1540:15-1551:12. He saw the Defendant assign the Black employees' seats and place them under the cameras. 1544:1-17. Only Indian employee were allowed to be a core group and talk freely and share ideas while the Black employees could not, including Pringle and the Tijani brothers. 1545:22-1548:1. Most importantly, Pringle did

-32-

not have the same access to the tools for his job as his non-Black peers. 1548:1-1550:17. This led to Pringle not being allowed as much overtime opportunities as his non-Black peers. 1548:1-1550:17. The project manager and HR also regularly avoided Pringle because he was asking too many questions about racial discrimination. 1555:2-1557:22.

At the time of Pringle's termination, the Defendant did not give Pringle a reason. 1553:11-22. Pringle was not terminated for performance and never received any disciplinary actions, because his work product was good. 1553:23-1554:16. He was terminated along with two other employees, one of which was an African American. 1553:23-1554:16.

### 5.     Totality of Circumstances

Plaintiffs have provided sufficient evidence of pretext that together with the prima facie case or the totality of the circumstances is enough for a reasonable jury to find discrimination and retaliation against the respective Plaintiffs. Further, Plaintiffs have presented multiple forms of evidence of pretext, which viewed individually suffice for a factfinder to find pretext. However, the evidence is stronger when viewed as a whole.

## II.     Response to Motion for New Trial

### A.     The Jury Verdict Was Not Against the Great Weight of the Evidence.

Plaintiffs presented direct and indirect evidence of discrimination. Direct evidence in the form of Defendant's statement to not lay off the white people. Indirect evidence in the form of the prima facie case together with pretext and additionally, the totality of the circumstances.

**B.      The Verdict Was not the Result of Unfair Passion or Prejudice.**

The Fifth Circuit review the denial of a motion for new trial or motion for remittitur under an abuse of discretion standard. *See Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 177 (5th Cir. 1992). The testimony of an imported caste system did not create unfair passion or prejudice. It is by definition discrimination itself. Discrimination based on race is a cultural matter and is a violation regardless of the culture. Discussing caste systems in discrimination is not uncommon. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 274(1995). (Ginsburg, J., dissenting) (recognizing that the "lingering effects" of discrimination, "reflective of a system of racial caste only recently ended, are evident in our workplaces, markets, and neighborhoods"); *Dotson v. City of Indianola, Miss.*, 739 F.2d 1022, 1027 (5th Cir. 1984) (Wisdom concurring) (This type of discrimination against racial groups is precisely the kind of discrimination prohibited by the Civil War Amendments and the Voting Rights Act. The effect of that discrimination was to continue the historic caste status of blacks.); *Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant*, 491 F.2d 1364, 1373 (5th Cir. 1974) (referring to froze black employees frozen "into a discriminatory caste"); *Chance v. Bd. of Examiners & Bd. of Ed. of City of New York*, 534 F.2d 993, 1001 n. 1 (2d Cir. 1976), opinion modified on reh'g sub nom. *Chance v. Bd. of Examiners & the Bd. of Educ. of the City of New York*, No. 75-7161, 1976 WL 13310 (2d Cir. May 17, 1976).

Aside from evidence of a caste system shown by the hierarchy withing the organization, Plaintiffs presented an abundance of evidence showing disparate treatment

and admission of discrimination in the statement prohibiting the lay of any white people. Defendant has not presented evidence that they jury relied on unfair passion or prejudice.

### C.   Identical Compensation Awards Were Not Excessive.

The Plaintiffs' damages were unique in that they were identical to each other. The damages for emotional distress or mental anguish that attacks the dignity of the core of the meaning of being human: dignity. The Supreme Court recognizes the harm to dignity, noting that monetary damages under anti-discrimination statutes are "necessary to make discrimination victims whole for the terrible injury to their careers, to their mental and emotional health, and to their self-respect and dignity." *United States v. Burke*, 504 U.S. 229, 241 n. 12 (1992) (quoting H.R. Rep. No. 102–40, pt. 2, p. 25 (1991) (Report of Committee on the Judiciary). The Supreme Court also acknowledges that compensation under Title VII includes harm to reputation. Id. at 239. "[R]acial discrimination ... is a fundamental injury to the individual rights of a person." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661 (1987). *See also Monroe v. Columbia Coll. Chicago*, 990 F.3d 1098, 1100 (7th Cir. 2021), reh'g denied (Apr. 12, 2021) ("An injury resulting from discrimination produces impairments and wounds to the rights and dignities of the individual."); *Baker v. Bd. of Regents of State of Kan.,* 991 F.2d 628, 631 (10th Cir. 1993); *Mayberry v. United States*, 151 F.3d 855, 859 (8th Cir. 1998) (discussing tax consequences for dignity losses in an ERISA claim.) The injury to rights and dignity of the Plaintiffs were the same: the disrespect of the person as an equal. The dignity damages were appropriately the same for each individual.

### D.      Evidence of Mental Anguish

Plaintiffs testified to mental anguish, humiliation, pain and suffering, emotional distress, and loss of enjoyment of life, and most importantly, damage to dignity. Experts or corroborating testimony is not required for an award of mental anguish damages. *See Oden v. Oktibbeha County, Miss.*, 246 F.3d 458, 470–471 (5th Cir. 2001); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998). Plaintiffs testified in sufficient detail about the emotional harm.

The Plaintiffs did not ask for lost wages at trial. Many of them proceeded to get better paying jobs, further proof that they were good employees and good at their job. Lost wages are not the real damages to the Plaintiffs. The real damages are the damages to their dignity. The Plaintiffs each had a substantial amount of evidence regarding the damage to their dignity; their testimony and the evidence is legally sufficient to recover the dignity and emotional damages the jury awarded.

### 1.      Matt Lofland

Lofland was forced to delay his wedding due to the demotion and leaving the Defendant's company. 371:5-16. The new company paid less and did not provide any paid time off or sick time. 371:5-16. Lofland was proud of the work he did for the Defendant. 371:21-373:4. When he was demoted several levels below his current position for opposing and reporting race discrimination, Lofland felt as if he had wasted a year of his life. 371:21-373:4. He stood up for what he knew was right and was punished. 371:21-373:4. He became depressed and anxious, taking Lexapro, an anxiety medication. 371:21-373:4.

Lofland made an important point when he said, "you always hear about discrimination and racism, but this was the first time it was in my face." 373:1-2. He thought that if he addressed the issue, the Defendant would change and stop. 373:2-4. Nothing changed. 373:2-4. The Defendant should never have discriminated in the first place and had numerous opportunities to stop and fix the problem; instead, when those like Lofland choose to stand up and do what it right, they were punished. The jury saw the truth in Lofland's testimony and awarded appropriate dignity and emotional distress damages.

### 2. Joshua Yarbrough

Like Lofland, Yarbrough was demoted multiple levels without warning. 465:10-475:12. Yarbrough never saw it coming. 465:18. Initially, Yarbrough had anxiety about the demotion and seemed to initially be in shock. 465:10-475:12. It was hard to believe that the series of events of the way the Defendant systematically treated its Black employees differently from its non-Black employees and it came to a head when Yarbrough told Pauddar that he did not like the way the Defendant was treating its Black employees. When Pauddar demoted Yarbrough, giving his duties to Karen Montalbo (non-Black), Yarbrough could not take it anymore. 465:10-475:12. He had to leave. 465:10-475:12. He was frustrated. 465:10-475:12. He was upset. 465:10-475:12. He has lasting effects and questions the motives of his current employers. 465:10-475:12. Certain events at his current job will trigger memories of the discrimination and retaliation he experienced while working for the Defendant. 465:10-475:12. He was depressed, could not sleep, and still has trouble believing

that "we actually still have to deal with these things [racial discrimination and retaliation] in today's time." 465:10-475:12. The jury agreed.

Yarbrough's wife, Jaquia Drew, corroborated Yarbrough's testimony when she testified to the effects the Defendant's treatment of Yarbrough. Yarbrough was deflated and frustrated. 1725:18-21. He was depressed, stressed, and sad. 1725:18-21. She spoke about how he used to laugh at TV shows and sleep well before working for the Defendant and the demotion. 1726:1-9. After the treatment and demotion, he could not engage in the same way. 1726:1-9. He started to come back to life after he left the Defendant. 1726:1-25. This further supports the jury's compensatory damages awards, the dignity damages, for Yarbrough.

### 3.     Peter and Paul Tijani

Paul Tijani was scared for his job, but knew he had to stand up and try to stop the discrimination and retaliation. 833:1-20. The Defendant humiliated Paul Tijani. 817:9-24. He cried in the bathroom at work. 817:9-24. He had nightmares, felt hopeless, depressed, and anxious while he worked for the Defendant. 817:15-24. He felt hopeless. 817:15-24. The Defendant had "no humanity." 817:15-24. It was new slavery. 1102:7-10. To this day, thinking about the Defendant and the way it treated him makes him want to cry. 836:18-839:24. His wife was pregnant when he was terminated, and his termination made it hard to provide for his family. 836:18-839:24.

Paul Tijani spoke to a counselor but could only afford one visit. 838:6-10. He lives with the trauma today. 838:10. Paul Tijani brought this lawsuit for justice for himself and

the other workers. 836:18-839:24. Paul Tijani made it clear that race discrimination and retaliation should not happen to anyone and "no one should be treated lesser of a human than other people" because of race. 839:3-7.

Peter Tijani testified that the Defendant's treatment was mentally, emotionally, physically, and spiritually bad and draining. 1001:13-1011:24. He could not sleep. 1001:13-1011:24. It felt like going to a war front as he drove to work. 1001:13-1011:24. He had trouble eating. 1004:9-17. He had nightmares. 1004:9-17. Peter Tijani continues to go to counseling because of the effect from Defendant's treatment of him. 1004:18-23. When he was terminated, Tijani tried to leave quickly so that his manager would not see him cry. 1007:2-10. For weeks following his termination, Tijani cried, was hopeless, and felt like everything was over. 1008:12-22. Because the Defendant gas lighted Tijani and did not fix the discrimination after Tijani complained, reported, and opposed it, Tijani began to question himself, his sincerity and hard work. 1009:1-10. He knew he did everything right, but the Defendant made Tijani question his ethics. 1009:1-10.

Peter Tijani was offered another job that paid more than the Defendant. However, when he saw that Pauddar and Silat worked there, Peter Tijani immediately quit. 1009:16-1010:15. It was better emotionally for Peter Tijani to not receive $90,000 per year than to have to experience the same kind of unequal treatment from Pauddar and Silat. 1009:16-1010:15. Pauddar and Silat were not held accountable when they worked for the Defendant; in fact, they were rewarded by having Silat's girlfriend, Karen Montalbo, promoted over Black employees. Conduct rewarded is conduct repeated.

Peter Tijani saw that the Defendant wanted Black employees for cheap labor and then push them out; he had to speak up. 1011:8-19. He was punished for it and carries the mental, physical, emotional, and spiritual effects of it today. 1001:13-1011:24. The Defendant damaged his dignity. 1001:13-1011:24. The jury understood and awarded damages appropriately.

Tunde Oladipupo, former college roommate of Peter and Paul Tijani, testified about impact of the Defendant's treatment on them. 1703:13-1704:6. The Tijani brothers were always happy and cheerful before working for the Defendant. 1704:18-25. After working for the Defendant and being retaliated against, the brothers had mood changes and were depressed. 1705:7-22. They did not go out as much. 1705:7-22. Oladipupo witnessed Paul Tijani crying. 1705:25-1706:10. Oladipupo witnessed how sad Peter Tijani looked. 1706:15-18. Paul Tijani used to organize cookouts, but he does not do that anymore. 1708:11-25.

Abimbola Adeboye is an old college friend of the Tijani brothers and now friend of Aigheyisi. 1713:5-16. Prior to experiencing the discrimination and retaliation from the Defendant, the Tijani brothers were fun to be around. 1714:1. After the discrimination and retaliation, Adeboye noticed that they drink more alcohol and saw Paul Tijani cry for the first time. 1714:14-25.

Peter and Paul Tijani's sister, Esther Tijani, spoke of the lasting effects of their discrimination and retaliation. Prior to the discrimination and retaliation, her brothers were funny people and the life of the party. 1670:3-10. While the Tijani brothers experienced the

discrimination and retaliation from the Defendant, Esther felt as if she lost her brothers; they became different people; and they call Esther and cry on the phone to her. 1670:14-25.

The jury saw the impact of how the Defendant's treatment affected Paul Tijani's dignity and life and awarded the proper damages.

>    4.    **William Aigheyisi**

Aigheyisi's termination, consistent gas lighting, and unequal treatment on a daily basis made him feel worthless, never good enough, and like he was being raped. 1230:3-1231:18. Aigheyisi experience anxiety, describing it as getting pumped up in the moment and attacking. 1232:9-1234:5. The anxiety would build over time and he did not know how to control it or calm down. 1232:9-1234:5. He could not sleep. 1232:9-1234:5. The Defendant's treatment made Aigheyisi feel horrible about himself—like he could not defend himself. He was hopeless and vulnerable. 1232:9-1234:5. It was hard for Aigheyisi to open up and share these intimate details on the witness stand at trial, but he needed to tell the truth and talk about it in front of the jury and Court. 1232:9-1234:5.

Aigheyisi's sister, Uwa Aigheyisi, testified of how she witnessed the Defendant's treatment on her brother. They lived together during the time Aigheyisi worked for the Defendant. 1808:8-15. Uwa noticed changes in Aigheyisi when he worked for the Defendant. 1808:20-1812:7. Usually, Aigheyisi is a happy and bubbly person. 1808:20-1812:7. Uwa noticed that her brother became depressed while working for Defendant. 1808:20-1812:7. He would not open up to his family about his feelings as much. 1808:20-1812:7. He would complain more, lock himself in his room, and not want to talk to anyone.

1808:20-1812:7. He looked exhausted. 1812:5-6. After Aigheyisi was terminated, he was still sad and the loss of income was initially hard, but he did start to seem happier after a while. 1808:20-1812:7. As an example, Uwa testified that she remembers a specific instance when she had to snap her fingers to get Aigheyisi to pay attention to their conversation. 1808:20-1812:7. Uwa Aigheyisi further confirms the damage Aigheyisi suffered to his dignity as well as emotionally and physically. The jury saw the same and awarded the appropriate amount of damages as a consequence.

### 5.   Joshua Walker

The harder Walker worked, the more he was mistreated by Defendant. 766:6-11. He was scared to lose his job, which would mean he would have to go back home in another state, something he very badly did not want to do. 768:3-18. The daily unequal treatment hurt Walker. 768:19-769:13. To be qualified for a promotion and be passed over in favor of non-Black employees was humiliating and made Walker feel hopeless and depressed. 768:19-769:13. He was trapped. 769:4-5. Walker's depression manifested through loss of appetite and trouble sleeping. 769:11-13. Walker testified that is felt surreal to actually experience racial discrimination in the workplace. 769:19-25. It was traumatizing. 769:19-25. It is an experience that will never leave Walker. 769:19-25. Even after working for the Defendant, Walker remembers the discriminatory and retaliatory treatment. 770:1-13. He is now more cautious at work and does not trust the HR department. 770:1-13. Walker now prefers to work from home rather than worrying about being discriminated against because

of his skin color. 771:3-7. The jury awarded damages in proportion to the legally sufficient and trustworthy evidence of Walker's dignity and emotional distress damages.

### 6.      Michael Brown

The Defendant humiliated Brown with its discriminatory treatment. 1499:4-14. The Defendant took away Brown's pride and dignity. 1499:4-14. Thinking about the Defendant's treatment is a trigger, making Brown want to cry. 1499:4-14. He could not eat. 1499:15-50. After his termination, he was depressed and tried to focus and stay busy to not think about the unequal treatment by Defendant. 1500:7-11. Brown was older than many of his peers and had more managerial experience. The Defendant would discriminate against Brown in front of the younger workers, embarrassing him. 1500:7-17. He developed migraines because of the stress and it affected his ulcer. 1500:19-1501:21. The jury heard this legally sufficient evidence and awarded Brown dignity damages in accordance with the evidence.

### 7.      Adewale Ashiru

After termination, Ashiru decided to go back to being a field technician because he developed a phobia of being discriminated against because of the color of his skin. 1411:19-1412:11. In the field, he would not be around as many people, and he could at least feel like he was his own boss. 1411:19-1412:11. The Defendant's treatment of Ashiru made him feel like he was not a person or a human being. 1412:12-25. He was made to feel crazy or less than others who were not Black. 1412:12-25. The gas lighting continued, and no one listened to Ashiru when he tried to oppose his wrongful termination and the lies employees made

about him. 1412:12-25. With his current employer, he is the only employee who keeps the video off on his work zooms. 1413:10-1414:4. He does not want his peers to see that he is Black in case they discriminate against him the same way as the Defendant did. 1413:10-1414:4. He cannot stop thinking about how the Defendant treated him. 1413:10-1414:4. Because it was mostly Indian employees who treated him so horribly, Ashiru is afraid of new Indian people he meets, even though he knows there are good Indian people out there. 1414:19-1415:8. The jury had legally sufficient evidence to make their award for the damages to Ashiru's dignity and emotional distress.

### 8.   Brandon Price

Price is another example of the variety of ways people respond to racial discrimination. While the Tijani brothers had no problem calling a spade a spade when they saw and experience the different treatment because of their skin, Price had trouble talking about race. 1828:6-1831:18. He does not like to talk about race but had to tell the truth on the stand. 1828:6-1831:18. The jury heard the long pause as he had to gather himself before he could testify about such a difficult topic. 1829:4. Price felt used, unappreciated, lied to. 1829:15-16. He was just another tool, hardly counting as a human, to Defendant. 1828:6-1831:18. Given the substantial evidence of how the Defendant treated Price and how it affected his dignity, the jury awarded the appropriate damages.

### 9.   Harom Pringle

Pringle feared being retaliated against and fired. 1554:13-1561:24. He knew his manager was avoiding him. 1554:13-1561:24. It made him uneasy at work. 1554:13-1561:24.

Pringle knows from his personal experience that someone does not need to use racial slurs to treat you differently because of race. 1556:17-1557:22. Pringle is analytical and more stoic than many of the other Plaintiffs, but experienced the same discrimination and retaliation, which affected his dignity. The jury was able to take the context of Pringle's testimony with all of the other evidence presented at trial and award the appropriate damages for dignity for Pringle. *See Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 403-04 (5th Cir. 2021) (noting that a reasonable factfinder can conclude harassment based on race using context-specific factors and totality of the circumstances).

## III.    Remittitur

### A.      Maximum Recovery Rule – Compensatory Damages

The Fifth Circuit uses the "maximum recovery rule" to determine whether an award is excessive. Under the maximum recovery rule, the court will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction. *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 297 (5th Cir. 2019) (internal citations and quotations omitted). The court must "tread with caution on an award made by a jury and upheld by a district court." *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002).

#### 1.      Wide Discretion to Decide

District courts enjoy "wide discretion" in awarding damages. *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1339 (5th Cir. 1990); *Wheat v. United States,* 860 F.2d 1256, 1259 (5th Cir.1988). A trial court's assessment of damages is a finding of fact, which is scrutinized

for excessiveness under the clearly-erroneous standard. Douglass, 897 F.2d at 1339; *Wheat*, 860 F.2d at 1259; *Johnson v. Offshore Express, Inc.,* 845 F.2d 1347, 1356 (5th Cir.), *cert. denied,* 488 U.S. 968 (1988). Under this standard, a court compares damages awarded in factually similar cases, and arising within the controlling jurisdiction, in order to construct an objective framework for comparison. *Id.* Excessive awards that are entirely disproportionate to the injury sustained will not be upheld. *Id.*

### 2.      Inapplicable if Unique Facts

Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited "if unique facts are present that are not reflected within the controlling caselaw." *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002) (quoting *Douglass* at 1339).

### 3.      The Case is Unique

The compensatory damages in this case are unique. First, this is a case of widespread discrimination and retaliation not just involving one individual or incident. The systemic discrimination and retaliation at the company ran deep and was observed by many black employees. It was characterized as "new slavery." The indignity was severe. Second, there are no reported cases in the Fifth Circuit for dignity damages based on race discrimination and retaliation. When a review of the caselaw reveals that there is no factually similar case in the relevant jurisdiction, the maximum recovery rule is not implicated. *Foradori v. Harris*, 523 F.3d 477, 505 (5th Cir. 2008) (maximum recovery rule not applicable if no reported similar cases). he "reassessment of damage awards is not an exact science; rather,

it is inherently subjective, involving the interplay of experience, emotions and calculation." *Wheat, id.* at 1259.

A departure from precedent is merited if unique facts are present that are not reflected within the controlling caselaw. *Id.* at 1260. *Douglass,* at 1339. This is such a case. This verdict is the first case in the jurisdiction for harm to dignity. A distinction should also be made between emotional distress damages awarded under Title VII which has a $300,000 statutory cap and those under Section 1981 which does not. Section 1981 predates Title VII by almost a century.

### 4.    If Not Unique

#### a.    Closely Related to Personal Injury Damages

##### 1.    Examples of Personal Injury Damages

In the event the Court finds that the claims are more closely related to general mental anguish damages, the following are examples of amounts awarded:

> *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 182 (5th Cir. 1995) ($3 million in noneconomic loss, including pain and suffering, disfigurement, and impairment not accounted for in lost wages);

> *Adams v. Ethyl Corp.*, 838 F. App'x 822, 832 (5th Cir. 2020) (General damages in Mesothelioma case. than $3,000,000);

> *Hale v. Wood Grp. PSN, Inc.*, 769 F. App'x 113, 114 (5th Cir. 2019) ($ 2,250,000 in general damages in personal injury case not clearly excessive); and

> *Lebron v. United States,* 279 F.3d 321, 327 (5th Cir. 2002) ($2 million loss of consortium to parents).

### 2.   Calculation If Personal Injury Awards Are Applicable

If the uniqueness of the case is not enough to prevent the implication of the maximum recovery rule, the uniqueness should be enough to relate the damages more to emotional distress related to personal injuries than garden variety emotional distress in employment cases. An amount of $1.5 million in compensatory damages each would be at least closely aligned to the pain and suffering of the Plaintiffs.

### b.   Employment Cases Generally

### 1.   Examples of Damages in Employment Cases

It is true that mental anguish damages awarded under the maximum recovery rule for discrimination cases are much lower than in personal injury cases, especially in the Fifth Circuit.

In other circuits, larger amounts are upheld.

*Goldstine v. FedEx Freight Inc.*, No. C18-1164 MJP, 2021 WL 952354, at *8 (W.D. Wash. Mar. 11, 2021) (award of $1.25 million in emotional distress in a disability case);

*Kingston v. Int'l Bus. Machines Corp.*, No. C19-1488 MJP, 2021 WL 2662216, at *6 (W.D. Wash. June 29, 2021) (six million in emotional distress was upheld in a race discrimination case);

*Diaz v. Tesla, Inc.*, No. 3:17-CV-06748-WHO, 2022 WL 1105075, at *15 (N.D. Cal. Apr. 13, 2022), *motion to certify appeal denied,* No. 17-CV-06748-WHO, 2022 WL 2046827 (N.D. Cal. June 7, 2022) remittitur of $1.5 million on a verdict of $6.9 million in a race discrimination case);

*Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 44-47 (lst Cir. 2011) (Upholding award of $1.6 million dollars in compensatory damages for claims raised under federal law, which has a limit of $300,000 in non-pecuniary compensatory damages, and Massachusetts state law which does not have

such a limit. The plaintiff could not sleep or eat and lost weight, had anxiety, anger, fear and nervousness which resulted in abdominal pain. The plaintiff testified that after years of hard work dedicated to her career, she was reduced to someone who could not function and could not pay her bills. The plaintiff did not present any medical documentation in support of her claims. The Court found no abuse of discretion in the district court's refusal to grant a remittitur in this case.);

*Watson v. Department of Rehabilitation*, 212 Cal.App.3d 1271 (1989) (affirming $1.6 million award for race and age discrimination);

*Greta L. Anderson v. American Airlines*, 352 Fed. Appx. 182 (9th Cir. 2009) (affirming $1,000,000 award of emotional distress damages in employment discrimination case under the California Fair Employment and Housing Act);

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493 (9th Cir. 2000). (affirming $1 million emotional distress award for sexual harassment where plaintiff "worried, cried, and felt trapped and upset," spent less time with her family, suffered stomach problems, rashes and headaches, and sought counseling with her pastor).

## 2. Calculation if Damages in Employment Cases Generally are Considered

An amount of $1.5 million in compensatory damages for each plaintiff would be closely aligned to the remittitur in the Tesla case.

### c. Fifth Circuit Employment Cases

### 1. Examples of Damages in Fifth Circuit

In the Fifth Circuit, the following cases are damages awarded for mental anguish in employment cases:

*Smith v. Lowe's Home Centers, Inc.*, No. CIV.SA-03-CA-1118-XR, 2005 WL 1902544, at *1 (W.D. Tex. Aug. 10, 2005) ($325,000 in a retaliation case for filing a worker's compensation claim – no caps involved)

*Edwards v. Aaron Rents, Inc.*, 482 F. Supp. 2d 803, 816 (W.D. Tex. 2006) ($300,000.00 in a gender discrimination case).

### d.  Inflation

Inflation should be considered. *See Bureau of Labor Statistics's CPI Inflation Calculator*, available at https://data.bls.gov/cgi-bin/cpicalc.pl.; *Puga*, 922 F.3d at 298 n.12 (using this calculator to make inflation adjustments).

### e.  Limited Calculation

If the Court finds that the case must be tied to another compensatory award in an employment case found to be reasonable, the Court has the $325,000 found reasonable in a worker's compensation retaliation case which is sufficiently similar. *See Smith v. Lowe's Home Centers, Inc.,* No. CIV.SA-03-CA-1118-XR, 2005 WL 1902544, at *1 (W.D. Tex. Aug. 10, 2005).  No known multiplier was applied to the case. *Id.* Therefore, a 50 percent multiplier may be added. *Vogler v. Blackmore,* 352 F.3d 150, 157 (5th Cir. 2003). This would place the minimum amount at $487,500 for each Plaintiff. Adjusting for inflation from December, 2019, the date of the Original Complaint, the amount increases to $550,000 for each Plaintiff.

### B.    Punitive Damages

The desire to punish, however, can be a product of reason rather than emotion, and can result from a rational deduction that such action is necessary. *Smith v. City of Seven Points, Tex.*, 608 F. Supp. 458, 465 (E.D. Tex. 1985). "The Supreme Court has articulated three factors that courts should consider in determining whether an award of punitive

damages is constitutionally excessive: (1) the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) the sanctions imposed in other cases for comparable misconduct." *Lewis v. Pugh*, 289 F. App'x 767, 777 (5th Cir. 2008) (citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 434–35 (2001)).

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). The Supreme Court has instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.,* at 576–577, 116 S. Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. *Id.,* at 575, 116 S. Ct. 1589. *See also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

### 1.     Reprehensibility or Culpability

The Defendant actually instructed the decision maker in the layoff process to not lay off white people. This is direct evidence of discriminatory intent. This instruction was made by the Senior Manager of Human Resources who knew that it was against the law. Plaintiffs also presented evidence of repeated false accusations and setting plaintiffs up for failure. The demeaning of black employees was systematic. It devolved terminating each of the black plaintiffs except for one who was recalled to be a chauffeur for engineers rather than continue as an engineer. Defendant callously disregarded the law. The targets of the conduct were vulnerable, fearful of retaliation and having virtually no power to stop the violations. The Defendant's conduct involved repeated actions rather than isolated incidents and the harm is a result of intentional malice, trickery, and deceit; not mere accident. There was evidence that Defendant acted in the face of a perceived risk that its actions would violate federal law.

### 2.     The Relationship Between the Penalty and the Harm.

The penalty awarded by the jury bears a direct relationship to the harm to the Plaintiffs caused by Defendant's conduct. The jury was punishing for race discrimination and retaliation and not for some other tangential reason. The case centered on discrimination and retaliation and only business practices that related to those issues.

### 3.     The sanctions imposed in other cases for comparable misconduct

Punitive damages of $5 million was upheld in a disability discrimination case. *Goldstine v. FedEx Freight Inc.*, No. C18-1164 MJP, 2021 WL 952354, at *8 (W.D. Wash.

Mar. 11, 2021). A jury in North Carolina awarded $10 million in punitive damages in a race discrimination case. *David Duval v. Novant Health, Inc.*, No. 3:19-CV-624-DSC (W.D. N.C.) (case pending). A federal court in California upheld $13.5 million in punitive damages in a race discrimination case. *Diaz v. Tesla, Inc.*, No. 3:17-CV-06748-WHO, 2022 WL 1105075, at *25 (N.D. Cal. Apr. 13, 2022). A federal court in Texas found that found $1 million in punitive damages in a Title VII case supported by the evidence but reduced it according to the statutory cap. *Edwards v. Aaron Rents, Inc.*, 482 F. Supp. 2d 803, 816 (W.D. Tex. 2006).

If the Court considers a remittitur, then a suggested amount is four times the minimum compensatory suggested of $550,000, or $2,200,000 each.

WHEREFORE, Plaintiffs request that the motions be denied or limited in scope.

Respectfully submitted,

/s/ Brian Sanford
Brian Sanford
Texas Bar No. 17630700
bsanford@sanfordfirm.com
Elizabeth "BB" Sanford
Texas Bar No. 24100618
esanford@sanfordfirm.com

THE SANFORD FIRM
1910 Pacific Ave., Suite 15400
Dallas, TX 75201
Ph:  (214) 717-6653
Fax: (214) 919-0113

**ATTORNEYS FOR PLAINTIFFS**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this document has been served via electronic filing on June 28, 2022 to counsel of record.


*/s/  Brian P. Sanford*