UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| JOSHUA YARBROUGH ET AL. § | |
| § | Civil Action 4:19-cv-905-SDJ |
| § | |
| GLOW NETWORKS, INC., § | |

**DEFENDANT GLOW NETWORKS, INC.'S REPLY TO PLAINTIFFS'
RESPONSE TO MOTIONS FOR JUDGMENT AS A MATER OF
LAW, FOR NEW TRIAL, OR FOR REMITTITUR**

Rachel Z. Ullrich
Texas Bar No. 24003234
RUllrich@fordharrison.com
Buena Vista Lyons
Texas Bar No. 00797630
VLyons@fordharrison.com

**FORDHARRISON LLP**
1601 Elm Street, Suite 4450
Dallas, Texas 75201
Telephone: (214) 256-4700
Facsimile: (214) 256-4701

**ATTORNEYS FOR DEFENDANT**

# **TABLE OF CONTENTS**

I.   GLOW NETWORKS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL OF PLAINTIFFS' INDIVIDUAL CLAIMS ................................................................ 1

    A.   Plaintiffs Misunderstand The But For Standard Under *Bostock* ...................................... 1

    B.   No Gas Lighting – Only Facts ............................................................................................ 2

        1.   Plaintiffs' Speculation or Subjective Beliefs Are Not Evidence of Race Discrimination/Retaliation ........................................................................................ 2

        2.   What The Evidence Did Not Show Is Telling ............................................................. 2

        3.   What The Evidence Did Show Tells Even More ........................................................ 4

        4.   "Don't Lay Off White People" is a Red Herring ........................................................ 7

        5.   There Was No Conflicting Testimony From Defendants About Why The Cameras Were Put In. ............................................................................................................... 7

II.  REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR NEW TRIAL ......................... 9

III. REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR REMITTITUR .................. 10

    A.   The Maximum Recovery Rule Mandates Reduction of this Award .............................. 10

    B.   The Punitive Damages Awarded Were Constitutionally Excessive .............................. 13

# **TABLE OF AUTHORITIES**

Cases

*Adams v. Ethyl Corp.*,
  838 F.App'x 822 (5th Cir. 2020) .................................................................................... 11
*Armendariz v. Pinkerton Tobacco Co.*,
  58 F.3d 144 (5th Cir. 1995) ............................................................................................ 2
*Bostock v. Clayton County,*
  140 S.Ct 1731 (2020) ...................................................................................................... 1
*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
  140 S. Ct. 1009 (2020) .................................................................................................... 1
*Diaz v. Tesla, Inc.*,
  No. 3-17-cv-06748-WHO, 2022 WL 1105075 (N.D. Cal. April 12, 2022) ............... 12
*Edwards v. AaronRents, Inc.*,
  482 F.Supp.2d 803 (W.D. Tex. 2006) ......................................................................... 11
*Eiland v. Westinghouse Elec. Corp.*,
  58 F.3d 176 (5th Cir. 1995) .......................................................................................... 11
*Goldstine v. FedEx Freight Inc.*,
  No. C18-1164 MJP, 2021 WL 952354 (W.D. Wash. March 11, 2021) ................... 11
*Greta L. Anderson v. American Airlines*,
  352 Fed.App'x 182 (9th Cir. 2009) ............................................................................. 11
*Hale v. Wood Grp., PSN, Inc.*,
  769 F.App'x 113 (5th Cir. 2019) ................................................................................. 11
*Hitt v. Connell,*
  301 F.3d 240 (5th Cir. 2002) ......................................................................................... 9
*Kingston v. Int'l Bus. Machines Corp.*,
  No. C19-1488 MJP, 2021 WL 2662216 (W.D. Wash. June 29, 2021) .................... 11
*Lebron v. United States*,
  279 F.3d 321 (5th Cir. 2002) ....................................................................................... 11
*Minnis v. Board of Sup'rs of Louisiana State University*,
  620 F. App'x 215 (5th Cir. 2015) .................................................................................. 8
*Owens v. Circassia Pharm. Inc., 33 F.3d 814, 819 (5th Cir. 2022)* ................................ 4
*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
  212 F.3d 493 (9th Cir. 2000) ....................................................................................... 12
*Reeves v. Sanderson Plumbing Prod., Inc.*,
  530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ............................................. 1
*Salinas v. ONeil*,
  286 F.3d 827 (5th Cir. 2002) ....................................................................................... 11
*Sandstad v. CB Richard Ellis, Inc.*,
  309 F.3d 893 (5th Cir. 2002) ......................................................................................... 6
*Smith v. Lowe's Home Centers, Inc.*,
  No. CIV.SA-03-CA-1118-XR, 2005 WL 1902544 (W.D. Tex. Aug. 10, 2005) ....... 11
*Thomas v. Texas Dep't of Crim. Justice*,
  297 F.3d 361, 371-72 (5th Cir. 2002) ........................................................................ 10
*Vasquez v. Nueces Cnty., Tex.*,
  551 Fed. Appx. 91 (5th Cir. 2013) ................................................................................ 2

*Walton v. Bisco Industries, Inc.,*
   119 F3d. 368, (5th Cir. 1997) .................................................................................................. 6

Rules

FRCP Rule 50 ................................................................................................................................ 2

Other Authorities

Appellee, Orvel P. Hale,
   2019 WL 625284 (5th Cir. February 8, 2019) ......................................................................... 11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| JOSHUA YARBROUGH ET AL. § | |
| § | Civil Action 4:19-cv-905-SDJ |
| § | |
| GLOW NETWORKS, INC., § | |

**DEFENDANT GLOW NETWORKS, INC.'S REPLY TO PLAINTIFFS'
RESPONSE TO MOTIONS FOR JUDGMENT AS A MATER OF
LAW, FOR NEW TRIAL, OR FOR REMITTITUR**

TO THE HONORABLE SEAN D. JORDAN:

Defendant, Glow Networks, Inc., files this Reply to Plaintiffs' Response to Motions for Judgement as a Matter of Law, For New Trial, Or for Remittitur and states:

### I. GLOW NETWORKS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL OF PLAINTIFFS' INDIVIDUAL CLAIMS

#### A. Plaintiffs Misunderstand The But For Standard Under *Bostock*

The United States Supreme Court has made clear that the applicable causation standard governing a § 1981 claim is "but for" the employee's race, not race as a motivating factor. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). More recently, in *Bostock v. Clayton County,* 140 S.Ct 1731, 1739 (2020), wherein the Supreme Court held that Title VII's language of "because of sex" included discrimination on the basis of sexual orientation and gender identity, the Supreme Court defined "the 'simple' and 'traditional' standard of but-for causation" as "whenever a particular outcome would not have happened 'but for' the purported cause." While recognizing there may be more than one "but for" cause of something, at no point did the Supreme Court convert the "but for" causation standard to the lesser "motivating factor" standard. Nor did it change the ultimate question which each Plaintiff here had to prove at trial. That is, "whether the employer intentionally discriminated." *Reeves v. Sanderson Plumbing Prod.,*

*Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). As such, even under *Bostock,* each Plaintiff had to prove by a preponderance of the evidence that their race and/or their alleged complaints were a "but for" cause of each alleged adverse employment action. They failed to do so.

    B.    **No Gas Lighting – Only Facts**

        1.    **Plaintiffs' Speculation or Subjective Beliefs Are Not Evidence of Race Discrimination/Retaliation**

When confronted with the facts regarding the complete lack of evidence of race discrimination/retaliation presented at trial, Plaintiffs accuse Defendant of "gas lighting" about Plaintiffs' "*beliefs"*. But there is no gas lighting here. Plaintiffs cannot rely on their own subjective beliefs or speculation (either individually or together) to justify this verdict. *See Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir. 1995) (Reversing jury verdict in light of employer's FRCP Rule 50 motion in age discrimination case where plaintiff only proffered the trial testimony of himself and another employee who subjectively believed the employer had terminated him because of his age); *Vasquez v. Nueces Cnty., Tex.*, 551 Fed. Appx. 91, 94 (5th Cir. 2013) ("subjective belief of a plaintiff is not sufficient to establish a *prima facie* case of discrimination. . . ."). They were required to produce sufficient evidence at trial that would lead a reasonable jury to conclude that Glow Networks intentionally discriminated against them based on their race or that Glow Networks intentionally retaliated against them because of their complaints using either direct or circumstantial evidence. Plaintiffs did not do this.

        2.    **What The Evidence Did Not Show Is Telling**

The evidence was legally insufficient for the jury to find that Glow Networks intentionally discriminated or retaliated against any of the Plaintiffs. The fact remains, at the end of trial there was:

- **NO EVIDENCE** that Glow was discriminatory in the hiring process**.** In fact, it was undisputed that Glow hired a large number of African American/African employees for the RITC project;

- **NO EVIDENCE** that Glow had discriminatory pay practices. There was no evidence that the Tier 1 plaintiffs were paid less than their non-black Tier 1 counterparts or that the Tier 2 plaintiffs were paid less than their Tier 2 counterparts;

- **NO EVIDENCE** of racial slurs, epithets, nooses, cartoons, jokes, graffiti, etc.;

- **NO EVIDENCE** of any physical abuse or assault;

- **NO EVIDENCE** that a single plaintiff was yelled or cursed at (although there was evidence that some plaintiffs yelled at their coworkers and supervisors). In fact, the evidence showed nothing but Glow's managers speaking to Plaintiffs' in a professional manner;

- **NO EVIDENCE** of any name calling or anyone making fun of someone's accent, where they were from, or traditional dress; and

- **NO EVIDENCE** of anyone being denied any leave or time off for the birth of his child. In fact, Plaintiff Ashiru was allowed to take a multi-week leave shortly after he began his employment to care for his father.

While Plaintiffs vaguely testified that unnamed white or Indian employees were treated differently than they were, they presented **NO EVIDENCE** that any Plaintiff or other Black employee was ever written up for any of the break time violations, reading on the job, having their feet on the desk or dress code violations they claim occurred. In fact, most of the Black Plaintiffs (Yarbrough, Walker, Brown, Price, Pringle) suffered no written disciplinary actions whatsoever at any point during their employments with Glow and, of these Black Plaintiffs, only Walker testified that he was even received a verbal coaching. Further, Plaintiffs' individual experiences of alleged discrimination vary wildly. Only the Tijanis and Aigheyisi testified about receiving bad sites. Only certain Plaintiffs claimed they were put in a room with cameras. Only Brown claimed he was discriminatorily denied a laptop and denied overtime. If Black employees were truly being treated so differently regarding break times, ready on the job, etc. because of their race as Plaintiffs claim,

then surely these Black Plaintiffs would have testified about more shared experiences. **There was no such evidence.**

### 3. What The Evidence Did Show Tells Even More

At every turn the evidence disproved that Glow Networks was intentionally discriminating against any of the Plaintiffs when taking any actions related to their employments and the evidence certainly disproved that Glow was acting with malice or reckless indifference towards each Plaintiff's federal protected right to be free from discrimination.

The **EVIDENCE** proved that Glow Networks had in place policies and procedures to prevent and promptly correct discrimination and retaliation in the workplace. Plaintiffs acknowledged they were aware of those policies and some even utilized those policies to complain about workplace issues;

The **EVIDENCE** proved that Glow Networks responded to employee complaints. While the Plaintiffs claim that HR should have done more, "the mere fact that [Glow Networks] did not conduct these investigations as [Plaintiffs] might have preferred is not sufficient to show that the investigations were inadequate." *Owens v. Circassia Pharm. Inc.,* 33 F.3d 814, 819 (5th Cir. 2022).

- ➢ When there was concern about fair implementation of policies, Glow Network put in place the General Guidelines for Employment which laid out what unacceptable in the workplace so everyone was on an even playing field.

- ➢ When Peter Tijani complained Pauddar asked him to clean the kitchen, Pauddar stopped asking him to and cleaned the kitchen himself.

- ➢ When Aigheyisi complained to Paddock about Silat giving him wrong sites, Paddock calmly responded and sat down with Aigheyisi to discuss his concerns and addressed them with Silat.

- ➢ When the Tijani brothers complained they were receiving bad sites, Human Resources spoke to the Tijanis and managers about how sites were assigned and developed a new protocol to reduce the number of site errors.

> ➢ When Aigheyisi complained to Debbie Cahoon about Mohammed Silat the same evening she received a recommendation from Paddock to terminate his employment, Cahoon did not take the supervisors' version of the events at face value. She asked questions about the reasons for the recommendation and pressed them about the evidence supporting the recommendation.

The **EVIDENCE** also proved that <u>Glow Networks had legitimate, non-discriminatory, and documented reasons for terminating the five Plaintiffs who were terminated for cause</u>. The evidence proved Glow Networks took terminating employees seriously and it did not terminate employees for cause without proof of their conduct and only after discussions with Human Resources:

> ➢ Glow Networks terminated Peter Tijani only after a verbal altercation with a field technician. While Peter Tijani denied that he was at fault for the altercation, he did not deny that it took place and that others witnessed it.
>
> ➢ Glow Networks terminated Paul Tijani was terminated only after receiving photographic evidence of him playing Candy Crush in direct violation of new guidelines issued by Glow Networks approximately a week prior. Glow Networks even had a picture of him engaging in that activity. While Plaintiffs argue that this Court should discount the picture because it was not attached to his Exit Interview, it was attached to Aigheyisi's, who was terminated the same day as Paul Tijani for the conduct he engaged in according to that same photo.[1]
>
> ➢ Glow Networks terminated Plaintiff Aigheyisi only after it received photographic evidence of him watching videos on his telephone on the same date Paul Tijani was terminated for another phone policy violation. His termination came shortly after Dan Paddock recommended his termination for his insubordinate behavior towards Silat. Aigheyisi's termination did not occur until after Aigheyisi's performance did not improve despite multiple counselings, including being placed on a performance plan, having a sit down with Dan Paddock and previously being disciplined for admittedly sleeping.
>
> ➢ Glow Networks terminated Plaintiff Ashiru only after it received multiple complaints about his job performance, including a complaint received from Plaintiff Lofland.

---

[1] While Plaintiffs' claim that black employees were routinely disciplined for sleeping on the job, the only one of the 10 Plaintiffs who was disciplined for sleeping on the job was Aigheyisi, and he admitted to the conduct .

DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO MOTIONS FOR JUDGEMENT AS A MATTER OF LAW, FOR NEW TRIAL, OR FOR REMITTITUR – Page 5

- ➢ Glow Networks terminated Plaintiff Price only after he contacted them and told them he was unable to perform the job duties he was assigned any longer.

While these Plaintiffs may disagree that they should have been terminated for these actions, employers are "entitled to be unreasonable" in terminating their employees "so long as [they] do[] not act with discriminatory animus." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).

The **EVIDENCE** proved that Glow Networks <u>rewarded good work</u> regardless of race:

- ➢ Glow Networks promoted Matt Lofland multiple times even after he started making complaints;

- ➢ Glow Networks promoted black employees Joshua Yarbrough, Lee Green and Michael Burge to the Quality Assurance Team;

- ➢ Glow Networks gave Joshua Walker an award for good performance in front of the entire RITC team;

- ➢ Glow Networks gave Joshua Walker a raise to retain him;

- ➢ Glow Networks gave Adawale Ashiru the opportunity to work on a Sprint project which allowed him to get off the night shift and choose whatever shift he wanted.

- ➢ Glow Networks gave Lofland and Yarbrough the opportunity to continue their employments at their Tier 2 rates even though they only had Tier 1 work available for them.

[D]iscrimination laws [are not] vehicles for judicial second-guessing of business decisions." *Walton v. Bisco Industries, Inc.,* 119 F3d. 368, 372, (5th Cir. 1997). While Plaintiff may have presented some evidence that they had a less-than perfect employment experience at Glow Networks "[w]hether the employer's decision was the correct one, or the fair one, or the jury's province to decide." The issue is whether Glow Networks intentionally discriminated and/or retaliated against each of these Plaintiffs. The evidence, even taken in the light most favorable to the Plaintiffs, proved otherwise.

### 4. "Don't Lay Off White People" is a Red Herring

Plaintiffs continue to tout "don't lay off white people" as evidence of direct discrimination. But there was no evidence presented that Glow actually had such a policy. In fact, the layoffs undisputedly contained employees of all races. Further, only two of these 10 Black Plaintiffs were ever subject to layoff – Pringle and Brown – and even Brown survived multiple layoffs before his group finally ran out of funding months after all the other Plaintiffs' employment ended.

Moreover, there was much evidence presented regarding the term of project. It was undisputed that at the time Lofland and Yarbrough was asked to perform Tier 1 duties the project was winding down such that they both knew that their remaining time with Glow Networks would be limited.

### 5. There Was No Conflicting Testimony From Defendants About Why The Cameras Were Put In.

Plaintiffs, confronted with the undeniable evidence at trial that the cameras were placed in rooms where employees of all different races sat and the camera visualized all employees in the room regardless of race, attempt to show pretext by claiming that Defendant presented conflicting testimony regarding the reasons for the cameras. There is no conflict.

Plaintiffs blatantly misstate Glow's video surveillance policy. Def. Ex. 24. In their brief, Plaintiffs argue that because the policy states it is for "safety purposes" and Cahoon testified that there were additional other reasons for the cameras, a conflict of evidence exists. Doc. 171, p. 28. But the policy does not state is was solely for "safety purposes." In fact, the policy plainly sets out, on multiple occasions, the multi-faceted reasons why the cameras were installed:

> In order to enhance security and personal safety within CSS Corp.'s workplace, it has been determined that the use of video surveillance equipment may prevent losses, promote safety and aid in the enforcement of workplace policies.

. . .

<u>Purpose</u> Video surveillance equipment will be installed:

    1.    To assist in efforts to maintain personal safety of employees, visitors and other users of CSS Corp.'s facilities.

    2.    To assist with the application of company policies with regard to company property and the property of others.

    3.    To provide a visual deterrent to crime.

    4.    To increase the likelihood of identification of person(s) who may breach company policies and/or commit crimes.

    5.    To assist in protecting assets within the company facilities.

Def. Ex. 24. With the actual policy language before it, it is easy for the Court to conclude that Debbie Cahoon's trial testimony is entirely consistent:

> Q.    And what was the reason for putting in the cameras?
>
> A.    There were various reasons. We received reports that on the breaks, the meal and rest breaks, the tardiness, the leaving early, there were a few incidences that go very dramatic with the employee standing up face to face with the managers and berating them.
>
> We also had an incident where we had to let somebody go, and they actually ran out of the building with their laptop, which they were supposed to turn in. And our manager had to hunt them down, had to run after them should I say.

(Tr. 710:10-25). That Cahoon's testimony is not an exact replica of the policy is of no consequence as "proof of an employer's reasons becoming more detailed as the dispute moves beyond the initial notice to an employee and enters into adversarial proceedings is insufficient to create a jury question regarding pretext absent an actual inconsistency." *Minnis v. Board of Sup'rs of Louisiana State University*, 620 F. App'x 215, 220 (5th Cir. 2015).

Plaintiffs' argument that using the cameras to monitor employee's clocking in time was false because of the biometric system in place likewise fails to prove pretext. Plaintiff Walker's testimony explains why that argument has no merit:

> Q. And the cameras were located close by to where people – by the biometric system where people swiped, for the better term, in and out; right?
>
> A. Right.
>
> Q. And so if someone missed the biometric system for some reason, or the biometric system malfunctioned, then the cameras would have caught whomever happened to come and go at a particular time; right?
>
> A. Yes.
>
> Q. So that's a legitimate business reasons as to why the cameras would be placed in that front room, right?
>
> A. Right.

(Tr. 777:16-778:2). There was no conflicting testimony for why the cameras were installed.

The evidence was legally insufficient to demonstrate pretext for discrimination or retaliation and, further, the evidence was legal insufficient to prove punitive damages. As such, Defendant's motion for judgment as a matter of law should be granted.

## II. REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR NEW TRIAL

As set forth above and its prior brief, this verdict was against the great weight of the evidence as to each of the individual Plaintiff's individual claims. Plaintiff argue that this Court should ignore the fact that the jury awarded each Plaintiff the exact same damages because they had "approximately the same" "dignity damages." But given the wildly differing testimony each Plaintiff provided regarding any emotional harm they suffered, that clearly was not the case. These individuals had individual claims and had individual experiences at Glow Networks and the jury had to award damages accordingly.

Moreover, Fifth Circuit law is clear – testimony of mental anguish has to be particularized and extensive enough to prove not only that they suffered emotional distress in the past but will continue to experience it in the future as well. *Hitt v. Connell,* 301 F.3d 240, 250–51 (5th Cir.

2002). *See also Thomas v. Texas Dep't of Crim. Justice*, 297 F.3d 361, 371-72 (5th Cir. 2002), (ordering remittitur of future emotional damages because while "[t]he evidence pointed to some ongoing and future emotional distress," it was "nothing as severe as what [the plaintiff] suffered during the retaliatory period"). Plaintiffs provided no expert testimony, provided no medical records and only two testified they sought any type of mental health treatment. There was no evidence presented that they had difficulty finding subsequent employment, had any damages to their careers or relationship or that they suffered even any moderate financial hardship. The damages awarded were excessive and against the great weight of the evidence. Should this Court deny Glow Networks' motion for judgment as a matter of law, it should grant its motion for new trial.

## III.     REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR REMITTITUR

### A.     The Maximum Recovery Rule Mandates Reduction of this Award

There was nothing unique or special about this case. It was a simple, multi-Plaintiff § 1981 case alleging race discrimination and retaliation. There were no unique or novel legal or factual issues here. There were no class claims or complex issues of law. The jury instruction was largely based on the Fifth Circuit Pattern. Each individual Plaintiff had to prove their individual claim(s) just as if this was a single plaintiff case.

Faced with the knowledge that the comparable, published, Fifth Circuit cases cited by Glow dictate award exponentially less that what the jury awarded here, Plaintiffs first argue that this Court should use awards in personal injury cases to determine the maximum recovery. All of these cases, however, involve lasting, serious physical injuries that would impact the plaintiffs in these

cases for the rest of their lives.[2] At trial, there was no evidence any Plaintiff suffered any type of physical injury as a result of their employment with Glow much less a physical injury that would lead to lifelong complications or even death. These cases simply do not compare and should not be used in the maximum recovery rule analysis.

Plaintiffs next argue that this Court should look to other employment cases in other jurisdictions.[3] Even if this Court considered these cases, however, it would find that they do not justify the type of extraordinary damages Plaintiffs received here. The cases Plaintiffs cite had considerable economic damages awarded[4], evidence of lost or damaged careers, evidence of physical ailments, and evidence of how losing income caused the Plaintiff considerable financial hardship.[5] There was nothing close to this type of evidence or damages presented in this 10-day

---

[2] In *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 179 (5th Cir. 1995), the Fifth Circuit affirmed an award of $5 million in an electrical explosion case where the plaintiff required "five weeks of in-patient hospital care and several additional weeks of out-patient care, which included painful debridement procedures and various surgeries." Eiland also "developed extensive keloid scarring, and remains approximately 30% to 40% disabled and badly disfigured." In *Adams v. Ethyl Corp.*, 838 F.App'x 822, 832 (5th Cir. 2020), the plaintiff died after a mesothelioma diagnosis. In *Hale v. Wood Grp., PSN, Inc.*, 769 F.App'x 113, 114 (5th Cir. 2019), the plaintiff fell 8 to 10 feet which resulted in severe injuries, "including permanent injuries to six different vertebral discs in his cervical, thoracic and lumbar spine, which eventually resulted in two past surgeries and a recommendation of future spinal surgery and lifetime pain management." (quotation from Brief of Appellee, Orvel P. Hale, 2019 WL 625284 (5th Cir. February 8, 2019). Plaintiff also cites to *Lebron v. United States*, 279 F.3d 321, 327 (5th Cir. 2002) where the Fifth Circuit reduced a loss of consortium claim to $1 million per parent because a child was born with severe, permanent brain damage due to medical malpractice.

[3] *See Salinas v. ONeil*, 286 F.3d 827, 831 (5th Cir. 2002) (for federal discrimination claims, the relevant jurisdiction for the maximum recovery rule means only those published cases decided by the Fifth Circuit).

[4] The two Texas district court cases Plaintiffs cite likewise had considerable economic damages awarded. *See Smith v. Lowe's Home Centers, Inc.*, No. CIV.SA-03-CA-1118-XR, 2005 WL 1902544 (W.D. Tex. Aug. 10, 2005) (plaintiff awarded $187,084 in economic damages and $125,000 in noneconomic damages for workers' compensation claim) and *Edwards v. AaronRents, Inc.*, 482 F.Supp.2d 803, 816 (W.D. Tex. 2006) ($38,493 awarded (after remittitur) for backpay and $30,440 in front pay).

[5] For example, in *Goldstine v. FedEx Freight Inc.*, No. C18-1164 MJP, 2021 WL 952354 (W.D. Wash. March 11, 2021), the jury heard evidence that plaintiff faced a cancer diagnosis without insurance or sufficient funds for surgery, causing him to ask family and friends to pay for his medical bills. Goldstein also suffered additional past and future economic damages in excess of $400,000. In *Kingston v. Int'l Bus. Machines Corp.*, No. C19-1488 MJP, 2021 WL 2662216 (W.D. Wash. June 29, 2021), a $6,000,000 emotional harm award was upheld in a case where the plaintiff was awarded almost $5 million in past and future economic loss and where plaintiff, who was 62, testified about the emotional distress he suffered looking for another job at his age. In *Greta L. Anderson v. American Airlines*, 352 Fed.App'x 182 (9th Cir. 2009), plaintiff was awarded $238,333 in economic damages and plaintiff presented evidence: 1) of anxiety over losing 28-year career with the airline, 2) of rumors that she was mentally ill, 3) that she and her 2 school-aged children had to move multiple times; 4) she had to sell her cars and had her van repossessed, 5) her son

trial. In fact, these Plaintiffs did not seek any lost wages as they had all found subsequent employment in their chosen field and they did not seek any medical or mental health care. They presented no evidence of bankruptcies being filed, no repossessions or even a late charge on a credit card.

Stunningly, Plaintiffs argue that this Court should make an award similar to that in *Diaz v. Tesla, Inc.*, No. 3-17-cv-06748-WHO, 2022 WL 1105075 (N.D. Cal. April 12, 2022), *motion to certify appeal denied,* No. 17-cv-06748-WHO, 2022 WL 2046827 (N.D. Cal. June 7, 2022). But in that case, there was *considerable evidence* of racial slurs and similar conduct – none of which was presented here. Diaz and others testified that the "N-word" was used repeatedly and frequently on the factory floor, including by supervisors. Further plaintiff was called a "porch monkey", told to "go back to Africa", encountered slurs and swastikas on bathroom stalls, and encountered a "racist picaninny drawing near his workstation." Diaz also provided corroborating *and* expert testimony regarding his emotional distress. Even faced with this considerable evidence of discrimination, the California district court still found it appropriate to reduce Diaz's compensatory damages to $1.5 million. These Plaintiffs presented nothing like the evidence in *Diaz.* It was undisputed throughout trial that Glow Networks was a workplace completely devoid of any racial slurs, inappropriate racial comments, jokes, photos, or graffiti.  *Diaz* is simply not a proper case to compare this case to when it comes to damages.

The verdicts in this case were completely disproportionate to similar cases in the Fifth Circuit. Glow Networks suggests that, should the Court decide that remittitur is the appropriate

---

worried so much he developed rapid breathing and chest pains due to stress and that, in turn, caused plaintiff anxiety about how her job loss was impacting her children. In *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493 (9th Cir. 2000), plaintiff was awarded $100,000 in backpay and $2 million in front pay. There was also evidence that reduced promotability status caused plaintiff anxiety, rashes, stomach problems and other symptoms.

remedy, it should remit each Plaintiff's damage award between what was found in appropriate in *Vadie* ($10,000) or *Thomas* ($75,000) based on each individual's testimony and evidence.

### B.     The Punitive Damages Awarded Were Constitutionally Excessive

Plaintiffs use the same set of cases to try to convince this Court that the $4,000,000 per Plaintiff punitive damages awards were not constitutionally excessive. But again, all of these cases involved things like considerable economic damages, racial slurs and drawing, or considerable physical injuries, none of which are present here. There was simply no evidence presented that justified the award of punitive damages much less an identical punitive award of damages $4 million per Plaintiff punitive damages award here.

Respectfully submitted,

By: */s/ Rachel Z. Ullrich*
Rachel Z. Ullrich
Texas Bar No. 24003234
RUllrich@fordharrison.com
Buena Vista Lyons
Texas Bar No. 00797630
VLyons@fordharrison.com

**FORDHARRISON LLP**
1601 Elm Street, Suite 4450
Dallas, Texas  75201
Telephone:  (214) 256-4700
Facsimile:  (214) 256-4701

**ATTORNEYS FOR DEFENDANT GLOW NETWORKS, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2022 a true and correct copy of the above foregoing instrument was filed with the Clerk of Court by using the CM/ECF system, which will send notification of such filing to all counsel.

*/s/ Rachel Z. Ullrich*
Rachel Z. Ullrich

WSACTIVELLP:13229503.1