UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JOSHUA YARBROUGH, ET AL. | § | |
| | § | |
| v. | § | CIVIL NO. 4:19-CV-905-SDJ |
| | § | |
| GLOW NETWORKS, INC. | § | |

## **MEMORANDUM OPINION AND ORDER ON POST-TRIAL MOTIONS**

I. BACKGROUND ............................................................................................... 1

II. LEGAL STANDARDS ..................................................................................... 3

  A. Judgment as a Matter of Law .................................................................... 3

  B. New Trial ................................................................................................... 4

III. DISCUSSION ................................................................................................ 5

  A. Race-discrimination claims ...................................................................... 5

    i. Common evidence does not establish racial discrimination. ............................ 7

      a.    Camera Installation and Placement ........................................ 8

      b.    Feelings of Racism ................................................................. 12

      c.    Conclusory Allegations .......................................................... 13

      d.    Wrong Site Information .......................................................... 14

      e.    Impressions of Disparate Treatment ...................................... 16

      f.    Statement by a Human Resources Manager ......................... 24

      g.    Required to Work More but Paid Less .................................. 26

      h.    Wearing a Dashiki ................................................................. 27

    ii. Plaintiff-specific evidence does not establish racial discrimination. .............. 29

      a.    Paul Tijani ............................................................................. 29

      b.    Peter Tijani ............................................................................ 31

      c.    William "Will" Aigheyisi ...................................................... 32

      d.    Joshua Yarbrough ................................................................. 33

      e.    Joshua Walker........................................................................ 35

      f.    Michael Brown ...................................................................... 38

      g.    Adewale Ashiru .................................................................... 41

      h.    Brandon Price........................................................................ 43

      i.    Harom Pringle ...................................................................... 45

  B. Retaliation Claims .................................................................................... 47

    i. Matt Lofland ............................................................................................. 49

    ii. Paul Tijani ............................................................................................... 52

    iii. Peter Tijani ............................................................................................. 54

    iv. William "Will" Aigheyisi ........................................................................ 58

C. Prejudice Against Glow ........................................................................................ 63

IV. Conclusion............................................................................................................ 81

Before the Court is Defendant Glow Networks, Inc.'s Renewed Motion for Judgment as a Matter of Law; or, in the Alternative, Motion for New Trial; or, in the Alternative, Motion for Remittitur. (Dkt. #150). Plaintiffs filed a response in opposition, (Dkt. #171), and Glow filed a reply, (Dkt. #181). The Court, having considered the motion, subsequent briefing, record, and applicable law, **GRANTS in part** and **DENIES in part** Glow's Motion for Judgment as a Matter of Law, **GRANTS in part** Glow's Alternative Motion for New Trial, and **DENIES as moot** Glow's Alternative Motion for Remittitur.

## I. BACKGROUND

The factual background of this employment discrimination case is detailed in the Court's order on Defendant's motion for partial summary judgment, and the Court will only briefly summarize it here. *See Yarbrough v. CSS Corp.*, No. 4:19-CV-905, 2022 WL 326141 (E.D. Tex. Feb. 2, 2022). Plaintiffs Joshua Yarbrough, Michael Brown, Paul Tijani, Peter Tijani, Joshua Walker, Brandon Price, Adewale Ashiru, William Aigheyisi, Harom Pringle, and Matt Lofland are former Glow Networks, Inc. ("Glow") employees. Plaintiffs worked for Glow on its Remote Integration and Testing Center ("RITC") project. The purpose of the project was to upgrade cell sites from 4G to 5G capabilities on behalf of Glow's primary client, Nokia. Except for Lofland, who was a team lead, Plaintiffs were either Tier 1 or Tier 2 employees.[1] Tier 1 employees were responsible for working with the field technicians to conduct the site

---

[1] Joshua Yarbrough was selected to work on the Quality Assurance team for a portion of his employment, at which time he was not in the Tier 2 role for which he was hired. (Dkt. #129 at 225).

1

integrations and migrations necessary for the upgrades. Tier 2 employees provided technical support to Tier 1 employees. Glow employees performed this work remotely at a Glow office building in Texas. By its nature, the duration of the project was limited. As more sites were upgraded, the workload would decrease and the project would wind down, thus resulting in the termination of positions on the RITC project.

Plaintiffs contend that Glow treated black employees differently than employees of other races in violation of 42 U.S.C. § 1981. Plaintiffs' allegations center chiefly on two managers on the RITC project during the relevant times—Mohammad Silat and Sandeep Pauddar. To a lesser extent, Plaintiffs also complain about Debbie Cahoon, the Senior Human Resources Manager at Glow, and Dan Paddock, another project manager.

The case proceeded to trial. After Plaintiffs rested their case, Defendants[2] made an oral motion for judgment as a matter of law, which the Court denied.[3] Once both parties rested, Defendants re-urged their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The Court granted in part and denied in part that motion. *See* (Dkt. #115). After the Court's rulings, the following claims remained: (1) retaliation claims by Lofland, the Tijanis, and Aigheyisi; (2) a discrimination claim predicated on demotion by Yarbrough; (3) a discrimination claim

---

[2] At that time, both Glow and SlashSupport Inc. were defendants. However, the Court later dismissed SlashSupport from this case. (Dkt. #115 at 7).

[3] The day after the Court heard argument on the oral motion, Plaintiffs stipulated that Walker's constructive discharge-based discrimination claim and retaliation claim should be dismissed. The Court entered an order dismissing those claims. *See* (Dkt. #110).

predicated on failure to promote by Walker; and (4) discrimination claims predicated on layoff or termination by Brown, Ashiru, the Tijanis, Price, Pringle, and Aigheyisi.

The jury found for all ten Plaintiffs on their retaliation and/or discrimination claims. The jury also found that all ten Plaintiffs were entitled to punitive damages. The jury awarded identical damages to each Plaintiff: $2,000,000 for past pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life; $1,000,000 for future pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life; and $4,000,000 in punitive damages.

Glow now moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, alternatively, for a new trial pursuant to Rule 59. In the alternative to relief from liability, Glow moves for remittitur.

## II. LEGAL STANDARDS

### A. Judgment as a Matter of Law

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *SMI Owen Steel Co. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008) (quotation omitted). In ruling on a post-trial motion for judgment as a matter of law, the Court is "especially deferential to the verdict." *Mays v. Chevron Pipe Line Co.*, 968 F.3d 442, 447 (5th Cir. 2020) (cleaned up). The Court must "review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party; the [C]ourt may not make credibility determinations or weigh the evidence, as those are jury functions." *Brennan's Inc v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004). "A jury verdict must be upheld unless there is no legally sufficient evidentiary basis

3

for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995) (quotation omitted).

## B. New Trial

Pursuant to Rule 50, a party may alternatively request a new trial under Rule 59. FED. R. CIV. P. 50(b). The Court may grant a motion for new trial if "the verdict is against the great weight of evidence; the damages awarded were excessive; the trial was unfair; or prejudicial error was committed." *Adams v. Ethyl Corp.*, 838 F.App'x 822, 827 (5th Cir. 2020) (citing *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991)). This standard is lower than that for judgment as a matter of law. *See Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982). "A verdict can be against the 'great weight of the evidence[,'] and thus justify a new trial, even if there is substantial evidence to support it." *Id.* In considering a motion for a new trial—unlike a motion for judgment as a matter of law—the Court "need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence." *Id.* "While the court is to respect the jury's collective wisdom and must not simply substitute its opinion for the jury's, [i]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (cleaned up).

Additionally, if the jury's verdict on liability demonstrates "evidence of influence by passion [or] prejudice . . ., then a complete new trial [is] necessary." *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1242 (5th Cir. 1985) (per curiam) (citations omitted). The decision to grant or deny a new trial is committed to the

Court's sound discretion. *Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 230 (5th Cir. 2020).[4]

### III. DISCUSSION

Plaintiffs claim that they were discriminated against because of their race, retaliated against for opposing racial discrimination, or both, in violation of 42 U.S.C. § 1981. The jury found in favor of all ten Plaintiffs for all thirteen of their claims, awarding a total of $70,000,000 distributed evenly to each Plaintiff. However, the jury's verdict is unsupported by the evidence presented in this case and must be overturned.

For the following reasons, the Court grants Defendant's motion for judgment as a matter of law as to all Plaintiffs' discrimination claims and Paul Tijani's and Matt Lofland's retaliation claims. The Court grants Defendant's motion for a new trial as to Peter Tijani's and William Aigheyisi's retaliation claims. For those claims, both liability and damages must be retried.

### A. Race-discrimination claims

To establish a prima facie case of race discrimination under 42 U.S.C. § 1981, a plaintiff must prove that: (1) he is a member of a protected class, (2) he was qualified for the position, (3) he experienced an adverse employment action, and (4) he was replaced by someone outside of his protected class or treated less favorably than a

---

[4] The Court does not include the legal standard for remittitur because, as explained herein, the Court concludes that a new trial on both liability and damages is required for all claims that survive Glow's motion for judgment as a matter of law.

similarly situated colleague.[5] *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022). A plaintiff may prove a claim of race discrimination either by direct or circumstantial evidence. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (per curiam).

Once a plaintiff has presented a prima facie case of discrimination, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the adverse employment action. *Owens*, 33 F.4th at 825. If the defendant satisfies this burden, "the burden shifts back to [the plaintiff], who must counter with substantial evidence that [the defendant's] proffered reason is pretextual." *Id*. To prevail in a Section 1981 case, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S.Ct. 1009, 1019, 206 L.Ed.2d 356 (2020).

"When, as here, a case has been fully tried on its merits, [courts] do not focus on the . . . burden-shifting scheme [and] [i]nstead . . . inquire whether the record contains sufficient evidence to support the jury's ultimate findings." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 475–76 (5th Cir. 2005) (cleaned up). Thus, the Court "need not parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's

---

[5] Because "[c]laims of racial discrimination in employment, pursuant to 42 U.S.C. § 1981 . . . are governed by the same analysis as that employed for such claims under Title VII," the Court relies upon cases considering either statutory provision in its analysis. *See DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007).

decision, and a showing of pretext," but rather must review the trial evidence in its entirety. *Id.*

Here, nine Plaintiffs presented discrimination claims to the jury—Paul Tijani, Peter Tijani, William Aigheyisi, Joshua Yarbrough, Joshua Walker, Michael Brown, Adewale Ashiru, Brandon Price, and Harom Pringle. Their discrimination claims were premised on their allegations of wrongful termination (the Tijanis, Aigheyisi, Ashiru, and Price), wrongful demotion (Yarbrough), wrongful layoff and Glow's failure to subsequently rehire them (Brown and Pringle), or Glow's failure to promote them (Walker). While Plaintiffs presented some evidence at trial specific to their individual claims, other evidence was raised by multiple Plaintiffs. The Court first addresses the evidence raised by multiple Plaintiffs and then turns to the evidence raised only by individual Plaintiffs.

### i. Common evidence does not establish racial discrimination.

Although the Court labels evidence raised by multiple Plaintiffs "common evidence," the true common evidence—the facts and experiences shared by *all* Plaintiffs—refutes, rather than supports, Plaintiffs' claims. Conspicuously absent from Plaintiffs' showing is any evidence that Glow had racially discriminatory employment practices (in fact, Glow had many black employees working on the RITC project); that Glow had discriminatory pay or promotion practices; that any Plaintiff was physically abused or assaulted; or that any Plaintiff faced racial slurs, epithets, jokes, or other verbal or symbolic gestures of hostility towards their race. Other testimony showed that when Glow conducted lay-offs, it laid off employees of a variety of races—not just black employees; Glow had policies and procedures in place to

prevent and correct workplace discrimination and retaliation; Glow accommodated employees' leave requests (for example, Adewale Ashiru took three weeks off to tend to his father in Nigeria shortly after he began working at Glow); and Glow responded to employee complaints.

An examination of the remaining common evidence offered by multiple Plaintiffs fails to show that Glow's black employees were subject to any regime of adverse treatment based on race or any discrimination actionable under Section 1981. In the end, the asserted race-discrimination claims in this case devolve into each Plaintiff's individualized workplace complaints, which vary widely and are untethered to any demonstrated policy, scheme, or pattern of race-discriminatory conduct at Glow. Such evidence is legally insufficient to support Plaintiffs' race-discrimination claims.

### a. Camera Installation and Placement

The Tijanis, Aigheyisi, Yarbrough, Walker, Brown, Ashiru, and Pringle testified that Glow's installation of cameras in the front two workrooms and their placement in view of those cameras is evidence of racial discrimination. (Dkt. #130 at 250–51) (Paul Tijani); (Dkt. #131 at 226) (Peter Tijani); (Dkt. #132 at 172–73, 181) (Aigheyisi); (Dkt. #129 at 205–06) (Yarbrough); (Dkt. #130 at 194) (Walker); (Dkt. #133 at 32, 76) (Brown); (Dkt. #132 at 287–88) (Ashiru); (Dkt. #133 at 95) (Pringle). Several of those Plaintiffs testified that they were placed in front of the cameras because of their race. *See* (Dkt. #131 at 226) (Peter) ("The issue of the Black employees being placed in the specific room under a camera should be [the] bone of contention here."); (Dkt. #132 at 188) (Aigheyisi) ("So what it seems like to me is

you're moving a specific group of people underneath the camera."); (Dkt. #129 at 195) (Yarbrough) ("[O]ne of the first things that I noticed is the African-Americans being moved to the front up under the cameras."). The testimony at trial, however, does not support Plaintiffs' contentions. Rather, the record reflects that Glow installed the cameras for its own security and monitoring purposes and that employees of *all* races—not just black employees—were captured on the cameras.

At the outset, the record is clear—and many Plaintiffs conceded—that Glow had a legitimate business reason for installing the cameras at the front of the work room: namely, to monitor *all* employees' conduct in the workplace and capture the biometric system where employees swiped in and out such that "if someone missed the biometric system for some reason, or the biometric system malfunctioned, then the cameras would have caught whomever happened to come and go at a particular time." *See* (Dkt. #130 at 219–20) (Walker acknowledging that Glow had a legitimate business reason for installing the cameras); *see also* (Dkt. #131 at 226) (Peter) ("I'm not questioning why they got a camera in that building."). Such a policy that covers all employees, regardless of race, refutes an inference of racial discrimination even if the policy had a disparate impact on black employees. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 388–91, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (holding that Section 1981 "can be violated only by purposeful discrimination," not a facially-neutral policy with a disparate impact); *Armstrong v. City of Dallas*, 997 F.2d 62, 67 n.20 (5th Cir. 1993) (noting that a policy that was "applied to all

9

members of the fire department in an unquestionably objective and neutral manner" did not suggest racial animus in Title VII case).

Since Glow satisfied its burden to proffer a legitimate, non-discriminatory reason for installing the cameras, Plaintiffs were required to prove that Glow's rationale was merely a pretext for its real motivation to target black employees. *See Autry*, 704 F.3d at 347. Based on the evidence presented to the jury, the Court concludes that it was not merely a pretext and that it was unreasonable for the jury to find otherwise.

*First*, not all black employees were seated in front of the cameras. In fact, Yarbrough testified that while he briefly sat in the room with the cameras, he was moved to a different room without cameras when he was placed on the Quality Assurance team. *See* (Dkt. #129 at 205–06). *Second*, some black employees chose to sit in the rooms with the cameras without being directed to do so by a supervisor— hardly evidence to support a claim of racial discrimination. For example, Pringle testified that he did not recall a supervisor instructing him to sit in view of the cameras and that he "stayed [in the camera room] for a while" even after they had been installed. (Dkt. #133 at 138–39).

*Third*, and perhaps most fatal to Plaintiffs' allegations, several Plaintiffs admitted that non-black employees were also in view of the cameras. For example, Aigheyisi conceded that non-black employees were in camera view. (Dkt. #132 at 181– 82). Walker confirmed that "other races were videoed or on the camera just like the Black employees in the room." (Dkt. #130 at 220). Yarbrough corroborated this

account in his testimony, stating that non-black employees were in the room with the camera, including "a Hispanic guy," a "white guy by the name of 'Craig,'" "another guy by the name of 'Michael Salbador' [whom he] believe[s] . . . was white as well," and potentially others that he could not recall. (Dkt. #129 at 251). And Lofland testified that while "the majority were the Black employees," he "think[s] there were a few" white or Indian employees in the rooms with the cameras. (Dkt. #129 at 92).

In fact, the only evidence Plaintiffs presented to rebut Glow's legitimate, non-discriminatory reason for installing the cameras was mere speculation. For example, Yarbrough testified that he "made the *assumption* [that Glow] must be trying to watch African-Americans" with the cameras. (Dkt. #129 at 253) (emphasis added). As did Walker:

> Q [by Defendant's counsel]: That's something you *assumed*, that the cameras were there to spy on you because you're Black; right?
> A [by Walker]: But we all felt that way. But, of course, you know, it's still a legitimate business reason.

(Dkt. #130 at 220) (emphasis added). But mere speculation based on one's subjective impressions is insufficient to succeed on a race-discrimination claim. *See Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 313 (5th Cir. 1999) (holding that the plaintiff's "subjective belief that she was not selected for the new Nursing Supervisor position based upon race or age is . . . insufficient to create an inference of the defendants' discriminatory intent [because] 'a subjective belief of discrimination, however genuine, [may not] be the basis of judicial relief.'" (quoting *Elliott v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983) (alterations in original))). Without more, the cameras' mere existence, and some Plaintiffs' placement under

them, does not suggest race discrimination. But there is no more. Thus, there was insufficient evidence for a jury to conclude that Glow's installation of cameras and placement of some of its employees in view of those cameras was racially motivated.

### b. Feelings of Racism

Next, Paul Tijani, Walker, Brown, and Pringle testified that they "felt" Glow treated them differently because of their race. (Dkt. #131 at 40) (Paul) ("[T]he systematic, you know, racism in the organization, you know, you can feel. You feel it."); (Dkt. #130 at 187) (Walker) ("[Y]ou can feel [that you were treated differently because of your race] and you can see it."); (Dkt. #133 at 107–08) (Pringle) (stating that he knew he was being discriminated against based on his "own personal experiences" despite never having racial slurs used against him at Glow and "feel[ing] like management and . . . HR [did not] step[] in to do what they were supposed to do to avoid any of this from going on").

Such subjective feelings of discrimination, however, no matter how sincere, are insufficient bases for a discrimination claim. *See Lawrence*, 163 F.3d at 313; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) (explaining that the plaintiff's subjective belief that he was discriminated against because of his race is insufficient to create a question of fact); *see also Harris v. Home Sav. Ass'n*, 730 F.Supp. 298, 304 (W.D. Mo. 1989) ("It is well-settled, however, that a plaintiff's 'beliefs' or 'feelings' cannot create a triable issue of discrimination."). Accordingly, Plaintiffs' feelings of racism do not support their race-discrimination claims.

### c. Conclusory Allegations

Plaintiffs also made conclusory and unsubstantiated allegations that they were discriminated against because of their race. For example, Peter Tijani testified that "when [he] saw the way [his manager, Mohammad Silat,] was treating [him], [his] brother, and the other black guys in the organization, then [he] realize[d] that . . . this is not anything personal[,] [but rather was Silat] having issues with Africans and . . . African-Americans, just black people in general." (Dkt. #131 at 114). But Peter presented no evidence to support his contention that Silat was treating him and other black employees a certain way because of their race.

Similarly, Brown testified that colleague Ralph McAllister and manager Dan Paddock "would discriminate" against him, but he did not provide any supporting evidence for his claim. (Dkt. #133 at 44). And Yarbrough testified that while he was not the recipient of discriminatory comments, "actions speak louder than words. So just how they were operating . . . and actually seeing what we saw every night would just show this is what's going on." (Dkt. #129 at 206–07). Finally, Walker testified that he "assumed" that Silat was referring to black employees when he heard him say that "[t]hese people should be fired." (Dkt. #130 at 205, 217).

These unsubstantiated, conclusory allegations of discrimination cannot support a discrimination claim. *Newsome v. Collin Cnty. Cmty. Coll. Dist.*, 189 F.App'x 353, 355 (5th Cir. 2006) (per curiam) ("Conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy [the plaintiff's burden."). Thus, this evidence does not support Plaintiffs' claims.

### d. Wrong Site Information

The Tijanis and Aigheyisi testified that they were occasionally given incomplete or incorrect information regarding the cell sites that they were supposed to be working on from one of their supervisors, Mohammad Silat, which frustrated their ability to perform their job duties. These Plaintiffs implied—without any supporting evidence—that they were given these faulty links due to their race. Peter Tijani testified that Silat gave "multiple Black employees [including him] wrong site[s]." (Dkt. #131 at 214); *see also* (Dkt. #131 at 123) ("These Black guys are saying, yes, we [are] getting the wrong site[s]."). Paul Tijani testified that Silat intentionally gave him the wrong sites to "set [him] up for failure" since working on the wrong site meant "automatic termination." (Dkt. #131 at 28). And Aigheyisi testified that he was given wrong sites by Silat after Aigheyisi had tried to help the Tijanis troubleshoot their work. (Dkt. #132 at 45–46). Aigheyisi implied that because his coworker Matt Lofland, who is white, "always" got correct site links, while he, a black man, was "always" getting site links with errors, Silat must have been discriminating against him. (Dkt. #132 at 48) ("[I]f you're the one assigning the site, we're getting the same spreadsheet, me and Matt, and Matt's sites [are] always correct, but somehow yours [are] always having errors . . . how much are you going to cost the company, in that sense?").

This evidence is insufficient to show racial discrimination for several reasons. First, while Plaintiffs claimed that multiple black employees were given wrong sites, they did not testify that *only* black employees were given wrong sites. Thus, Plaintiffs presented no evidence that being given wrong site information was a problem unique

to the black employees. Accordingly, this evidence does not support the notion that black employees were treated less favorably than non-black employees.

Second, even taking Aigheyisi's uncorroborated testimony that Lofland "always" received correct sites as true, Lofland cannot serve as a comparator because he was not similarly situated to Aigheyisi and the Tijanis. *See Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 340 (5th Cir. 2021) ("The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." (citation omitted)). Unlike Aigheyisi and the Tijanis, Lofland was in a managerial role.

Third, Defendants presented evidence demonstrating that, while Mohammad Silat occasionally forwarded incorrect site information, he corrected the information or sent a new site after being informed that there was a problem. (Dkt. #127-42). This rebuts the notion that Silat intentionally sent incorrect information.[6]

Fourth, and most importantly, Plaintiffs did not present any evidence linking the faulty sites to their race. Thus, any inference that *only* black employees received

---

[6] Silat testified that he merely "cop[ied], paste[d], and sen[t]" site information to the Tier 1 employees, and that the site information ultimately came from Nokia, who passed it down through several layers of employees. (Dkt. #135 at 232–33). The idea that Silat generated and intentionally sent incorrect sites to employees whom he disliked is refuted by his testimony describing the process. *See also* (Dkt. #127-42 at 4) (Silat) (explaining to Paul Tijani that "[he's] just a messenger," and that he just "pass[es] along" the site information by copying and pasting it). Moreover, regardless of any alleged animus that Silat had towards Plaintiffs, it would make little sense for him to intentionally deliver bad sites, thus delaying the project and jeopardizing Glow's relationship with Nokia, as that failure would directly reflect on him.

wrong site information *because* they were black would be grounded in pure speculation. But, again, speculation cannot serve as the basis of a discrimination claim. *See Lawrence*, 163 F.3d at 313.

Thus, without any evidence showing that Glow intentionally gave Aigheyisi and the Tijanis bad sites because of their race, this evidence cannot suggest race discrimination.

### e.  Impressions of Disparate Treatment

Many Plaintiffs testified about their impressions of Glow's disparate treatment of black employees. **First**, Plaintiffs testified that while employees of all different races broke company policy, such as by using their cellphones during work or sleeping on the job, only black employees were written up by Glow management for such violations. *See* (Dkt. #132 at 51–52) (Aigheyisi) ("I'm seeing people doing different things, it could be Black, white, Indians, people will be on the phones, people like watching Netflix, people studying, people doing whatever they're doing. And I'm only seeing only a specific type of people getting reported and not coming back for doing these things everybody's doing. . . . That's Black people."); (Dkt. #132 at 61–62, 64) (Aigheyisi) (testifying about getting "written up" for watching videos on his computer and sleeping on the job despite Mohammad Silat not being disciplined for watching videos during work, but later acknowledging that he never saw Silat sleeping on the job); (Dkt. #129 at 197) (Yarbrough) ("[W]e also saw other employees with their feet on the desk every single night, but it was a problem when Blacks were doing it."); (Dkt. #130 at 188, 193) (Walker) (testifying that Indian and white employees could be on their phones browsing the internet during work, while black employees could

not because they were being watched); (Dkt. #130 at 202) (Walker) (testifying that Sandeep Pauddar decided to audit his time to ensure that he was reporting overtime correctly, while other employees' hours were not similarly audited).[7]

Aigheyisi and Yarbrough testified that Silat would take photographs of black employees violating company policy, while not doing the same for non-black employees. Aigheyisi also testified as to one instance in which he observed a white employee sleeping on the job, but Silat did not take a photograph of him. (Dkt. #132 at 57–58). And Yarbrough similarly testified to observing Silat "walk around and take pictures of African-Americans on their phone . . . whereas, the other cultures [were] doing the exact same thing but nobody's saying anything, there's no reports of it." (Dkt. #129 at 200–01).

However, taking photos of employees does not, standing alone, amount to race discrimination. This evidence does not demonstrate unequal enforcement of Glow's policies because taking a photo is not the same as enforcing a rule. And to the extent

---

[7] Walker's testimony regarding the audit illustrates common shortcomings in Plaintiffs' testimonies, including their inability to show a common thread of discrimination within Glow. *First*, Walker admitted that his time was only audited after he showed up an hour late for work, thus raising a question in his employers' minds whether he was recording his time accurately. (Dkt. #130 at 202). This is a non-discriminatory reason to audit Walker's time. *Second*, Walker testified that that once he accounted for his time, "[he] didn't hear back anything from [Sandeep Pauddar]." (Dkt. #130 at 202). He did not suffer any punishment, was not reprimanded, and it does not appear that this audit was a factor in Glow's decision not to promote him. This evidence is largely—if not entirely—irrelevant to his claim. *Third*, he claimed that this audit was evidence of discrimination, but then he later said that "[he] was the only one singled out to audit [his] time." (Dkt. #130 at 202). If Glow's motivation to audit Walker's time was race-based, it would follow that Glow would likewise audit other black employees' times. But there is no evidence that it did so. A theme common to Plaintiffs' testimonies and highlighted by Walker's testimony here is Plaintiffs' attribution of race discrimination to mundane or immaterial actions that (1) appear to have no connection whatsoever to their race and (2) were insignificant or irrelevant to the adverse actions for which they sued.

17

the photos are purported to be part of a scheme to report only black employees, the evidence refutes that theory because employees of all races were reported for misconduct. Silat testified that he took photographs of and reported non-black employees for sleeping on the job—specifically, Jennifer Satele (white), Zaid Aboulgader (Iraqi), and Claudia [last name unknown] (Puerto Rican). (Dkt. #135 at 241–42). Thus, Plaintiffs' "contention that they were disciplined more severely than were whites in similar circumstances [is] refuted by evidence of specific instances in which white employees were disciplined in precisely the same manner as [Plaintiffs] had been." *Harris v. Plastics Mfg. Co.*, 617 F.2d 438, 440 (5th Cir. 1980). Therefore, this evidence does not demonstrate race discrimination because black and non-black employees were treated the same.

Further, while Aigheyisi testified that Lofland, who is white, slept on the job without consequence—despite Lofland never testifying that he did so—Aigheyisi acknowledged on cross examination that he would not have been privy to any disciplinary action taken by Glow against Lofland if Lofland had in fact slept on the job. (Dkt. #132 at 190–93); (Dkt. #132 at 65) (Aigheyisi) (noting that non-black employees "could have been [written up for violating company policy], but [were] not to [his] knowledge"). In fact, when pressed, Walker and Aigheyisi testified that they merely assumed that their supervisors were targeting black employees for violations of Glow policies. *See* (Dkt. #130 at 190) (Walker) ("That's how I felt, just to make our work environment more hostile, like they kind of nitpicking at you."); (Dkt. #132 at 107) (Aigheyisi) ("I believe he's picking on me."). But, again, presumptions or

18

assumptions are insufficient bases for race-discrimination claims. *See Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) ("This court has consistently held that an employee's 'subjective belief of discrimination' alone is not sufficient to warrant judicial relief." (quoting *EEOC v. La. Off. Of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995))).

This shortcoming is fatal to Plaintiffs' contentions. Without competent evidence supporting Plaintiffs' arguments that Glow intentionally and unfairly disciplined them because of their race, Plaintiffs' testimonies about the alleged disparate enforcement of company policies are insufficient to prove racial discrimination. *See id.*

**Second**, Yarbrough and Aigheyisi testified that there were black employees whom they believed should have been promoted, but were not, while their non-black coworkers were promoted. *See* (Dkt. #129 at 202) (Yarbrough) ("When the promotions were actually being offered, I did myself know of a couple of people that I believe that should have been promoted that were African-American, and they didn't get promoted, but the Indians were actually promoted."); (Dkt. #132 at 44–45) (Aigheyisi) (testifying that Lofland, who is white, and Silat, who is Indian, were both promoted to Tier 2 positions, while he was not, despite believing that "[they] have the same qualifications literally").[8]

But neither Yarbrough nor Aigheyisi brought failure-to-promote claims. Rather, Yarbrough's claim is for wrongful demotion and Aigheyisi's claim is for

---

[8] Lofland testified that he was hired as a Tier 2 employee.

19

wrongful termination. Further, even if considered, neither Yarbrough nor Aigheyisi testified that Glow failed to promote them *because* of their race, nor did they offer any evidence that would support such a contention. Instead, they testified as to their personal feelings about who should have been promoted. But determinations of who to promote are left squarely within a company's business judgment, and thus cannot be the predicate of a race-discrimination claim unless the plaintiff can show that he is "clearly better qualified (as opposed to merely better or as qualified)" for the role or that Glow's "proffered explanation [for failing to promote him] is false or unworthy of credence." *Roberson-King v. La. Workforce Comm'n*, 904 F.3d 377, 381 (5th Cir. 2018) (cleaned up); *see also Scott v. Univ. of Miss.*, 148 F.3d 493, 509 (5th Cir. 1998) ("Disagreements over which applicant is more qualified are employment decisions in which we will not engage in the practice of second guessing."), *abrogated on other grounds by Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Plaintiffs did not even attempt to make that showing.[9]

And even if they had testified that Glow's decision on who to promote was based on race, such testimony would be grounded only in speculation—which cannot be credited, *Bauer*, 169 F.3d at 967—because there is no evidence that Glow considered race in its decisions.

***Third***, the Tijanis, Yarbrough, and Walker testified that they were treated differently than their non-black coworkers for taking breaks. For example, Peter

---

[9] Walker was the only Plaintiff who brought a discrimination claim premised on Glow's failure to promote him, but as explained below, his claim does not survive judgment as a matter of law.

Tijani testified that he knew "taking breaks or going to [his] car on the very down time was an issue for the Black folks, but not an issue for the Indian guys." (Dkt. #131 at 223). Paul testified that his supervisors would "watch what time [he] c[a]me from break, what time [he] le[ft] for break, what time [he] resume[d] work." (Dkt. #131 at 14). And while Yarbrough did not contest that black employees were permitted to take breaks, he testified that black employees' breaks were monitored while Indian employees' breaks were not. *See* (Dkt. #129 at 196). Similarly, Walker testified that Indian employees could take longer breaks than black employees and that white and Indian employees were allowed to read magazines and newspapers during their downtime, while he was not allowed to do the same. (Dkt. #130 at 191–92, 207).

However, none of the Plaintiffs testified that they were admonished or punished for taking a break of any duration. Thus, they did not show that taking breaks had anything to do with the adverse actions they suffered. And no Plaintiff could point to anything discriminatory about their supervisors ensuring that their breaks did not impede their job duties. In fact, there was substantial evidence presented at trial that Glow supervisors had good reason to keep a close eye on some of these employees. For example, Pauddar testified that the Tijani brothers would play video games on their phones during work hours, would not follow the company's process for handling sites, were slow to get work done, and "would leave people hanging, waiting for them." (Dkt. #135 at 44–45). And Peter Tijani had been placed on a Performance Improvement Plan ("PIP") for "insubordination and threatening language/behavior [and being] [u]nprofessional in [the] work environment."

21

(Dkt. #127-65). Thus, given that Glow had a non-discriminatory reason for monitoring these employees' breaks—namely, to ensure the breaks did not impede their work performance—and that Plaintiffs failed to tie this to their termination or failure to get promoted, this argument fails. Additionally, since it is unclear that these employees had "essentially comparable violation histories"—and it appears that some did not—the Court cannot say that these Plaintiffs were similarly situated to their non-black colleagues who were allegedly given more freedom on their breaks. *See Ernst*, 1 F.4th at 340.

**Fourth**, Aigheyisi testified about witnessing the poor treatment of two *other* black Glow employees who were also terminated. As to the first employee, Aigheyisi testified that Mohammad Silat would "berate her[], you know, talk down to her." (Dkt. #132 at 41). Aigheyisi further testified that he was "not sure why she's not part of us here [in this lawsuit] because – [he] saw that happen [to her] before she was let go." (Dkt. #132 at 41). And as to the second terminated black Glow employee, Aigheyisi testified that "she left like pretty much the first or second week, so [he] wasn't too familiar" with her but "knew . . . the basis" of why she was fired because "[e]verybody talks"—implying discrimination. (Dkt. #132 at 41). Aigheyisi noted that he could hear and see these interactions due to Glow's open floor plans. (Dkt. #132 at 37–40). However, such evidence about how *other* employees were treated or the reason for *other* employees' terminations cannot be the basis of a race-discrimination claim. *See generally Ernst*, 1 F.4th at 339 ("To establish a *prima facie* claim for race discrimination . . . a plaintiff must show 'that *he* . . . was treated less favorably.'"

22

(quoting *Stroy v. Gibson ex rel. Dep't of Veterans Affairs*, 896 F.3d 693, 698 (5th Cir. 2018) (emphasis added)). Thus, this evidence does not establish race discrimination.

And ***fifth***, Brown and Pringle testified that they felt like they were not given the opportunity to work overtime, unlike their non-black colleagues. (Dkt. #133 at 76) (Brown); (Dkt. #133 at 100) (Pringle) ("I signed up [for overtime] a few times and got ignored. . . . And so, one of the mornings when I came in early . . . I was like, Sandeep [Pauddar], I was asking to get on, like, overtime. . . . So, like, when I spoke to him, he was like . . . we're not going to do it."); (Dkt. #133 at 106) (Pringle) ("I'm feeling like [Sandeep is] avoiding me and he's preventing me from working this overtime."). But Brown was eventually permitted to work overtime. (Dkt. #133 at 73) (Brown) (explaining that he was permitted to work overtime after "begging" for "[t]wo or three months"); (Dkt. #133 at 132) (Pringle) ("And, eventually, . . . [Brown] was allowed to go work on the overtime"). And while Pringle was apparently never permitted to work overtime, he acknowledged that working overtime would require him to undergo additional training—even though his supervisors "wanted [him] to continue focusing on [his] job and not the job" for which overtime was required, (Dkt. #133 at 131)— thus establishing a non-discriminatory reason for denying him the opportunity to work overtime.

Regardless, neither witness tied their inability to work overtime to their race, and Pauddar testified that determinations on who could work overtime were left to the client. (Dkt. #134 at 210) ("Nokia would have the final say in who can be tasked to perform overtime duties. . . . Nokia wanted to make sure that people who can

23

deliver, who have higher level of quality in their work, only those people would come and do the overtime."). Thus, this piece of evidence also does not demonstrate race discrimination.

### f.  Statement by a Human Resources Manager

Plaintiffs repeatedly pointed to a statement made by Human Resources Manager Debbie Cahoon to Pauddar, which Pauddar later shared with Lofland. Lofland testified that Cahoon told Pauddar, "don't lay off any white people." (Dkt. #129 at 171). Plaintiffs contend that this statement is direct evidence of discrimination. However, "[t]o serve as direct evidence of an employer's discriminatory intent, a workplace comment must be 'direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [race] was an impermissible factor in the decision to terminate the employee.'" *Vital v. Nat'l Oilwell Varco*, No. H-12-1357, 2014 WL 4983485, at *18 (S.D. Tex. Sept. 30, 2014) (quoting *EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)).[10]

In *Jones v. Overnite Transportation Co.*, 212 F.App'x 268 (5th Cir. 2006), the court held that racially biased comments that were far more startling than Cahoon's statement were not direct evidence of discrimination. The plaintiff, a dockworker at a transportation company, allegedly overheard a supervisor state that he wanted to "get rid of all the blacks" and "fire a bunch of niggers." *Id.* at 273. The plaintiff was

---

[10] The record shows that Glow was a racially and ethnically diverse workplace. It employed whites, blacks, Hispanics, Asians, and individuals with two or more races. (Dkt. #127-83). Given Glow's racial and ethnic diversity, Cahoon's statement regarding not laying off white employees, without more, does not equate to a command to lay off black employees.

terminated a few months after these comments were made. *Id.* The court held that although these comments revealed the supervisor's discriminatory animus, they "lack[ed] the indicia of specificity and causation required to be direct evidence of race discrimination." *Id.*

Here, Cahoon's statement could only conceivably aid Brown and Pringle, as they are the only Plaintiffs to bring wrongful layoff claims. However, if the egregiously offensive racial slurs in *Jones* "lack the concrete specificity . . . to be direct evidence of unlawful discrimination, *see id.*, so too does Cahoon's statement to not lay off white people. Brown and Pringle presented no evidence that Cahoon's statement reflected Glow's policy or that it directly led to their layoffs—thus failing to show causation. Therefore, Cahoon's statement would require a "trier of fact to infer a nexus between the evidence" and Brown's and Pringle's layoffs. *See id.* Brown and Pringle offer none.

Further, Plaintiffs pointed to "no other racial epithets directed toward [them] or another employee." *Id.* And "comments [that] are vague and remote in time . . . are insufficient to establish discrimination." *Id.* at 273–74 (cleaned up). Plaintiffs identified no other discriminatory comments, and thus Cahoon's lone statement does not establish discrimination. Brown and Pringle also failed to identify the period between Cahoon's comment and their layoffs, thus failing to demonstrate a temporal proximity sufficient to show discrimination.

Finally, additional evidence adduced at trial demonstrated that Cahoon's statement did not impact Glow's layoff strategy. Based on Glow's layoff list,

employees of many races and ethnicities were laid off, including whites, Asians, blacks or African Americans, Hispanics or Latinos, and individuals with two or more races. Thus, this evidence does not support their race-discrimination claims.

### g.  Required to Work More but Paid Less

The Tijanis testified that they worked more but were paid less than non-black employees. (Dkt. #131 at 120–21, 200) (Peter) ("I never went to complain[] to [Dan Paddock] that I was being overworked, even though I knew it."); (Dkt. #130 at 241) (Paul) ("I was working so much, a lot more than the white guy or the Indians. . . . So in the night, I would end up working nine, ten hours. . . . [T]he minimum site I would do in the night would be eight sites."); (Dkt. #130 at 242) (Paul) ("They really used me and other black, you know, workers over there. . . . And I was getting lesser pay.").

However, the Tijani brothers presented no evidence—other than their testimony—that Glow made them work more and paid them less than non-black employees. And even if the jury accepted the Tijani brothers' testimonies as true, neither Peter nor Paul presented evidence that Glow increased their workloads and paid them less *because* of their race. Such evidence is necessary for a jury to infer race discrimination. *See Hiner v. McHugh*, 546 F.App'x 401, 408 (5th Cir. 2013) (finding that, in a Title VII case, the plaintiff "provide[d] no evidence that race was a factor in any of the three incidents that form the basis of his hostile work environment claim," one of which was an increase in his workload); *cf. Allen v. Envirogreen Landscape Pros., Inc.*, 721 F.App'x 322, 327 (5th Cir. 2017) ("Complaints about wages, hours of work, and working conditions are protected under . . . the Fair Labor Standards Act . . ., but protected activity under Title VII must relate to discriminatory practices

based on race . . .”). Because they provided no evidence tying their alleged increased workload and decreased pay to their race, this testimony does not support their race-discrimination claims.

### h. Wearing a Dashiki

Next, the Tijanis and Ashiru testified that Mohammad Silat and Sandeep Pauddar did not permit them to wear their native African dashiki attire, even though Indian employees were allowed to wear comparable attire. *See* (Dkt. #130 at 254–55) (Paul Tijani) (“[Silat] and [Pauddar] specifically told me that [wearing a dashiki] wasn’t allowed. And this is my African attire. This is my pride. And the Indians were able to wear their hijab. . . . And until the last day I got fired, they never stopped the Indians of wearing their attire, and I was stopped from wearing mine.”); (Dkt. #131 at 219) (Peter Tijani) (“[Silat] saw me. He said it in a very cocky way, and I believe he said, *You know you can’t wear [a dashiki] at work?*”); (Dkt. #132 at 281–82) (Ashiru) (“I put [on] African attires . . . Silat accuse[s] me one to one in person that he likes my outfit but I shouldn’t put this on again, ever again. . . . I asked him why. He said he don’t care, he doesn’t care.”); (Dkt. #132 at 282) (Ashiru) (“And the Indian ladies and men, they put on their attires.”). Yarbrough confirmed this account in his testimony. (Dkt. #129 at 199) (“[A]nother thing that I noticed as well is the African employees . . . would wear their dashikis. . . . They were told they weren’t supposed to be wearing that, but the Indian employees were able to wear . . . their head wraps and whatever.”).

Critically, however, these Plaintiffs failed to establish that Silat and Pauddar’s instructions not to wear dashikis in the workplace were motivated by race—an

essential element of a race-discrimination claim.[11] *See Vaughn v. Miss. Dep't of Mental Health*, No. 1:09-CV-00136-SA-JAD, 2010 WL 3782435, at *5 (N.D. Miss. Sept. 20, 2010) (holding that the plaintiff, a black woman, offered "no evidence that her being sent home [due to her work attire] was motivated by racial animus"). Moreover, even if these instructions not to wear dashikis were racially motivated, there was no evidence before the jury that tied such instructions to their terminations. Accordingly, this incident cannot serve to prove that "but for race" they would not have been terminated. *See Comcast Corp.*, 140 S.Ct. at 1019.

*     *     *

In sum, the common evidence presented by Plaintiffs served only to show the absence of any policy, scheme, or pattern of conduct at Glow that could support a race-discrimination claim. Testimony consisting of unsupported, conclusory allegations, impressions, or assumptions regarding discrimination provides no evidence that such discrimination occurred. Likewise, generalized, vague complaints about work policies at Glow that either applied to all employees or that Plaintiffs failed to show were enforced in a race-discriminatory manner also provides no evidence of race discrimination. Having determined that Plaintiffs' common evidence is legally

---

[11] Further, "Title VII protects persons in covered categories with respect to their *immutable* characteristics, but not their cultural practices." *See EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 (11th Cir. 2016) (emphasis added); *see also id.* ("Critically, the EEOC's proposed amended complaint did not allege that dreadlocks themselves are an immutable characteristic of black persons, and in fact stated that black persons choose to wear dreadlocks because that hairstyle is historically, physiologically, and culturally associated with their race. That dreadlocks are a 'natural outgrowth' of the texture of black hair does not make them an immutable characteristic of race.").

insufficient to find Glow liable, the Court next turns to the remaining evidence that specific Plaintiffs raised at trial.

### ii. Plaintiff-specific evidence does not establish racial discrimination.

#### a.  Paul Tijani

Glow hired Paul Tijani as a Tier 1 employee in October 2017. He was terminated on March 8, 2018, which he claims was due to his race. After his termination, Paul was able to find a new, higher-paying job within a "couple of months." (Dkt. #131 at 82).

As noted in his exit report, which outlines the reasons for his termination, Paul Tijani was terminated for violating company policy by watching videos on his cellphone while on the job. (Dkt. #127-46). In his exit report, Paul is listed as "unsatisfactory" for all categories[12]—including his overall performance. (Dkt. #127-46). Sandeep Pauddar corroborated this account, testifying that Paul would play video games on his cellphone during work, would not follow the company's process for handling sites, and was slow to get work done. (Dkt. #135 at 44–45). Paul failed to rebut Glow's non-discriminatory reason for terminating him.

Aside from the categories of evidence already discussed herein, *see supra* Section III.A.i, Paul Tijani presented two other pieces of evidence to support his claim that he was terminated because of his race. ***First***, Paul testified that he was

---

[12] Glow's exit report evaluated employees on their: (1) knowledge and skill in the performance of their duties; (2) promptness, dependability, and professionalism; (3) communications and progress reporting; (4) accuracy, timeliness, and adherence to scheduled commitments; (5) ability to "handle[] out-of-scope activities"; and (6) overall performance. (Dkt. #127-46).

humiliated when Pauddar "single-handedly pick[ed]" him "almost every night" "out of the majority of black, white, [and] Indians" to "wash the dishes in the kitchen," while non-black employees were never asked to do the same. (Dkt. #130 at 246–48). Paul explained that he stopped cleaning the dishes after "a week or two"—which he later clarified was only five or six days, (Dkt. #131 at 42)—upon informing Pauddar that he was not willing to continue cleaning the dishes. (Dkt. #130 at 246–48). And **second**, Paul testified that a coworker "called [him] and [his] brother and said to [them] specifically, Hey, guys, be careful. Mohammad [Silat] and Sandeep [Pauddar] do not like you guys." (Dkt. #131 at 53). Paul stated that this was "happening because of [his skin] color." (Dkt. #131 at 53). This testimony cannot support an inference of race discrimination.

As to the first piece of evidence, Paul failed to tie Pauddar's instruction that he clean the dishes to his race or his ultimate termination from Glow. He presented no evidence demonstrating that Pauddar selected him to clean the dishes *because* he was black. Again, Paul had to present at least *some* evidence of a nexus between being chosen to clean the dishes, his race, and his termination from Glow. His conclusory statements are insufficient. *Newsome*, 189 F.App'x at 355. And not only did Pauddar stop asking Paul to clean the dishes once Paul complained, Pauddar *himself* took on the task. (Dkt. #131 at 42). He did not make Paul clean the dishes against his will, nor did he give the task to another black employee, as one might have expected if Pauddar's goal was to treat black employees poorly. Turning to the second piece of evidence, Paul failed to tie Silat and Pauddar's alleged dislike of him to his race, and

his assumption that it must have been because of his race necessarily fails. *See Lawrence*, 163 F.3d at 313.

Because Paul failed to present sufficient evidence for a reasonable jury to find that he was terminated because of his race, the Court grants Glow's motion for judgment as a matter of law as to Paul's race-discrimination claim.

### b. Peter Tijani

Like his brother, Peter Tijani was hired as a Tier 1 employee in October 2017. He claims that Glow wrongfully terminated him because of his race. As noted in his exit report, Peter was terminated on February 6, 2018, for:

> Poor behavior in the work place. Told an external Field Tech (customer) that he was only going to migrate 1 site of a 2 site Co-Located set. Erupted in angry outburst cursing his Tier 2 and Team Lead over this and wanted to leave early without completing the migration.

(Dkt. #127-65). Concerning this incident, Peter testified that his Tier 2 supervisor was the one cursing at him—not the other way around. (Dkt. #131 at 260–61). In a video displaying a different incident, the jury heard and saw Peter raising his voice and gesticulating at Pauddar about being given wrong sites. (Dkt. #125 at 4) (Def.'s Ex. 144).

The exit report also lists Peter as "unsatisfactory" or "improvement required" for all categories—including his overall performance. (Dkt. #127-65). The exit report also notes that Peter was placed "on a PIP on Jan 8th for insubordination and threatening language/behavior. Unprofessional in work environment." (Dkt. #127-65). Pauddar corroborated this account, testifying that Peter would play video games on his phone, would not follow the company's process for handling sites,

and was slow to get work done. (Dkt. #135 at 44–45). These all form the basis of a non-discriminatory reason for terminating Peter, and Peter failed to offer sufficient evidence of race discrimination to rebut Glow's reason.

Besides the evidence presented by multiple Plaintiffs—which the Court already explained is insufficient to find race discrimination—Peter presented no evidence of race discrimination. Because Peter failed to present sufficient evidence for a reasonable jury to find that he was terminated because of his race, the Court grants Glow's motion for judgment as a matter of law as to Peter's race-discrimination claim.

### c. William "Will" Aigheyisi

Aigheyisi joined the RITC project in October 2017 as a Tier 1 employee. (Dkt. #132 at 22). Aigheyisi's race-discrimination claim is based on his alleged wrongful termination. According to his exit report, Aigheyisi was terminated on March 8, 2018, for violating company policy by playing Candy Crush on his cell phone when he was supposed to be working. (Dkt. #127-82). In his exit report, Aigheyisi is listed as "unsatisfactory" for all categories—including his overall performance. (Dkt. #127-82). Prior to this incident, Aigheyisi had been placed on a PIP for breaking company policy by sleeping on the job. (Dkt. #132 at 110). That PIP indicated it was Aigheyisi's "final warning." (Dkt. #127-36 at 7). Yet he was placed on a second PIP on January 31, 2018—a mere twenty-three days after the first—this time for "[l]acking professionalism [and displaying] insubordination with disregard to acknowledgement [of] work assignments." (Dkt. #127-37 at 2). This second PIP indicated that it would

be "the *final* attempt to correct the employee's performance." (Dkt. #127-37 at 2) (emphasis added).

At trial, Aigheyisi disputed the rationale for his termination, testifying that he "wasn't playing Candy Crush when [he] got fired. [He] was playing Candy Crush two or three weeks prior." (Dkt. #132 at 270–71). While Aigheyisi admitted that he was captured on camera with his legs crossed and playing Candy Crush on his phone, he stated that this incident must have occurred around February 2018 "because that's when they moved [him] to the front under the camera." (Dkt. #132 at 109–10, 117). Notably, this event took place after his second PIP. Considering Aigheyisi's history of violating company policies, Glow had legitimate, non-discriminatory reasons to terminate him.

Besides the evidence presented by multiple Plaintiffs, Aigheyisi points to no evidence that he was terminated because of his race. He simply contends that he was "good at his job" and that being fired for playing Candy Crush is unreasonable. (Dkt. #171 at 38). But these subjective beliefs are insufficient to overcome Glow's proffered legitimate, non-discriminatory reason for Aigheyisi's termination— especially in light of his history of misconduct at work. Because Aigheyisi failed to present sufficient evidence for a reasonable jury to find that he was terminated because of his race, the Court grants Glow's motion for judgment as a matter of law as to Aigheyisi's race-discrimination claim.

### d.  Joshua Yarbrough

Yarbrough was hired as a Tier 2 employee for the RITC project in October 2017. (Dkt. #129 at 224). Within six months, he was promoted to the Quality Assurance

team. (Dkt. #129 at 225). Yarbrough's race-discrimination claim is based on his alleged wrongful demotion from the Quality Assurance team to a Tier 1 role in July 2018. According to Glow, Yarbrough was moved because Glow's client no longer needed as many employees working in the Quality Assurance position and instead needed more experienced employees working in a Tier 1 capacity. (Dkt. #134 at 257–58) (Pauddar); *see also* (Dkt. #129 at 114–15) (Lofland) ("[Yarbrough] went to work, and he stated that right when he got in, Sandeep [Pauddar] stated he's not on the QA team anymore. And not just that, he's not going to be working as a Tier 2 or . . . a bridge manager . . . he's going to solely be doing Tier 1 work."). Notably, Pauddar testified that neither Yarbrough's pay nor his designation were changed as a result of his new position. (Dkt. #134 at 257–58). Further, Matt Lofland, who is white, was similarly demoted when the relevant project was winding down. This evidence supports Glow's non-discriminatory reason for moving Yarbrough from his Quality Assurance role to Tier 1 capacity.

Yarbrough, on the other hand, testified that Pauddar informed him that he was demoted to Tier 1 duties and was replaced on the Quality Assurance team by Karen Montalbo—who is Asian. (Dkt. #129 at 213). Silat disputed that Montalbo moved onto the Quality Assurance team. (Dkt. #135 at 257) ("[Montalbo] was trained for [the Quality Assurance team], but she was working as a Tier 2 helping out Tier 1s."). Yarbrough further testified that he was demoted even though he had previously been promoted, performed well, had not been disciplined, and had no warning of an impending demotion. (Dkt. #129 at 213) ("I never seen it coming.").

34

The Court finds that there was sufficient evidence for the jury to have concluded that Yarbrough was demoted. However, Yarbrough failed to present sufficient evidence to establish that his race was the "but for" cause of his demotion. He heavily relied upon his subjective beliefs and perception of disparate treatment—evidence the Court has already determined is insufficient—and he failed to direct the jury or the Court to any meaningful evidence that could rebut Glow's legitimate, non-discriminatory reason for demoting him.[13] And the fact that Lofland—a similarly situated non-black employee—suffered the same adverse action under the same circumstances refutes Yarbrough's claim that he only faced such action because he was black.[14]

Since Yarbrough presented insufficient evidence for a reasonable jury to find Glow liable for race discrimination, Glow is entitled to judgment as a matter of law on this claim.

### e.  Joshua Walker

Walker's race-discrimination claim is premised on Glow's failure to promote him from a Tier 1 to a Tier 2 employee. Based on Sandeep Pauddar's testimony, Glow decided not to promote Walker because (1) the client was not approving promotions

---

[13]  While Yarbrough presented evidence that his demotion occurred after he complained to Pauddar about how black employees were treated at Glow, *see* (Dkt. #129 at 210) ("And not too long after [the conversation with Pauddar about a petition regarding how black employees were treated at Glow], you know, I was demoted at that point."), such evidence is relevant to a retaliation claim, not a discrimination claim such as this one. *See* 42 U.S.C. § 2000e-3(a).

[14]  Both Joshua Yarbrough, who is black, and Matt Lofland, who is white (1) served on the Quality Assurance team, (2) were reassigned to Tier 1 capacity at the same time, and (3) resigned the same night they were reassigned. (Dkt. #129 at 114–17).

at the time and (2) Walker was not yet ready to perform complex site migrations and resolve difficult sites, which Tier 2 employees were required to do. (Dkt. #134 at 265–66). Thus, Glow carried its burden of presenting a non-race-based rationale for not promoting Walker.[15]

Despite not getting an official promotion, Walker testified that he nevertheless got a raise while working as a Tier 1 employee after informing Pauddar that he had received an offer for a job that paid better. (Dkt. #130 at 221). Glow's records confirmed that Walker's pay increased from $18 per hour to $21 per hour in April 2018. (Dkt. #127-66, #127-67). And Walker acknowledged that he stayed at Glow, despite the better job offer, "because of the duration of the project" at Glow. (Dkt. #130 at 222).

To show that Glow's non-discriminatory reason for failing to promote him was pretextual, Walker had to demonstrate that he was "clearly better qualified (as opposed to merely better or as qualified)" for the role or that Glow's "proffered explanation [for failing to promote him] is false or unworthy of credence," (i.e., is a cover for race discrimination). *Roberson-King*, 904 F.3d at 381 (cleaned up). The "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines v. Tex. Dep't of*

---

[15] Walker ultimately left Glow upon finding a different, higher paying job. While Walker testified that he gave Glow his two-weeks' notice, (Dkt. #130 at 226), Glow's records indicate that Walker "left without notice," (Dkt. #127-68 at 1). Because Walker's departure from Glow is not the subject of his race-discrimination claim, the Court need not address this discrepancy.

*Protective & Regul. Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999); *see also Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002) ("In order to establish pretext by showing the losing candidate has superior qualifications, the losing candidate's qualifications must leap from the record and cry out to all who would listen that he was vastly—or even clearly—more qualified for the subject job." (cleaned up)). Walker failed to make such a showing.

To support his position, Walker testified that he received an award for his excellent performance. (Dkt. #130 at 203). This award was presented to him by Human Resources in the presence of the entire RITC project. (Dkt. #130 at 230). He also testified that he "personally felt" that other employees were not "putting in the same work [he] was putting in." (Dkt. #130 at 204) ("I was volunteering to come in on Sundays by myself. I was staying late, coming in early, always asking is there anything else I can do or helping anyone. I was helping others, and people was coming to me for help."). And he testified that he did not "think" that the other employees were "more qualified than [him]." (Dkt. #130 at 222) (noting that "one of them didn't even have a degree"). At the same time, however, Walker acknowledged that other employees could have been as qualified as he was. (Dkt. #130 at 222).

Walker's testimony is insufficient to prove race discrimination. His testimony does not demonstrate such a severe difference in qualifications that "no reasonable person" could have chosen the other candidate over him. *Deines*, 164 F.3d at 280–81. Absent a race-based-motivation—which Walker provided no evidence of—"employers are generally free to weigh the qualifications of prospective employees," and "an

employee's 'better education, work experience, and longer tenure with the company do not establish that he is clearly better qualified.'" *Martinez v. Tex. Workforce Comm'n–Civ. Rights Div.*, 775 F.3d 685, 688 (5th Cir. 2014) (per curiam) (emphasis omitted). Walker's mere belief that he was better qualified does not establish that he was qualified to such a degree that a reasonable person could only have selected him for the promotion. *McLendon v. Ingalls Shipbuilding Inc.*, 260 F.3d 622, at *4 (5th Cir. 2001) (per curiam) ("Any alleged disparity in qualifications is not of such a degree as to create a jury issue that [the defendant's] proffered justification was pretextual."). His testimony that the other employees might have been just as qualified as him further proves his inability to show that he was vastly more qualified.

Because Walker failed to present sufficient evidence for a reasonable jury to find that he was not promoted because of his race, the Court grants Glow's motion for judgment as a matter of law as to Walker's race-discrimination claim.

### f. Michael Brown

Brown was hired as a Tier 2 engineer at the beginning of the RITC project. (Dkt. #133 at 21). Because he had more experience in the information technology industry, he was assigned to the Fault Management Team—a specialized team responsible for troubleshooting issues with site upgrades. (Dkt. #133 at 22–23). Brown's race-discrimination claim is premised on being laid off and not rehired. As noted in his exit report, Brown was laid off on November 9, 2018—towards the end of the RITC project—"[d]ue to reduced funding from Nokia" resulting in the elimination

of his position. (Dkt. #127-55). This satisfies Glow's burden to present a non-discriminatory rationale for laying him off.

Brown did not receive high marks from Glow: His exit report notes that while he was "[p]ossibly" eligible for re-hire, he had "[v]ery strange written and verbal communication" and "could not retain any cross-training by other teams." (Dkt. #127-55). Brown received "meets requirements" or "improvement required" ratings for all categories concerning his job performance at Glow. (Dkt. #127-55). Pauddar explained that Brown's exit report reflects the feedback Glow received from the client. (Dkt. #134 at 243–44).

After Brown was laid off, he immediately sought reemployment with Glow. (Dkt. #133 at 46–47, 60). As to his possible rehiring, Brown testified that when he was laid off, Pauddar informed him that he would be "on the top of his list" to get rehired if another project opened up. (Dkt. #133 at 46–47). The evidence presented to the jury reflects that after Brown was let go, Glow kept Brown apprised of potential job openings. *See, e.g.*, (Dkt. #127-56) (containing emails between Glow's Human Resources Manager Debbie Cahoon and Brown concerning a new project at Glow); (Dkt. #127-57) (email from Glow recruiter to Brown: "I have a . . . position for Nokia in Plano Texas. Please email me your updated resume . . . if you are interested and available."); (Dkt. #127-58) (email from Pauddar to Brown: "Hi Michael, the funding has been going down. We have only 13 ppl left. If we get more T2 funding, I will let you know."). Brown testified that he was given an opportunity to interview with a member of Glow's team located in Virginia, but he later received a call from the

interviewer informing him that he would not be getting the job and asking what he had done to upset his managers. (Dkt. #133 at 47–48). Brown claimed that this is evidence that he was being blackballed and discriminated against by Pauddar. (Dkt. #133 at 66). But notably, Brown presented no evidence that Pauddar's alleged issues with him stemmed from his race, rather than his poor performance as noted in his exit report.

Aside from the categories of evidence already discussed herein, *see supra* Section III.A.i, Brown presented three other pieces of evidence to support his claim that he was laid off and not rehired because of his race. **First**, Brown testified that he had an unusually long delay in getting his laptop and that he received sub-par training when he began working at Glow. (Dkt. #133 at 25–26, 28–29). However, as to the laptop, Brown acknowledged that he was paid the entire time, and he otherwise failed to tie such delay to his race. (Dkt. #133 at 69). And as to the training, Brown was unable to explain how non-black employees were trained differently because of their race. (Dkt. #133 at 28); *see also Rudolph v. Huntington Ingalls, Inc.*, No. 1:06-CV-820, 2011 WL 4350941, at *9 (S.D. Miss. Sept. 15, 2011) (holding that the burden is on the plaintiff to make out a prima facie case of discrimination, and that denials of training opportunities are not necessarily discriminatory).

**Second**, Brown testified that his schedule changed often, which apparently did not happen to others. (Dkt. #133 at 71). But Brown did not provide any evidence that his schedule was being changed because of his race, (Dkt. #133 at 71), and such evidence is necessary to establish a race-discrimination claim. *See Harris-Childs v.*

*Medco Health Sols., Inc.*, 169 F.App'x 913, 917 (5th Cir. 2006) (holding that the plaintiff's assertion that she was treated "worse than non-African-American pharmacists in terms of scheduling, work performance expectations, and disciplinary incidents" could not support her hostile work environment claim absent specific evidence that "any of the alleged harassing events were based on her race or had a racial character or purpose").

**Third**, Brown testified that Silat would tease him prior to his termination by indicating that "he already knew what Sandeep was getting ready to do, keep Doug and Kyle" (white employees). (Dkt. #133 at 59–60). But again, Brown failed to tie such teasing to his race. Thus, this evidence does not support his claim.

Because Brown failed to present sufficient evidence for a reasonable jury to find that he was laid off and not rehired because of his race, the Court grants Glow's motion for judgment as a matter of law as to Brown's race-discrimination claim.

### g.  Adewale Ashiru

Ashiru worked on the RITC project as a Tier 1 employee from October 2017 until his termination on April 5, 2018. As noted in his exit report, Ashiru was terminated for "poor performance" and "[c]ontinued . . . mistakes even after training and coaching." (Dkt. #127-3). Ashiru was listed as "unsatisfactory" for all categories— including his overall performance. (Dkt. #127-3). Pauddar corroborated this account, testifying that Ashiru was "a low performer" and that it "was difficult to get him through the training process and qualification process." (Dkt. #134 at 216).

Several emails presented to the jury noted the escalating nature of Ashiru's poor job performance. For example, an email dated April 3, 2018, from Lofland to

Pauddar, Paddock, Henderson (another manager), and Silat describes an incident in which a client waited over two hours to hear back from Ashiru, who had already left work without permission. (Dkt. #127-7). Another email dated April 5, 2018, describes Ashiru's poor performance on a specific assignment. (Dkt. #127-8). And finally, an email also dated April 5, 2018, from Pauddar to various other Glow personnel notes that Ashiru had been placed on a Performance Improvement Plan since March 28, 2018, and describes issues with Ashiru's job performance on several assignments. (Dkt. #127-9). While Ashiru testified that he had never seen the PIP and "wasn't aware of" Pauddar receiving multiple customer complaints about him, this evidence strongly supports Glow's non-race related reason for terminating Ashiru. (Dkt. #132 at 321).

Aside from the categories of evidence already discussed herein, *see supra* Section III.A.i, Ashiru presented two other pieces of evidence to support his claim that he was terminated because of his race. ***First***, Ashiru testified that while shadowing other employees, he was told by Silat not to sit next to the Tijanis, who are black. *See* (Dkt. #132 at 282) ("[Silat] said I should sit down here. I shouldn't go to Peter and Paul. I shouldn't sit down near them."); (Dkt. #132 at 313–14) (testifying that he thought he could not shadow the Tijanis "[b]ecause [Silat and the Tijanis] have differences already"). But Ashiru failed to tie such instruction to his or the Tijanis' race.

***Second***, Ashiru testified that Glow did not let him use his cellphone to communicate with field technicians via text message. (Dkt. #132 at 285–87). At the

outset, Ashiru fails to tie this policy to his race. Additionally, Walker testified that the no cellphone-use policy applied to all workers regardless of their race. (Dkt. #130 at 190). Accordingly, this cannot be the basis of a race-discrimination claim.

Because Ashiru failed to present sufficient evidence for a reasonable jury to find that he was terminated because of his race, the Court grants Glow's motion for judgment as a matter of law as to Ashiru's race-discrimination claim.

### h. Brandon Price

Although Price's race-discrimination claim is based on his *firing*, his grievance with Glow appears to be centered on the circumstances of his *hiring*. Price, who had previously worked on the RITC project, was contacted by a Glow recruiter about an open job position in California. Price testified that Glow was vague about the details of the job, but that he nonetheless decided to accept the opportunity. (Dkt. #134 at 75) ("I couldn't even get any information on what the project was . . . What is consisting of this job? What are my job duties? What are my . . . responsibilities?"). Once he began working, he was tasked with driving two engineers to cell sites so that they could perform the upgrades. (Dkt. #134 at 75) ("They just told me it was a Sprint fit project. . . . I was going to have to drive around."). Price did not perform any engineering work, to his displeasure. Price was terminated because he was unable to perform his job duties due to the expenses associated with the job—expenses that Price knew he would incur. (Dkt. #134 at 75–76) ("My employment ended because . . . I became financially tight. . . . So, you know, because I couldn't go and pick up the guys the days that they need me to, they released me."); (Dkt. #134 at 96) ("Q. And

when you were unable to perform those job duties, Glow let you go? A. That's correct."); *see also* (Dkt. #134 at 84).

Price claims that Glow discriminatorily hired him as a chauffeur because he is a black man from the Compton area in Los Angeles. (Dkt. #134 at 74) ("I figured, um, I was offered the job because . . . I'm from Los Angeles. I used to live in the area. I was familiar with the terrain. . . . I know some of the cell sites that we were going to were in questionable areas. And I mean . . . I am a Black man and I know the area, and with me being with them, it was going to be less threatening for them to be in certain areas with me being around."); (Dkt. #134 at 78) ("I believe they hired me to be a chauffeur because . . . I was a Black man, I knew the area, I'm from certain parts of Los Angeles.").

The Court notes that evidence concerning Price's hiring cannot be the basis of his race-discrimination claim predicated on his firing. *See Guillory v. St. Landry Par. Police Jury*, 802 F.2d 822, 824 (5th Cir. 1986) (holding that the plaintiff's "termination as well as his later unsuccessful application for reemployment must be evaluated as separate instances of alleged discrimination"); *see also* (Dkt. #120 at 4) (noting Price's firing as the adverse employment action in the jury's verdict form). And, in any event, Price presented *no* evidence that the "but for" cause of his termination from Glow was his race. In fact—as Price acknowledged—he was terminated because he was unable to perform his job duties.

Accordingly, because Price failed to present sufficient evidence for a reasonable jury to find that he was terminated because of his race, the Court grants Glow's motion for judgment as a matter of law as to Price's race-discrimination claim.

### i.  Harom Pringle

Pringle was hired as a Tier 2 engineer on the RITC project, and he was later assigned to the BAU task force—a day shift troubleshooting team whose task was to correct issues that arose during the night shift. (Dkt. #133 at 90–91). Pringle received training specific to his duties on the BAU team, and he does not claim that he received different or lower-quality training than the other members of the team—including the non-black members. (Dkt. #133 at 117–19). He was never disciplined, nor did he ever receive any criticism from his supervisors. (Dkt. #133 at 104–05).

Pringle's discrimination claim is premised on being laid off and not rehired. Pringle testified that he was laid off without explanation in July 2018 because of his race. (Dkt. #133 at 104–08). According to Glow, however, Pringle was laid off with other employees—including non-black employees—at the direction of Glow's client due to the winding down of the RITC project. *See, e.g.*, (Dkt. #134 at 271) (Pauddar) ("I think that that summer we started tapering down the project and multiple layoffs had occurred and [Pringle] was probably in one of the groups."); (Dkt. #135 at 194–99) (Debbie Cahoon). This was confirmed by Glow's layoff list that included employees of all races. *See* (Dkt. #127-83 at 2). This supports Glow's legitimate, non-discriminatory reason for laying off Pringle.

Pringle presented insufficient evidence for a reasonable jury to conclude that Glow's proffered reason for his layoff was merely pretextual. Aside from the

categories of evidence already discussed herein, *see supra* Section III.A.i, Pringle presented two other pieces of evidence to support his claim that he was laid off because of his race. **First**, Pringle testified that he was laid off as "retaliation" for "trying to gather information to find out what's really happening" to black employees at Glow and for "pursu[ing] Sandeep [Pauddar] in such a manner at that time." (Dkt. #133 at 150). However, Pringle's claim is premised on discrimination—not retaliation. Thus, any testimony relating to retaliation is not relevant to his race-discrimination claim.

**Second**, Pringle testified that he was not permitted to use a certain site-migration tool at the same capacity as employees on the night shift. *See, e.g.*, (Dkt. #133 at 121) ("Jules [who is Black] and the Indian lady, they were put on a rotation where they worked that night to get that experience to use the tool to its full capacity."). According to Pringle, he was limited to using the tool only to the extent necessary to fulfill his duties as a troubleshooter on the day shift. (Dkt. #133 at 131). But Pringle failed to tie this limitation on his use of a site-migration tool to his race. And when asked whether he understood that his supervisors, Pauddar and Paddock, imposed the limitation because they "wanted [Pringle] to continue focusing on [his] job [on the BAU team] and not the job that other people were doing on the nightshift," Pringle answered in the affirmative. (Dkt. #133 at 131). This non-race-based limitation of Pringle's access to a particular work tool does not support a claim of race discrimination.

Because Pringle failed to present sufficient evidence for a reasonable jury to find that he was laid off and not rehired because of his race, the Court grants Glow's motion for judgment as a matter of law as to Pringle's race-discrimination claim.

*   *   *

None of the Plaintiffs presented "sufficient evidence to support the jury's ultimate findings" that Glow is liable for race discrimination. *Bryant*, 413 F.3d at 476 (cleaned up). Even being "especially deferential to the verdict," *Mays*, 968 F.3d at 447 (cleaned up), and "review[ing] all of the evidence in the record" in the light most favorable to Plaintiffs, *Brennan's Inc.*, 376 F.3d at 362, the Court concludes that the evidence presented to the jury was legally insufficient to find Glow liable. Therefore, the Court grants Glow's motion for judgment as a matter of law as to all Plaintiffs' race-discrimination claims.

## B. Retaliation Claims

To establish a prima facie case of retaliation under 42 U.S.C. § 1981, a plaintiff must prove that (1) he engaged in a protected activity, (2) he experienced an adverse employment action, and (3) there is a causal link between the protected activity and the adverse employment action. *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 436–37 (5th Cir. 2022). "An employee engages in a protected activity under Section 1981 when 'he has opposed any practice made unlawful by [Title VII].'" *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021) (per curiam)

(quoting 42 U.S.C. § 2000e-3(a)).[16] This includes either (1) opposing race discrimination (opposition clause) or (2) making a charge, testifying, or participating in an investigation, proceeding, or hearing concerning a Title VII complaint (participation clause). *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a)). To establish liability under the opposition clause—as all Plaintiffs attempt here[17]—the employee must demonstrate that he "*reasonably believed* the practice was unlawful." *U.S. Bank Nat'l Ass'n*, 16 F.4th at 1210; *see also Rite Way Serv., Inc.*, 819 F.3d at 237 ("It has long been the law in this and other circuits that a plaintiff contending that she was retaliated against for proactively reporting employment discrimination need not show that the discrimination rose to the level of a Title VII violation, but must at least show a reasonable belief that it did."). However, "[a] vague complaint or general allegation of unfair treatment, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity." *Allen*, 721 F.App'x at 326.

---

[16] As with race-discrimination claims, courts "examine retaliation claims under Section 1981 using the 'same rubric of analysis' as Title VII." *U.S. Bank Nat'l Ass'n*, 16 F.4th at 1209 (cleaned up).

[17] Although the Tijanis filed charges with the EEOC, they presented no evidence that their managers were aware of the charges. "Generally, if the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity." *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 171 (5th Cir. 2014) (cleaned up). And any internal complaints raised by any Plaintiff does not count for purposes of the participation clause. *See Rite Way Serv., Inc.*, 819 F.3d at 239 n.2 (explaining that "participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause" (quotation omitted)). Thus, none of the Plaintiffs' retaliation claims implicate the participation clause.

Once a plaintiff makes a prima facie case, the burden then shifts to the defendant to "articulate a legitimate, nonretaliatory reason for the alleged retaliatory action." *Wantou*, 23 F.4th at 437. If the defendant satisfies this burden, the onus shifts back to the plaintiff "to prove that the adverse employment action would not have occurred but for the protected conduct." *Id.* A defendant is not liable for unlawful retaliation "if the employee would have faced that discipline even without the protected conduct." *Id.* Again, the Court's task at this stage of the proceedings is to "inquire whether the record contains sufficient evidence to support the jury's ultimate findings." *Bryant*, 413 F.3d at 475–76 (cleaned up).

Recall that four Plaintiffs asserted retaliation claims that went to the jury: Matt Lofland, Paul Tijani, Peter Tijani, and Will Aigheyisi. For the reasons explained below, the Court will grant Glow's motion for judgment as a matter of law as to Lofland's and Paul Tijani's retaliation claims, and will grant Glow's motion for a new trial as to Peter Tijani's and Will Aigheyisi's retaliation claims.

### i. Matt Lofland

Lofland began working at Glow in 2017 as a Tier 2 employee. (Dkt. #129 at 80). He was then promoted two levels, ultimately becoming a Team Lead. (Dkt. #129 at 80–81). He was also selected to create and serve on the Quality Assurance team. (Dkt. #129 at 97–98) In April 2018, Lofland became a full-time Glow employee and received a $5 per hour raise. (Dkt. #129 at 84). However, Lofland's role was changed in July 2018, when both he and Joshua Yarbrough were reassigned to a Tier 1 capacity. (Dkt. #129 at 115–17). Lofland, like Yarbrough, then resigned

without notice. (Dkt. #129 at 117–18). Lofland claims that his reassignment was retaliation for complaints he made at Glow.

Glow is entitled to judgment as a matter of law on Lofland's retaliation claim because Lofland failed to establish that he engaged in a protected activity. Although Lofland identifies several complaints that he made, he fails to cite a single one where he specifically opposed an unlawful employment practice. For instance, Lofland testified that he recommended to Sandeep Pauddar that two black employees be promoted, but Pauddar instead promoted two Indian employees. (Dkt. #129 at 100–01). When Lofland brought this issue up with Pauddar and asked for an explanation, Lofland never complained about or accused Pauddar of racial discrimination. *See* (Dkt. #129 at 101–03). Likewise, Lofland complained about disparities in the enforcement of office policies and how Glow conducted its layoffs, but he never complained that such incidents were grounded in discrimination.[18] (Dkt. #129 at 93–97, 107–09).

Lofland also reported to Pauddar that many of the black employees, including Yarbrough, were preparing a petition regarding unfair treatment. (Dkt. #129 at 103). In response, Pauddar told Lofland that "anyone that does this will be fired on the spot." (Dkt. #129 at 103). Lofland noticed that his managers began treating him unfairly after he reported this information. (Dkt. #129 at 105). But reporting on a potential petition—albeit one arising due to alleged discrimination—is not a

---

[18] Lofland told the jury that he thought the policies were enforced unequally between black employees and non-black employees, but he did not make a similar claim at Glow. *See* (Dkt. #129 at 93).

protected activity, and thus cannot be the basis for a retaliation claim. Lofland never signed the petition, indicated his support for the petitioners, or otherwise expressed any opposition to a discriminatory practice. He merely reported *other* individuals' opposition. Thus, he did not engage in a protected activity. *See Rite Way Serv., Inc.*, 819 F.3d at 239.

Lofland further testified that, after he reported on the potential petition, he noticed that Pauddar "was coming after Joshua Yarbrough" and "targeting him." (Dkt. #129 at 105). When Lofland confronted Pauddar about his treatment of Yarbrough, Pauddar said that he would "never forgive Joshua Yarbrough for what he did." (Dkt. #129 at 105–06). Lofland then "pushed the issue more saying that [they] should move on from this." (Dkt. #129 at 106). In response, Pauddar told Lofland that "there's no way you weren't part of this. So I can either pursue this or . . . you can basically stop talking to me." (Dkt. #129 at 106). However, Lofland's statement to Pauddar that he was targeting Yarbrough does not constitute a protected activity because it never "refer[red] to an unlawful employment practice." *Allen*, 721 F.App'x at 326. Instead, it merely constitutes a "vague complaint or general allegation of unfair treatment"—and one not even about Yarbrough's race. *See id.* Since Lofland never "put the employer on notice that [his] complaint was based on racial . . . discrimination," he never engaged in a protected activity. *See Harris-Childs*, 169 F.App'x at 916.

Moreover, Lofland never testified or otherwise indicated that he believed Pauddar's targeting of Yarbrough was unlawful, rather than merely mean-spirited

and uncalled for. Thus, his reporting is not covered by the opposition clause. *See Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996); *see also Brown v. United Parcel Serv., Inc.*, 406 F.App'x 837, 840 (5th Cir. 2010) ("Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue.").

Since Lofland never engaged in a protected activity, he cannot succeed on his retaliation claim. Therefore, the Court grants Glow's motion for judgment as a matter of law as to this claim.

### ii. Paul Tijani

Paul Tijani's retaliation claim also fails. Although he identifies a number of complaints that he raised, he presented no evidence that those complaints were specifically about racial discrimination. Rather, he complained generally that he did not like how he was being treated and he reported "cultural discrimination." But Paul was required to prove that he complained of *racial discrimination*—not discrimination generally, and not cultural discrimination. *See Allen*, 721 F.App'x at 326. Since he did not do so, he failed to establish a retaliation claim.

Paul testified that he orally complained to Dan Paddock that he was being assigned too many sites and he told the jury—but not anyone at Glow—that he personally "felt" that this was a product of racial discrimination. (Dkt. #131 at 22–23). He later brought additional complaints up the chain of command—none of which referenced race. *See* (Dkt. #130 at 258–62). In addition to his verbal complaints, Paul authored a written complaint that he sent to Human Resources personnel. (Dkt. #127-41). In the letter, Paul asserted that he "ha[s] been a victim of

52

discrimination, and unfairly treated at work," and that he has felt "very oppressed and humiliated" because he was disciplined for reporting that he received an incorrect site. (Dkt. #127-41 at 2). He also wrote that "[t]here's discrimination act(s) from []Mohammed and Sandeep (Cultural discrimination)." (Dkt. #127-41 at 3).

None of these complaints were specifically about racial discrimination. Most of his complaints amount to vague and general assertions that he was being treated unfairly, which do not constitute protected activities. *See Allen*, 721 F.App'x at 326. And his complaint about cultural discrimination cannot save his claim because "culture and race are two distinct concepts." *EEOC v. Catastrophe Mgmt. Sols.*, 11 F.Supp.3d 1139, 1143 (S.D. Ala. 2014), *aff'd,* 852 F.3d 1018 (11th Cir. 2016). Unlike culture, "race . . . is an immutable characteristic." *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *see also Catastrophe Mgmt. Sols.*, 11 F.Supp.3d at 1143 ("Culture is 'a set of behavioral characteristics and therefore significantly dissimilar from the immutable characteristics of race and national origin.'" (quoting *United States v. Guzman*, 236 F.3d 830, 836 (7th Cir. 2001) (Ripple, J., concurring in part and dissenting in part))). And Title VII only protects immutable characteristics. *See Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084, 1091 (5th Cir. 1975); *see also Catastrophe Mgmt. Sols.*, 852 F.3d at 1030 ("Title VII protects persons in covered categories with respect to their immutable characteristics, but not their cultural practices."). Thus, Paul's complaint about

cultural discrimination does not give rise to a retaliation claim because he never opposed a practice made unlawful by Title VII.[19]

The jury found that Paul "would not have been terminated . . . but for his opposition to or reporting of *race discrimination*." (Dkt. #120 at 1–2). However, Paul never opposed or reported race discrimination—or discrimination against any other protected class, for that matter. Since Paul failed to present sufficient evidence for a reasonable jury to find that he engaged in a protected activity—let alone that he was fired because of such activity—the Court grants Glow's motion for judgment as a matter of law as to Paul's retaliation claim. *See Harris-Childs*, 169 F.App'x at 916 (finding that an employee did not engage in a protected activity when she complained of harassment but did not mention race or sex).

### iii. Peter Tijani

Unlike his brother, Peter specifically complained about racial discrimination, and thus he engaged in a protected activity. And after reviewing the evidence in its entirety, the Court concludes that there is a reasonable basis for a jury to doubt Glow's rationale for Peter's termination and to find that the stated reason for his termination was pretextual.

First, Peter testified that he specifically complained that he was discriminated against because of his race. (Dkt. #131 at 131–33). Peter told Dan Paddock that he

---

[19] The protected classes under Title VII are "race, color, religion, sex, [and] national origin." 42 U.S.C. § 2000e-2(a)(1). Paul did not oppose discrimination against any of these classes. *See U.S. Bank Nat'l Ass'n*, 16 F.4th at 1209 ("An employee engages in a protected activity under Section 1981 when he has opposed any practice made unlawful by Title VII." (cleaned up)).

believed the black employees were intentionally given incorrect sites, (Dkt. #131 at 132–33), and he told Human Resources personnel that he believed he was being treated unfairly because he is black, (Dkt. #131 at 138). Thus, since Peter complained about racial discrimination, he engaged in a protected activity.

Second, Peter was terminated on February 6, 2018—within a couple weeks after he brought up his complaints in a meeting with Human Resources personnel and managers. *See* (Dkt. #131 at 143–47). Notably, in its correspondence with Peter, Human Resources never acknowledged that Peter made complaints of racial discrimination, and instead just referred to his "concerns" generally. *See* (Dkt. #131 at 159); (Dkt. 126-5); (Dkt. 126-6). Glow contends that it fired Peter for poor behavior in the workplace. (Dkt. #127-65). Peter's exit report identifies several examples: Peter told a customer that he was not going to complete his assignment, he erupted in an angry outburst at a Tier 2 and Team Lead, and he was placed on a PIP on January 8th, 2018, for insubordination and threatening language and behavior. (Dkt. #127-65). Peter denies that any of this occurred and instead insists that he was fired because he "spoke up against discrimination." (Dkt. #131 at 170).

In considering a motion for judgment as a matter of law, "the [C]ourt may not make credibility determinations or weigh the evidence," *Brennan's Inc.*, 376 F.3d at 362, and it must be "especially deferential to the verdict," *Mays*, 968 F.3d at 447 (cleaned up). The Court's only task is to determine "whether the record contains sufficient evidence to support the jury's ultimate findings." *Bryant*, 413 F.3d at 476 (cleaned up). Based on the temporal proximity between Peter's complaint and his

termination, Human Resources' failure to acknowledge the subject and seriousness of Peter's complaints, and the allegedly fabricated instances of misconduct in his exit report, and after drawing all reasonable inferences in Peter's favor—as the Court must—the Court finds that there is sufficient evidence to support the jury's ultimate findings that Peter was retaliated against for reporting racial discrimination. *See Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 579 (5th Cir. 2020) ("The temporal proximity between [a plaintiff's] protected activity and her termination is relevant to, but not alone sufficient to demonstrate, pretext. Therefore, [a court] must consider whether [the plaintiff's] other evidence, in combination with this temporal proximity, is sufficient for a reasonable jury to find but-for causation." (citation omitted)). Therefore, the Court denies Glow's motion for judgment as a matter of law as to Peter's retaliation claim.

However, the Court finds that the jury's verdict in favor of Peter was "against the great weight of the evidence," and thus a new trial on this issue is required. *See Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005); *see also Shows*, 671 F.2d at 930 (noting that a court can order a new trial if it is "convinced that the verdict is against the great weight of the evidence"). Under this lower standard, the Court "need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence." *Shows*, 671 F.2d at 930.

Here, after considering and weighing all the evidence adduced at trial, the Court concludes that the jury's verdict on this claim is against the great weight of evidence. As explained above, Peter's exit report indicates that he was a low-

performance employee who engaged in misconduct. In addition to the bad acts described above, the exit report lists Peter as "unsatisfactory" in four of five categories—including his overall performance—and he received "improvement required" in the fifth category. (Dkt. #127-65). And although Peter claims that he did not commit any of the misconduct described in his exit report,[20] video evidence of him raising his voice and gesticulating when he confronted Pauddar about receiving incorrect sites discredits his position and corroborates Glow's. In response to his coworkers telling him to calm down and accusing him of making threats, Peter said, "I don't have to threaten you. I'm . . . big African chief, so I don't have to threaten you. I don't think you want to see me threaten you." (Dkt. #125 at 4) (Def.'s Ex. 144). This could reasonably be perceived as threatening behavior and language, as it is described in the exit report. (Dkt. #127-65). At the very least, it was "[u]nprofessional" and an example of "[p]oor behavior." (Dkt. #127-65). Based on all of his misconduct, it is likely that Peter "would have [been terminated] even without the protected conduct." *See Wantou*, 23 F.4th at 437.

Further, the temporal proximity between Peter's complaint and his termination—approximately two weeks—is insufficient to find pretext. While a "very close" proximity can serve as persuasive evidence to establish a *prima facie* case of retaliation, it alone cannot serve as sufficient proof of pretext. *Strong v. Univ.*

---

[20] Even if Peter did not engage in all the misconduct listed in his exit report, as he contends, that does not necessarily mean that Glow retaliated against him, as "[e]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason." *Eaglin v. Tex. Child.'s Hosp.*, 801 F.App'x 250, 257 (5th Cir. 2020) (quotation omitted).

*Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007). Here, the temporal proximity helps Peter make a prima facie case of retaliation, but it does not help him cross the finish line of proving retaliation.

Finally, the fact that Glow's Human Resources department did not specifically state that Peter was complaining about racial discrimination lends little support to Peter's retaliation claim. Human Resources confirmed that they "understood [his] concerns and [they] addressed them internally." (Dkt. #126-6). Human Resources' apparent investigation and resolution of Peter's claims weighs against a finding of retaliation. *See generally Owens*, 33 F.4th at 829 (noting that an investigation's "nature, extent, and quality" can be evidence of pretext or the lack thereof). In sum, while the jury's verdict is supported by evidence sufficient to withstand judgment as a matter of law, it is against the great weight of evidence. Therefore, this issue must be retried pursuant to Rule 59.

### iv. William "Will" Aigheyisi

Aigheyisi's retaliation claim also survives Glow's motion for judgment as a matter of law. Sometime after January 2018, Aigheyisi orally reported to Human Resources "what [he] noticed about Blacks and other races, the treatment, how it was different, and how [he] felt some[thing] needed to be done." (Dkt. #132 at 97). And on the morning of March 7, 2018, Aigheyisi submitted a written complaint to Human Resources wherein he explicitly complained of racial discrimination in the workplace. (Dkt. #126-9). He was fired later that day. Thus, Aigheyisi engaged in a protected activity, and his firing constitutes an adverse employment action.

Aigheyisi argues that the temporal proximity between his complaint and his firing and the lack of investigation into his complaint establish a causal link between the protected activity and the adverse employment action. Glow, on the other hand, argues that Aigheyisi was fired "only after it received photographic evidence of him watching videos on his telephone," and that his "termination came shortly after Dan Paddock recommended his termination for his insubordinate behavior towards [Mohammad] Silat." (Dkt. #181 at 9). Glow further argues that "Aigheyisi's termination did not occur until after Aigheyisi's performance did not improve despite multiple counseling [sessions], including being placed on a [PIP], having a sit down with Dan Paddock and previously being disciplined for admittedly sleeping." (Dkt. #181 at 9). Aigheyisi's exit report says that he was terminated for "[v]iolating company policy [by] playing Candy Crush on his cell phone." (Dkt. #127-82).

Although Aigheyisi had a history of unprofessional conduct, the Court holds that the record contains sufficient evidence to support the jury's ultimate finding that Aigheyisi was retaliated against for reporting racial discrimination. While "temporal proximity alone is insufficient to prove but for causation," a "very close" proximity can serve as persuasive evidence to establish a prima facie case of retaliation. *Strong*, 482 F.3d at 808. Here, Aigheyisi was fired on the same day that he submitted a written complaint of racial discrimination. Further, Aigheyisi testified that when he met with Human Resources personnel and other managers on the day he was fired, he was asked to explain his complaint in person, which he did. (Dkt. #132 at 108–09). But, instead of addressing his complaint, Aigheyisi was disciplined for playing on his

phone—which he asserted occurred weeks before this meeting—and for sleeping. (Dkt. #132 at 109–11, 117). Respecting the jury's prerogative to make credibility determinations and weigh the evidence, *Brennan's Inc.*, 376 F.3d at 362, and being "especially deferential to the verdict," *Mays*, 968 F.3d at 447 (cleaned up), the Court concludes that a reasonable jury could have found Glow liable for retaliation against Aigheyisi based on this evidence. Therefore, the Court denies Glow's motion for judgment as a matter of law as to Aigheyisi's retaliation claim.

However, the Court finds that the jury's verdict is against the great weight of evidence. Like Peter Tijani, Aigheyisi repeatedly violated company policy and engaged in unprofessional behavior. Specifically, a couple of months before his termination, Aigheyisi had received two PIPs: the first for sleeping on the job and the second—issued a mere twenty-three days after the first—for his inability to communicate with his team lead. (Dkt. #127-37). The first PIP stated that it was "the final warning," (Dkt. #127-36 at 7), and the second PIP stated that it would "be the final attempt to correct the employee's performance," (Dkt. #127-37 at 2). The latter PIP cited him with lack of professionalism and insubordination. (Dkt. #127-37 at 2).

Aigheyisi's exit report indicates that he was fired for playing Candy Crush in violation of company policy. (Dkt. #127-82). Although Aigheyisi argues that he "wasn't playing Candy Crush when [he] got fired," he admits to doing so "two or three weeks prior," (Dkt. #132 at 270–71)—hence, after he received his second PIP and was issued a final warning, (Dkt. #127-37). The exit report lists him as "unsatisfactory" in all five categories—including overall performance. (Dkt. #127-82). Based on his

poor performance record and history of infractions, Aigheyisi likely "would have [been terminated] even without the protected conduct." *See Wantou*, 23 F.4th at 437. In fact, on March 7—the day Aigheyisi was fired—project manager Dan Paddock recommended that Glow terminate Aigheyisi, and there is no evidence that Paddock was aware of Aigheyisi's written complaint. (Dkt. #127-39 at 3); *see Gorman*, 753 F.3d at 171 ("Generally, if the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity." (cleaned up)).

The evidence Aigheyisi offers to show pretext is minimal, particularly when compared to his workplace infractions that gave Glow several legitimate, non-discriminatory reasons to terminate him. As to the temporal proximity, Aigheyisi's claim is strengthened by the fact that he was terminated very shortly after he complained. But temporal proximity alone cannot serve as sufficient proof of pretext. *Strong*, 482 F.3d at 808.

The only other evidence of pretext offered by Aigheyisi is his complaint that Glow's Human Resources department failed to address his complaints in its meeting with him and his suggestion that Glow failed to conduct any investigation of his discrimination claim. *See* (Dkt. #171 at 39–40). Contrary to Aigheyisi's assertion, however, the evidence suggests that Human Resources investigated his discrimination claims. Human Resources sent an email to Aigheyisi after his termination which stated that "after interviewing the employees involved in the complaint, completing and finalizing the investigation regarding the claims of

discrimination in the RITC project, we were unable to substantiate any form of harassment or discrimination." (Dkt. #127-36 at 1). Human Resources also invited Aigheyisi to share "any additional information" about his complaint. (Dkt. #127-36 at 1). In this regard, the fact that Human Resources may not have conducted its investigation as Aigheyisi "might have preferred" is not sufficient to show that the investigation "[was] inadequate" such that pretext can be inferred. *See Owens*, 33 F.4th at 829.

The evidence supporting the jury's verdict—even if it could be considered "substantial" (which it cannot)—is dwarfed by the evidence supporting Glow's reasons for terminating Aigheyisi. *See Shows*, 671 F.2d at 930 ("A verdict can be against the 'great weight of the evidence[,'] and thus justify a new trial, even if there is substantial evidence to support it."). Thus, Aigheyisi's retaliation claim must be retried.

*       *       *

Given the record before the Court, Glow is entitled to judgment as a matter of law on the retaliation claims brought by Lofland and Paul Tijani because there is insufficient evidence to support the jury's verdict. *See Hiltgen*, 47 F.3d at 700. The two retaliation claims that survive judgment as a matter of law—Peter Tijani's and Aigheyisi's—must be retried because the verdict on these claims is against the great weight of evidence. *See Cates*, 431 F.3d at 460. And while the jury's finding against the great weight of evidence alone warrants a new trial, the Court is further persuaded that this is the correct course of action because the jury was prejudiced

against Glow. *See infra* Section III.C; *see also Smith*, 773 F.2d at 613 ("[I]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial." (cleaned up)). Therefore, the Court grants (1) Glow's motion for judgment as a matter of law as to Matt Lofland's and Paul Tijani's retaliation claims, and (2) Glow's motion for a new trial as to Peter Tijani's and Will Aigheyisi's retaliation claims.

## C. Prejudice Against Glow

As the foregoing discussion makes clear, the jury in this case did not function properly. Out of thirteen claims for which the jury found for Plaintiffs, only two survive Defendant's motion for judgment as a matter of law. The rest fail because there is insufficient evidence to find Defendant liable. And the two that survive must be retried because the verdict on these claims is against the great weight of evidence. In addition to rendering a verdict contrary to the evidence, the jury also exhibited prejudice against Glow, presenting another independent reason to grant a new trial on the issues that survive judgment as a matter of law. *See Westbrook*, 754 F.2d at 1241–42 ("When a jury verdict results from passion or prejudice, a new trial is the proper remedy.").

***First***, the jury's verdict as to both Glow's liability and Plaintiffs' damages is so contrary to the evidence as to evince bias and prejudice on the part of the jury. The jury found for Plaintiffs on every single claim, despite the dearth of evidence for all of them. This lack of sound judgment and failure to follow the Court's instructions that Plaintiffs must prove their claims by a preponderance of the evidence demonstrates to the Court that the jury was prejudiced against Glow. *See id.* at 1242

("If the verdict on liability were to show evidence of influence by . . . prejudice . . ., then a complete new trial would be necessary."); *cf. Stanton v. Jarvis Christian Coll.*, 477 F.Supp.3d 561, 574 (E.D. Tex. 2020) ("A court may order a new trial if . . . a jury fails to follow instructions." (cleaned up)); *Alexander v. City of Jacksonville*, No. 3:04-CV-614, 2008 WL 907658, at *4 (S.D. Miss. Mar. 31, 2008) ("In view of the jury's failure to follow the law on the matter of damages, this court now wonders whether the jury properly assessed the credibility of witnesses, especially the credibility of plaintiffs.").

**Second**, the jury's damages awards are "so exaggerated as to indicate[] bias . . . [or] prejudice" against Glow. *See Wackman v. Rubsamen*, 602 F.3d 391, 405 (5th Cir. 2010); *see also Gaddy v. Taylor Seidenbach, Inc.*, 446 F.Supp.3d 140, 159 (E.D. La. 2020) (explaining that a court can "grant a new trial when the jury's award is excessive and against the great weight of the evidence in a manner that suggests bias or prejudice"). "A verdict is excessive as a matter of law if shown to exceed any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992) (cleaned up).

Each Plaintiff was awarded identical amounts of compensatory damages: $2,000,000 in past emotional damages and $1,000,000 in future emotional damages.[21] Being careful not to substitute its judgment for that of the jury, the Court concludes

---

[21] Each Plaintiff was also awarded identical punitive damages in the amount of $4,000,000.

that these awards are unsupported by the evidence and grossly disproportionate to awards granted in cases with similar or more egregious facts.[22] The Court first considers Peter Tijani's and Will Aigheyisi's awards, since their claims survive judgment as a matter of law, and then it turns to the other Plaintiffs' awards.

"[T]o merit any award greater than nominal damages, emotional distress damages must be supported by competent evidence concerning the injury." *Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp.*, 586 F.App'x 643, 650 (5th Cir. 2014) (cleaned up). "[H]urt feelings, anger and frustration are part of life, and are not the types of emotional harm that could support an award of damages." *Hitt v. Connell*, 301 F.3d 240, 250 (5th Cir. 2002) (cleaned up). Instead, a plaintiff must "present *specific* evidence of emotional damage: [T]here must be a specific discernable injury to the claimant's emotional state, proven with evidence regarding the nature and extent of the harm." *Id.* (cleaned up); *see also Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 239 (5th Cir. 2001) ("To demonstrate an actual, or specific discernable, injury, [t]he existence, nature, and severity of emotional harm must be proved." (cleaned up)). In some circumstances, "a plaintiff's testimony alone may be sufficient proof of mental damages," but courts must "scrupulously analyze" such testimony. *Dulin*, 586 F.App'x at 650 (quotation omitted); *see Hitt*, 301 F.3d at 250–51 ("The plaintiff's own testimony, standing alone, may be sufficient to prove mental damages but only if the testimony is 'particularized and extensive' enough

---

[22] In addition to demonstrating prejudice, the excessiveness of the awards alone warrants a new trial. *See Adams*, 838 F.App'x at 827 ("A new trial may be granted under [Rule] 59 if the trial court finds that . . . the damages awarded are excessive.").

to meet the specificity requirement discussed above."). "Neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages." *Hitt*, 301 F.3d at 251 (cleaned up).

Further, a plaintiff can only recover damages if the alleged "actual injury" "*result[ed] from*" the claim at issue. *Flowers*, 247 F.3d at 238 (emphasis added). Evidence regarding events that occurred before or after the relevant timeframe is "irrelevant to the question of actual injury stemming from the [adverse employment action]." *Id.* at 239. And when there is "no evidence in the record focusing on the existence of actual injury during the [relevant] time period," the court "must vacate the jury's award of damages." *Id.*; s*ee also Johnson v. Watkins*, 803 F.Supp.2d 561, 576 (S.D. Miss. 2011) (explaining that, in a sexual harassment and retaliation case brought under Title VII, the plaintiff could not recover for emotional distress that occurred before the adverse employment action). Thus, Plaintiffs here were required to prove that their alleged harms arose because of or stemmed from the relevant adverse employment action taken against them.

***Peter Tijani.*** As to his past injuries, Peter Tijani testified that he "cr[ied] in [his] house" and "fe[lt] hopeless . . . [and] like everything was over" following his firing. (Dkt. #131 at 187). He further testified that it was "a tough moment" that he "can't really describe with a word." (Dkt. #131 at 188). Peter claimed that his trauma from working at Glow was so profound that he turned down a job that paid $90,000 per year because he "saw [his Glow supervisors] Mohammad [Silat] and Sandeep

[Pauddar] in there." (Dkt. #131 at 188–89); (Dkt. #131 at 280). He later clarified that he merely saw their email addresses. (Dkt. #131 at 280).

The Tijanis' sister, Esther Tijani, testified that she believed Peter not only cried the day he was fired because he had just lost his job, but "because he knew it was going to affect" his family which relied on him for financial support. (Dkt. #133 at 222–23) ("For a man like Peter to cry, I knew it was a lot. Peter cried, and I thought he was going to cry out blood."). Abimbola Adeboye, a college friend of the Tijanis, testified that Peter began "drinking a lot" after he was terminated. (Dkt. #133 at 267). Adeboye also described an instance after Peter's termination in which he got uncharacteristically angry after getting "pushed . . . from behind" by someone while playing soccer. (Dkt. #133 at 267). While Peter would usually "just let it go," Adeboye testified that they had to stop the soccer game because Peter was "fighting and causing a scene" and had to be taken "out of that place." (Dkt. #133 at 267).

Concerning his future pain and suffering, Peter testified that he still attends counseling, (Dkt. #131 at 183), and believes that his feelings are "nothing that's ever going to go away," (Dkt. #131 at 182). However, Peter did not present any medical records, bills, or medical provider testimony regarding his injuries. Within a few weeks of his termination, Peter was offered a job that paid "considerably more than what [he was] making at Glow." (Dkt. #131 at 269).[23]

---

[23] Peter's start date with the new company was slightly delayed because he lost his immigration papers and was unable to prove that he was able to legally work in the United States. (Dkt. #131 at 270).

**Will Aigheyisi.** With regard to his past injuries, Aigheyisi testified that he felt "worthless" and like he was not "being heard." (Dkt. #132 at 119–20). He also said that he felt like he was "being raped" and that he was a "rape victim" because he felt like no one at Glow was listening to his concerns. (Dkt. #132 at 251). However, this testimony related to incidents occurring before his termination. He further testified that "anxiety is real" and indicated that it has caused sleeplessness some nights, but that he has not seen a doctor or a counselor and that he has not taken any medicine. (Dkt. #132 at 120, 123–24).

Aigheyisi's sister, Uwa Aigheyisi, testified that she "started noticing some changes in his behavior, like he wasn't – he was more depressed so to say, he wasn't happy." (Dkt. #134 at 58). She also testified that Aigheyisi's job at Glow was "more depressing than [his mother's] cancer." (Dkt. #134 at 64). However, this testimony concerns Aigheyisi's employment with Glow—not his termination. (Dkt. #134 at 58). As to his termination specifically, she claimed that he was not "happy because the source of income . . . was gone." (Dkt. #134 at 59).

And as to his future injuries, Uwa testified that Aigheyisi is "way better off" now that he no longer works at Glow, though "it's not a full 360 yet." (Dkt. #134 at 59, 64). She also testified that Aigheyisi has "been able to move on and enjoy the things in life that [she] saw him enjoy before his employment with Glow." (Dkt. #134 at 64). Notably, the Monday after he was terminated at Glow, Aigheyisi began working at a new job that paid more than double what he received from Glow. (Dkt. #132 at 259–60). At the time of his testimony, Aigheyisi was gainfully employed with

68

another company where he was making nearly triple what he received from Glow. (Dkt. #132 at 261).

At the outset, the Court notes that the testimony of Peter Tijani, Aigheyisi, and their supporting witnesses focused on Peter's and Aigheyisi's hurt feelings, anger, and frustration. But such testimony cannot support an award of damages, as those emotions are "part of life." *See Hitt*, 301 F.3d at 250 (cleaned up). And much of their remaining evidence, though corroborated, does not specifically establish the nature and extent of their harms—as required to recover emotional distress damages—but rather amounts to vague allegations of depression, sadness, and other negative feelings. *See Thomas v. Tex. Dep't of Crim. Just.*, 297 F.3d 361, 368 (5th Cir. 2002) (explaining that a "plaintiff must provide specific evidence of the nature and extent of the harm" and "he must make more than vague allegations to support his claim" in order to recover emotional distress damages). Taking all the evidence together, neither of these Plaintiffs established the "existence, nature, and severity" of any "specific discernible" injury such that they could be awarded $2,000,000 in past emotional damages. *See Flowers*, 247 F.3d at 239 (cleaned up).[24]

As to future damages, Peter Tijani testified that he still sees a counselor, but this alone does not support an award of $1,000,000, especially considering that Peter failed to identify any specific, discernible injury, let alone the extent or nature of such injury. Further, Peter's counselor did not testify, nor did Peter present any corroborating medical evidence (though he was not "absolutely required" to do so,

---

[24] That Aigheyisi was unable to present any evidence of a specific physical or mental injury makes his statement that he felt like he was a "rape victim" particularly astonishing.

*Hitt*, 301 F.3d at 250). Aigheyisi presented no evidence whatsoever that he suffers from ongoing emotional distress. Instead, the evidence shows that he is "way better off," albeit not totally recovered. (Dkt. #134 at 59, 64). Absent some evidence establishing the specific harm he purportedly continues to suffer, Aigheyisi was not entitled to any future emotional damages. *See Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1088 (5th Cir. 1982) ("The plaintiff bears the burden of proof to show the amount, as well as the fact, of damages.").

To demonstrate the excessiveness of Plaintiffs' awards, consider *Vadie v. Mississippi State University*, 218 F.3d 365 (5th Cir. 2000), a race-discrimination case. There, the plaintiff testified that his adverse employment action "destroyed" and "totally ruined" him; he became "sick, totally ill, physically, mentally, and everything"; he saw "many doctors" and took "many pills"; he could not "sleep for months," had headaches and nausea, and was under "severe doctor surveillance." *Id.* at 377. He was originally awarded $300,000, but the Fifth Circuit remitted the award to $10,000 because the original award was "entirely disproportionate to the injury sustained." *Id.* at 377–78. Compare Peter Tijani and Will Aigheyisi, who were awarded $3,000,000 in compensatory damages, each based on testimony evincing demonstrably less significant injuries than the plaintiff in *Vadie*.

Further consider *Giles v. General Electric Co.*, 245 F.3d 474 (5th Cir. 2001), where the court remitted an emotional distress award of $300,000 in half. There, the plaintiff testified that he experienced trouble sleeping, headaches, and loss of prestige and social connections associated with his position. *Id.* at 488. The plaintiff's

70

symptoms were corroborated by a coworker who testified that the plaintiff appeared "despondent, depressed, down and absolutely utterly discouraged about not being able to come back to work." *Id.* Peter Tijani and Will Aigheyisi were awarded *twenty times* what this plaintiff received, despite similar allegations of harm.[25]

In sum, Peter Tijani and Will Aigheyisi failed to provide competent evidence establishing the "existence, nature, and severity" of any emotional harm that they allegedly suffered. *See Flowers*, 247 F.3d at 239. To the extent that they did present competent evidence, the evidence was insufficient to support such large awards. After considering all the evidence, the Court concludes that the awards were "so exaggerated as to indicate[] bias . . . [or] prejudice" against Glow. *See Wackman*, 602 F.3d at 405.

Next, as the following discussion will demonstrate, the other Plaintiffs likewise presented insufficient evidence to justify an award of $2,000,000 for past harm and $1,000,000 for future harm. These Plaintiffs largely testified about their "hurt feelings, anger[,] and frustration," which cannot support a damages award. *See Hitt*, 301 F.3d at 250. Further, most—if not all—Plaintiffs conflated the alleged anguish they suffered as a result of their respective adverse action with the anguish caused by their employment. A substantial number of Plaintiffs quickly found higher-paying jobs after their departures from Glow. Some Plaintiffs failed to present any evidence of future pain and suffering whatsoever. Few Plaintiffs submitted any corroborating

---

[25] The Court notes that while *Vadie* and *Giles* "provide an objective frame of reference, . . . they do not control [the Court's] assessment of individual circumstances" present here. *Dulin*, 586 F.App'x at 650 (cleaned up).

evidence. And no Plaintiff proffered medical records or presented testimony of their doctors—even though some claimed to suffer from specific disorders. Put simply, the jury awarded damages untethered to reality.

**Paul Tijani.** The jury found that Glow terminated Paul because he was black and that it unlawfully retaliated against him.[26] Paul testified that working at Glow "was the most depressing time of [his] life" and that he "shed tears." (Dkt. #130 at 255–56, 260). He also claimed that he suffered from anxiety, had nightmares, and felt hopeless. (Dkt. #130 at 261). Similar to his brother, Paul's sister and friend testified that his behavior had changed.

Paul also testified that he talked to a counselor once and that he has PTSD. (Dkt. #131 at 16–17).[27] He claimed that he still suffers from anxiety. (Dkt. #131 at 99). However, Paul never explained whether his anguish was a result of the alleged racial discrimination against him, the alleged retaliation, or just his general grievances with Glow.

After his termination, Paul found a better-paying job within a "couple of months." (Dkt. #131 at 82). However, he was unemployed at the time of trial and

---

[26] The Court determined that the jury's verdict was based on insufficient evidence as to Paul's claims and accordingly grants Glow judgment as a matter of law on those claims. *See supra* Sections III.A.ii.a, III.B.ii.

[27] PTSD is a mental illness listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM–5"). *See, e.g., Reddy v. Kelly*, 657 F.App'x 531, 543 (6th Cir. 2016). Paul presented no supporting medical records or any testimony of a medical provider establishing that he has been diagnosed with PTSD. Paul also failed to proffer any evidence that he meets the DSM-5's diagnostic criteria for PTSD. Paul's apparent self-diagnosis of PTSD is insufficient to show he suffers from this mental illness.

testified that he was only willing to work remotely, supposedly because of an unspecified fear that someone would discriminate or retaliate against him. (Dkt. #131 at 101) ("I just want to work in my house where I'm not going to . . . be scared of somebody discriminating against me or somebody retaliating against me.").

**Joshua Yarbrough.** The jury found that Glow demoted Yarbrough because he was black.[28] He claimed that the day he was demoted, he had "anxiety," "felt depressed," and was "just . . . upset overall." (Dkt. #129 at 216–17). He testified that he suffered an emotional toll between the time he resigned from Glow and the time he began working at a new job about a month later. (Dkt. #129 at 217–18). Although he did not have a "whole lot of physical" symptoms, he stated that there were times that he couldn't sleep and that "it would just bother [him]," and he claimed he also felt fatigued. (Dkt. #129 at 218–19). His wife testified that he was "depressed, stressed, [] sad," and "anxious." (Dkt. #133 at 276). However, she attributed these feelings to Yarbrough's work at Glow—not his demotion or his departure. (Dkt. #133 at 276). In fact, she testified that things were better after Yarbrough left Glow and that he "came back to life." (Dkt. #133 at 277).

Yarbrough testified that "life got better" after he quit working for Glow, although he still feels anxious and depressed when he remembers that some companies still discriminate. (Dkt. #129 at 220–22).

---

[28] The Court determined that the jury's verdict was based on insufficient evidence as to Yarbrough's claim and accordingly grants Glow judgment as a matter of law on that claim. *See supra* Section III.A.ii.d.

***Joshua Walker.*** The jury found that Glow did not promote Walker because he was black.[29] He testified that the unequal treatment he perceived "hurt" and is "traumatizing." (Dkt. #130 at 211). He claimed that he felt hopeless, humiliated, and depressed after he was not promoted. (Dkt. #130 at 211–12). He further testified that he "lost [his] appetite, lost a lot of weight, and [he] was having trouble sleeping." (Dkt. #130 at 212). Walker left Glow for a new, higher paying job. (Dkt. #130 at 227).

***Michael Brown.*** The jury found that Glow wrongfully selected Michael Brown for layoff and did not return him to work because of his race.[30] Brown complained of feeling embarrassed after being told by his supervisors to change seats "so many times at the last minute" while working at Glow. (Dkt. #133 at 35). Brown stated that this frequent moving took away his "dignity and [his] integrity." (Dkt. #133 at 35). And as a result, Brown testified that he lost his appetite and would "go the whole day without eating." (Dkt. #133 at 50). However, this testimony related to Brown's employment with Glow—not his layoff.

As to the alleged harm resulting from his layoff, he testified that he had no appetite, would cry because it was "depressing," and felt hurt when Glow retained junior employees whom Brown had trained. (Dkt. #133 at 51). He testified that he is still hurt, that he does not get sleep, and that he gets migraines. (Dkt. #133 at 51). He did not present any corroborating evidence, nor did he offer details of his physical

---

[29] The Court determined that the jury's verdict was based on insufficient evidence as to Walker's claim and accordingly grants Glow judgment as a matter of law on that claim. *See supra* Section III.A.ii.e.

[30] The Court determined that the jury's verdict was based on insufficient evidence as to Brown's claim and accordingly grants Glow judgment as a matter of law on that claim. *See supra* Section III.A.ii.f.

symptoms, including how often they occur, the duration and severity of them, or what triggers them.

At the time of his testimony, Brown worked as a 5G network design engineer for Verizon Wireless, making more money than he did at Glow. (Dkt. #133 at 52–53).

***Adewale Ashiru.*** The jury found that Glow terminated Ashiru because he was black.[31] Ashiru testified that *working* at Glow—not his termination from Glow—made him feel like he was not a "human being." (Dkt. #132 at 303). Ashiru testified that he has a "phobia" of working for a company where blacks "are not allowed." (Dkt. #132 at 302–03). Thus, while he was able to find a job after he was terminated from Glow, he "diversified [his] career" and became a field technician so that he could "be [his] own boss" and "no one [would] see [him]." (Dkt. #132 at 301–03). He claimed that he does not turn on his camera for work-related videoconferences so that his employers do not discover that he is black. (Dkt. #132 at 304).

Ashiru began a new job the same month he was terminated from Glow. (Dkt. #132 at 307). He has worked several jobs since and routinely makes more money than he did at Glow. (Dkt. #132 at 307–08).

***Brandon Price.*** The jury found that Glow wrongfully terminated Price because of his race.[32] As to his past pain and suffering, Price testified that he felt "used" and "lied to" after finding out that he would be a chauffeur for Glow despite

---

[31] The Court determined that the jury's verdict was based on insufficient evidence as to Ashiru's claim and accordingly grants Glow judgment as a matter of law on that claim. *See supra* Section III.A.ii.g.

[32] The Court determined that the jury's verdict was based on insufficient evidence as to Price's claim and accordingly grants Glow judgment as a matter of law on that claim. *See supra* Section III.A.ii.h.

having technical training. (Dkt. #134 at 78). Price also testified that he felt like he was "just a useful object" because he was not able to get details about what he was "going into" before accepting the job. (Dkt. #134 at 79).

However, like with the evidence Price presented regarding Glow's liability, his testimony does not concern the adverse employment action at issue—his alleged wrongful termination. Rather, this testimony relates to Price's disappointment regarding his responsibilities once he began working at Glow. But since his firing—not his hiring—was the adverse employment action presented to the jury for its consideration, it would have been improper for the jury to consider evidence of past pain and suffering stemming from Price's hiring. *See Flowers*, 247 F.3d at 239; *see also Guillory*, 802 F.2d at 824 (holding that the plaintiff's "termination as well as his later unsuccessful application for reemployment must be evaluated as separate instances of alleged discrimination"); *Tyler v. La-Z-Boy Corp.*, No. 3:09-CV-688, 2012 WL 12893064, at *3 (S.D. Miss. Mar. 28, 2012) (dismissing claim for discriminatory failure to rehire because the plaintiff did not allege distinct facts related to that claim); s*ee* (Dkt. #120 at 4) (answering "Yes" in the jury verdict that Price "proved that, during his second period of employment with Glow Networks, Inc., in 2019, he would not have been *terminated* by Defendant Glow Networks, Inc. but for his race" (emphasis added)).

Because Price presented no other evidence regarding his past harm and no evidence whatsoever of future harm, he produced no competent evidence concerning his injuries. *See Pizani*, 669 F.2d at 1088 ("The plaintiff bears the burden of proof to

show the amount, as well as the fact, of damages."); *see also Dulin*, 586 F.App'x at 650 ("[T]o merit any award greater than nominal damages, emotional distress damages must be supported by competent evidence concerning the injury." (cleaned up)).

**Harom Pringle.** The jury found that Glow wrongfully selected Pringle for layoff and did not return him to work because of his race.[33] Pringle only presented a single piece of competent evidence regarding his past pain and suffering: his delay in obtaining new employment.[34] Pringle testified that while he eventually was able to find a job after leaving Glow, "it took a while." (Dkt. #133 at 109). The Court notes, however, that Pringle acknowledged that he was partly to blame for this delay in obtaining new employment. Pringle testified that he allowed "various other job[] [opportunities to] go by" because he was waiting to get rehired by Glow, which did not ultimately occur. (Dkt. #133 at 109). And Pringle presented *no evidence* of any future pain and suffering stemming from his layoff.

---

[33] The Court determined that the jury's verdict was based on insufficient evidence as to Pringle's claim and accordingly grants Glow judgment as a matter of law on that claim. *See supra* Section III.A.ii.i.

[34] While Pringle testified about other purported injuries, such as a feeling of uneasiness and a fear of retaliation, these feelings occurred during his employment with Glow—not as a result of his layoff. (Dkt. #133 at 106–07). Thus, this testimony could not have been properly considered by the jury in awarding damages. *See Flowers*, 247 F.3d at 239 (vacating damages award because the plaintiff failed to present evidence "focusing on the existence of actual injury" "stemming from" the wrongful action); *Johnson*, 803 F.Supp.2d at 576 (explaining that, in a sexual harassment and retaliation case brought under Title VII, the plaintiff could not recover for emotional distress that occurred before the adverse employment action).

***Matt Lofland***. The jury found that Glow unlawfully retaliated against Lofland.[35] As to his past injuries, Lofland claimed that working at Glow caused him anxiety and depression and that he was prescribed Lexapro (which he only took for about one year). (Dkt. #129 at 187–88). However, he testified that the source of his anguish was not merely his demotion—the adverse employment action at issue—but was "everything that happened before that . . ., all the discrimination and the retaliation that led up to that," and also the "stress of going to a new job and starting over." (Dkt. #129 at 181). When pressed, Lofland again failed to specifically attribute his harm to his demotion, testifying that his harm was caused by the "culmination of incidents" that occurred during his time at Glow. (Dkt. #129 at 186); *see Flowers*, 247 F.3d at 239.

He further testified that "[o]nce he got . . . a better job, everything started getting better," although he "may carry [his distrust for Human Resources] to the future." (Dkt. #129 at 188). He started the job "right after" he left Glow. (Dkt. #129 at 118). Although it paid less, his need to seek employment was not caused by Glow, but rather was the result of his voluntary resignation. *See* (Dkt. #129 at 117–19).

\* \* \*

As the foregoing discussion illustrates, Plaintiffs put on little—if any—competent evidence establishing harm. Not a single Plaintiff presented any medical records, any testimony of doctors or experts, or any other corroborating testimony

---

[35] The Court determined that the jury's verdict was based on insufficient evidence as to Lofland's claim and accordingly grants Glow judgment as a matter of law on that claim. *See supra* Section III.B.i.

concerning their harm—other than a few Plaintiffs whose friends and family members testified, essentially, that Plaintiffs were sad. Moreover, most Plaintiffs failed to distinguish the harm they allegedly suffered from working at Glow from the harm resulting from their adverse employment action. The two cannot be conflated. Thus, any evidence of harm stemming from Plaintiffs' employment at Glow is irrelevant to the appropriate amount of damages. *See Flowers*, 247 F.3d at 238–39.

Further, no Plaintiff established that they suffered a specific discernible injury warranting more than a nominal award—let alone $3,000,000 for pain and suffering. *See Hitt*, 301 F.3d at 250. Indeed, most Plaintiffs simply complained that their feelings were hurt and that they were angry, but these emotions cannot support an award of damages. *See id.* To the extent any Plaintiff asserted that they suffered a specific injury, they failed to establish "[t]he existence, nature, and severity" of their alleged harm—a requirement to recover emotional damages. *Flowers*, 247 F.3d at 239 (cleaned up). Each award is shockingly excessive considering the utter lack of evidence Plaintiffs put on to establish their injuries, and the Court finds that this excessiveness indicates that the jury was biased against Glow.

In this regard, given the glaring shortcomings in Plaintiffs' damages evidence, it is telling that the jury nonetheless awarded identical, and enormous, damages to each Plaintiff—despite the differences in testimonies and evidence presented. The damages awarded are patently nonsensical and further convince the Court that the jury was prejudiced against Glow. For each and every one of the ten Plaintiffs at trial, the jury awarded exactly the same amount—$2,000,000—for past pain and suffering,

inconvenience, mental anguish, and loss of enjoyment of life. Likewise, for each of the ten Plaintiffs, the jury awarded exactly the same amount—$1,000,000—for future pain and suffering, mental anguish, and loss of enjoyment of life. But, as explained herein, a properly functioning jury simply could not have concluded that the severity of each Plaintiff's harms was so similar that they were entitled to identical damages.

To illustrate the unreasonableness of the jury's verdict, compare Peter Tijani and Harom Pringle. Peter succeeded on both a race-discrimination claim and a retaliation claim. He testified that he cried, felt hopeless, and that he sees a counselor. He further testified that he thinks his feelings are "nothing that's ever going to go away." (Dkt. #131 at 182). His sister and friend provided corroborating testimony, explaining that Peter's behavior had changed. On the other hand, Pringle presented a single piece of competent evidence regarding his past pain and suffering: his assertion that "it took a while" to obtain new employment—which was at least partially his fault. And, unlike Peter, Pringle presented *no evidence* of any future pain and suffering stemming from his layoff. This distinction should have resulted in at least *some* difference in their awards. But the jury awarded Pringle and Peter precisely the same compensatory damages.

Further consider Brandon Price, who was likewise awarded damages identical to every other Plaintiff, even though Price presented zero competent evidence regarding any injury—past or future. Such results are manifestly insupportable. A properly functioning jury would not have awarded each Plaintiff the exact same amount in damages despite the Plaintiffs' markedly different testimonies concerning

their degrees of harm. Even Plaintiffs themselves acknowledged such differences. In short, the compensatory damages awarded in the jury's verdict are entirely untethered to the evidence at trial.

Taken together with the other indicia of prejudice identified above, the Court concludes that the jury's verdict is a product of prejudice against Defendant. Only the effect of such prejudice can explain the jury's otherwise unfounded verdict, returning findings contrary to the evidence and awarding grossly excessive and identical damages to each of the ten Plaintiffs without any support in the record for this result. Because the Court concludes that prejudice infected the jury, the claims that survive judgment as a matter of law—Peter Tijani's and Aigheyisi's retaliation claims—must be completely retried.[36] *See Westbrook*, 754 F.2d at 1242 ("If the verdict on liability were to show evidence of influence by passion, prejudice, compromise, prejudicial error, or misconduct, then a complete new trial would be necessary.").

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant Glow Networks, Inc.'s Motion for Judgment as a Matter of Law is **GRANTED in part** and **DENIED in part**; Glow's Alternative Motion for New Trial is **GRANTED in part**; and Glow's Alternative Motion for Remittitur is **DENIED as moot**.

Glow's Motion for Judgment as a Matter of Law, (Dkt. #150), is **GRANTED** with respect to all Plaintiffs' discrimination claims and Paul Tijani's and Matt

---

[36] For the same reasons, the punitive-damage claims asserted by Peter Tijani and Will Aigheyisi must also be retried. *See Poullard v. Turner*, 298 F.3d 421, 424 (5th Cir. 2002) ("[W]hen a new trial is granted on compensatory damages, it must at the same time be granted on the issue of punitive damages." (cleaned up)).

Lofland's retaliation claims. It is **DENIED** with respect to Peter Tijani's and William Aigheyisi's retaliation claims.

However, Glow's Alternative Motion for New Trial, (Dkt. #150), is **GRANTED** with respect to Peter Tijani's and William Aigheyisi's retaliation claims. For those claims, it is **ORDERED** that both liability and damages shall be retried.

It is further **ORDERED** that Plaintiffs' Motion for Reasonable Fees and Costs, (Dkt. #147), and Plaintiffs' First Supplemental Motion for Reasonable Fees and Costs, (Dkt. #182), are **DENIED as moot**.

**So ORDERED and SIGNED this 1st day of March, 2024.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE